No. 23-2437

## UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

RECENTIVE ANALYTICS, INC.,

*Plaintiff-Appellant,*

v.

FOX CORPORATION; FOX BROADCASTING COMPANY, LLC; AND FOX SPORTS PRODUCTIONS, LLC,

*Defendants-Appellees.*

Appeal from the United States District Court for the District of Delaware
The Honorable Gregory B. Williams, Case No. 1:22-cv-01545-GBW

## APPELLANT'S OPENING BRIEF

Alexandra D. Valenti
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
Tel.: 212.813.8800
Fax.: 212.202.4038

Robert Frederickson III
David J. Zimmer
Jesse Lempel
GOODWIN PROCTER LLP
100 Northern Ave.
Boston, MA 02210
Tel.: 617.570.1000
Fax.: 617.523.1231

December 22, 2023

*Counsel for Plaintiff-Appellant*
*Recentive Analytics, Inc.*

## PATENT CLAIMS AT ISSUE

### U.S. Patent No. 11,386,367:

1.    A computer-implemented method of dynamically generating an event schedule, the method comprising:

> receiving one or more event parameters for series of live events, wherein the one or more event parameters comprise at least one of venue availability, venue locations, proposed ticket prices, performer fees, venue fees, scheduled performances by one or more performers, or any combination thereof;

> receiving one or more event target features associated with the series of live events, wherein the one or more event target features comprise at least one of event attendance, event profit, event revenue, event expenses, or any combination thereof;

> providing the one or more event parameters and the one or more event target features to a machine learning (ML) model, wherein the ML model is at least one of a neural network ML model and a support vector ML model;

> iteratively training the ML model to identify relationships between different event parameters and the one or more event target features using historical data corresponding to one or more previous series of live events, wherein such iterative training improves the accuracy of the ML model;

> receiving, from a user, one or more user-specific event parameters for a future series of live events to be held in a plurality of geographic regions;

> receiving, from the user, one or more user-specific event weights representing one or more prioritized event target features associated with the future series of live events;

> providing the one or more user-specific event parameters and the one or more user-specific event weights to the trained ML model;

> generating, via the trained ML model, a schedule for the future series of live events that is optimized relative to the one or more prioritized event target features;

> detecting a real-time change to the one or more user-specific event parameters;

providing the real-time change to the trained ML model to improve the accuracy of the trained ML model; and

updating, via the trained ML model, the schedule for the future series of live events such that the schedule remains optimized relative to the one or more prioritized event target features in view of the real-time change to the one or more user-specific event parameters.

## U.S. Patent No. 11,537,960:

1.     A computer-implemented method of dynamically generating an event schedule, the method comprising:

receiving one or more event parameters for one or more series of live events, wherein the one or more event parameters comprise scheduling information for one or more performances by one or more performers;

receiving one or more event target features associated with the series of live events, wherein the one or more event target features comprise at least one of event attendance, event profit, event revenue, event expenses, or any combination thereof;

providing the one or more event parameters and the one or more event target features to a machine learning (ML) model, wherein the ML model is at least one of a neural network ML model and a support vector ML model;

iteratively training the ML model to identify relationships between the one or more event parameters and the one or more event target features using historical data corresponding to one or more previous series of live events, wherein such iterative training improves the accuracy of the ML model;

receiving, from a user, one or more user-specific event parameters for a future series of live events associated with a first performer, the user-specific event parameters including scheduling information for one or more future performances by at least one second performer;

receiving, from the user, one or more user-specific event weights representing one or more prioritized event target features associated with the future series of live events;

providing the one or more user-specific event parameters and the one or more user-specific event weights to the trained ML model;

generating, via the trained ML model, a schedule for the future series of live events that is optimized relative to the one or more prioritized event target features;

detecting a real-time change to the scheduling information for the one or more future performances by the at least one second performer;

providing the real-time change to the trained ML model to improve the accuracy of the trained ML model; and

updating, via the trained ML model, the schedule for the future series of live events such that the schedule remains optimized relative to the one or more prioritized event target features in view of the real-time change to the scheduling information for the one or more future performances by the at least one second performer.

**U.S. Patent No. 10,911,811:**

1.      A computer-implemented method for dynamically generating a network map, the method comprising:

receiving a schedule for a first plurality of live events scheduled to start at a first time and a second plurality of live events scheduled to start at a second time;

generating, based on the schedule, a network map mapping the first plurality of live events and the second plurality of live events to a plurality of television stations for a plurality of cities,

wherein each station from the plurality of stations corresponds to a respective city from the plurality of cities,

wherein the network map identifies for each station (i) a first live event from the first plurality of live events that will be displayed at the first time and (ii) a second live event from the second plurality of live events that will be displayed at the second time, and

wherein generating the network map comprises using a machine learning technique to optimize an overall television rating across the first plurality of live events and the second plurality of live events;

automatically updating the network map on demand and in real time based on a change to at least one of (i) the schedule and (ii) underlying criteria,

wherein updating the network map comprises updating the mapping of the first plurality of live events and the second plurality of live events to the plurality of television stations; and

using the network map to determine for each station (i) the first live event from the first plurality of live events that will be displayed at the first time and (ii) the second live event from the second plurality of live events that will be displayed at the second time.

**U.S. Patent No. 10,958,957:**

1.     A computer-implemented method for dynamically generating a network map, the method comprising:

obtaining a schedule for a first plurality of events scheduled to start at a first time and a second plurality of events scheduled to start at a second time;

generating, based on the schedule, a network map mapping the first plurality of events and the second plurality of events to a plurality of television stations for a plurality of cities,

wherein each station from the plurality of stations corresponds to a respective city from the plurality of cities,

wherein the network map identifies for each station (i) a first event from the first plurality of events that will be displayed at the first time and (ii) a second event from the second plurality of events that will be displayed at the second time, and

wherein generating the network map comprises using a machine learning technique to optimize an overall television rating across the first plurality of events and the second plurality of events;

automatically updating the network map on demand and in real time based on a change to at least one of (i) the schedule and (ii) underlying criteria,

wherein updating the network map comprises updating the

mapping of the first plurality of events and the second plurality of events to the plurality of television stations; and

using the network map to determine for each station (i) the first event from the first plurality of events that will be displayed at the first time and (ii) the second event from the second plurality of events that will be displayed at the second time.

# CERTIFICATE OF INTEREST

Undersigned counsel for Plaintiff-Appellant certifies as follows:

**1.    The full name of every entity represented by undersigned counsel is:**

Recentive Analytics, Inc.

**2.    The name of the real party in interest for the entities is:**

N/A

**3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the entities are:**

N/A

**4.    The names of all law firms and the partners or associates that appeared for the entities in the trial court or agency or are expected to appear in this court (and who have not or will not enter an appearance) are:**

Shaw Keller LLP; John W. Shaw; Alison Siedor; Jenevieve N. Nutovits;

Karen Elizabeth Keller; Nathan Roger Hoeschen

**5.    The title and number of any case known to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal:**

None

**6.    Organizational victims and bankruptcy cases:**

None

/s/ *David J. Zimmer*
David J. Zimmer

# TABLE OF CONTENTS

**Page**

GLOSSARY ................................................................................... vii

STATEMENT OF RELATED CASES ............................................... viii

JURISDICTIONAL STATEMENT ................................................ viii

INTRODUCTION ........................................................................... 1

STATEMENT OF THE ISSUES ......................................................... 2

STATEMENT OF THE CASE ............................................................ 3

    I.    Recentive solved a technical problem through software using machine learning to optimize television network maps and event schedules. ....3

    II.    The patents-in-suit. ...............................................................6

        A.    The Machine Learning Training Patents. ...................................7

        B.    The Network Map Patents. ..........................................9

    III.    Procedural history ..............................................................11

SUMMARY OF ARGUMENT ........................................................ 14

ARGUMENT ............................................................................... 17

    I.    Standard of review ..............................................................19

    II.    The asserted claims are directed to eligible subject matter ................20

        A.    The asserted claims are directed to a specific method of improving a technological process. ........................................21

            1.    A fair reading of the claim language, specifications, and the complaint shows that the patents-in-suit are not directed to an abstract idea. ...........................................22

                a.    The Machine Learning Training Patents ............22

                b.    The Network Map Patents ................................24

            2.    The district court improperly considered the claims at too high a level of abstraction and ignored the claimed advance over the prior art. ...........................................26

            3.    The district court erroneously resolved factual and claim-construction disputes against Recentive at the pleading stage. ...............................................................29

B.      This Court's precedents confirm that the patents-in-suit are directed to eligible subject matter. ............................................32

C.      Persuasive guidance from the Manual of Patent Examining Procedures removes any doubt that the patents-in-suit are directed to eligible subject matter. ............................................41

III.    At *Alice* step two, there is at the very least a factual dispute about whether the asserted claims involve an inventive concept. ................42

IV.     The district court further erred in denying leave to amend. ................46

CONCLUSION .................................................................................................. 49

# TABLE OF AUTHORITIES

**Cases**                                                    **Page(s)**

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
882 F.3d 1121 (Fed. Cir. 2018) .................................... 16, 19, 20, 29, 30, 43, 47

*Adasa Inc. v. Avery Dennison Corp.*,
55 F.4th 900 (Fed. Cir. 2022) ...........................................................18

*Alice Corp. v. CLS Bank Int'l*,
573 U.S. 208 (2014).......................................................... 18, 21, 45

*Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*,
841 F.3d 1288 (Fed. Cir. 2016) ...........................................................44

*Ancora Techs. Inc. v. HTC Am. Inc.*,
908 F.3d 1343 (Fed. Cir. 2018) ...................................................22, 35

*Bancorp Servs., L.L.C. v. Sun Life Assurance Co. of Can. (U.S.)*,
687 F.3d 1266 (Fed. Cir. 2012) ...........................................................30

*BASCOM Global Internet Servs. v. AT&T Mobility LLC*,
827 F.3d 1341 (Fed. Cir. 2016) ...................................................43, 45

*In re Bd. of Trustees of Leland Stanford Junior Univ.*,
991 F.3d 1245 (Fed. Cir. 2021) ...........................................................38

*Berkheimer v. HP Inc.*,
881 F.3d 1360 (Fed. Cir. 2018) ...............................................43, 46, 47

*Cellspin Soft, Inc. v. Fitbit, Inc.*,
927 F.3d 1306 (Fed. Cir. 2019) ...............................................43, 46, 47

*CosmoKey Solutions GmbH & Co. KG v. Duo Security LLC*,
15 F.4th 1091 (Fed. Cir. 2021) ...........................................................43

*Digitech Image Technologies, LLC v. Electronics for Imaging, Inc.*,
758 F.3d 1344 (Fed. Cir. 2014) ...........................................................37

*Electric Power Group, LLC v. Alstom S.A.*,
830 F.3d 1350 (Fed. Cir. 2016) .......................................36, 37, 38, 39

*Enfish, LLC v. Microsoft Corp.*,
  822 F.3d 1327 (Fed. Cir. 2016) .................... 2, 18, 19, 21, 22, 25, 26, 27, 32, 34

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
  879 F.3d 1299 (Fed. Cir. 2018) .............................................22, 34, 36

*FTC v. AbbVie Inc.*,
  976 F.3d 327 (3d Cir. 2020) .................................................................20

*Koninklijke KPN N.V. v. Gemalto M2M GmbH*,
  942 F.3d 1143 (Fed. Cir. 2019) ......................... 19, 21, 24, 25, 34, 37

*Maiden Creek Assocs., L.P. v. U.S. Dep't of Transp.*,
  823 F.3d 184 (3d Cir. 2016) .................................................................20

*Mayer v. Belichick*,
  605 F.3d 223 (3d Cir. 2010) .................................................................20

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
  837 F.3d 1299 (Fed. Cir. 2016) .............................................22, 35, 45

*Parker v. Flook*,
  437 U.S. 584 (1978)...............................................................................21, 28

*In re Rudy*,
  956 F.3d 1379 (Fed. Cir. 2020) .........................................................41

*SAP Am., Inc. v. InvestPic, LLC*,
  898 F.3d 1161 (Fed. Cir. 2018) .........................................................38

*U.S. ex rel. Schumann v. Astrazeneca Pharm. L.P.*,
  769 F.3d 837 (3d Cir. 2014) ...............................................................47

*SRI Int'l, Inc. v. Cisco Sys., Inc.*,
  930 F.3d 1295 (Fed. Cir. 2019) ...................................................38, 40

*Uniloc USA, Inc. v. LG Elecs. USA, Inc.*,
  957 F.3d 1303 (Fed. Cir. 2020) ...............................20, 22, 26, 34, 35

*Weisner v. Google LLC*,
  51 F.4th 1073 (Fed. Cir. 2022) ..............................................22, 29, 43

**Statutes**

35 U.S.C. § 101 ...................................................................................17

**Other Authorities**

United States Patent and Trademark Office, Manual of Patent
    Examining Procedure (9th ed.; rev. July 2022; pub. Feb. 2023).................41, 42

# GLOSSARY

| | |
|---|---|
| '367 patent | U.S. Patent No. 11,386,367 |
| '960 patent | U.S. Patent No. 11,537,960 |
| '811 patent | U.S. Patent No. 10,911,811 |
| '957 patent | U.S. Patent No. 10,958,957 |
| Machine Learning Training Patents | The '367 patent and '960 patent, collectively |
| Network Map Patents | The '811 patent and '957 patent, collectively |
| Recentive | Recentive Analytics, Inc. |
| Fox | Fox Corporation, Fox Broadcasting Company, LLC, and Fox Sports Productions, LLC, collectively |
| NFL | National Football League |
| ML | Machine learning |

## STATEMENT OF RELATED CASES

There are no other appeals in or from the same civil action or proceeding in the originating tribunal that were previously before this or any other appellate court.

## JURISDICTIONAL STATEMENT

This district court had jurisdiction under 28 U.S.C. §§ 1331 and 1338(a) because all claims in this action arise under the patent laws of the United States, including 35 U.S.C. § 271. This Court has jurisdiction under 28 U.S.C. § 1291. The district court issued its final judgment granting Defendants' motion to dismiss on September 19, 2023. Appx28. Recentive Analytics, Inc. timely filed its notice of appeal on September 25, 2023. Appx638.

## INTRODUCTION

Large television broadcasters such as Fox have long struggled to optimize their "network maps"—*i.e.*, what content will be displayed on what channels at what times.  For instance, for a given NFL season, there are more than one million possible ways to allocate games, timeslots, and geographic markets.   Historically, broadcasters created network maps through what was effectively informed guesswork, using crude generalizations about viewer preferences across regions.

Recentive changed that.  It developed a groundbreaking, machine-learning based software platform that is dynamically updated, customizable, and far more accurate in generating optimal network maps.  And it obtained patents, including the patents-in-suit, that protect its novel inventions.  Many leading television networks, sports teams, and live entertainment entities—including the NFL—have contracted with Recentive to access Recentive's valuable predictive software.

Fox's independent partnership with the NFL gave it access to the maps built with Recentive's platform.  Rather than work with Recentive, however, Fox decided to use its access to Recentive's maps to reverse-engineer Recentive's system— creating its own system that seeks to generate the same outputs as Recentive's system by blatantly infringing Recentive's patents.  After Recentive sued, Fox filed a motion to dismiss, arguing that Recentive's patents are directed to ineligible subject matter under 35 U.S.C. § 101.  Even though the patent examiner specifically

concluded that Recentive overcame any Section 101 issues, the district court granted Fox's motion and invalidated the patents at the pleading stage without even giving Recentive leave to amend.

This Court should reverse that decision, which flouts basic principles from this Court's Section 101 cases. At *Alice*'s first step, the district court brushed past the asserted claims' specific limitations, invalidating the claims only by characterizing them "at such a high level of abstraction" that "all but ensures the exceptions to § 101 swallow the rule." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1337 (Fed. Cir. 2016). Properly understood, the claims are analogous to those this Court has repeatedly upheld. And at *Alice*'s second step, the court improperly rejected, at the pleading stage, factual allegations about the innovative nature of the asserted claims. Moreover, to the extent the court concluded that the facts alleged are inadequate, the court should at a minimum have given Recentive another chance to allege facts that would satisfy the *Alice* framework.

## STATEMENT OF THE ISSUES

I.    Whether the patents-in-suit are directed to eligible subject matter.

II.   Whether the district court erred in concluding that Recentive has not plausibly alleged that the patents-in-suit recite an unconventional inventive concept.

III.  Whether the district court erred in denying leave to amend on the ground that any amendment would be futile.

2

## STATEMENT OF THE CASE

I. **Recentive solved a technical problem through software using machine learning to optimize television network maps and event schedules.**

Recentive is a Boston-based analytics company.  Appx37 (¶1).  In 2017, Recentive invented a software platform that functions as "an automated predictive analytics tool tailored toward optimizing scheduling of live events and television broadcasts," such as sporting events, in order to maximize viewership.  Appx37-38 (¶¶1-4).  Recentive has contracted with leading television networks, sports teams, and live entertainment entities—including the National Football League ("NFL")—to provide them with Recentive's valuable predictive software.  Appx38 (¶3).

A television "network map" is a "schedule that outlines which content will be displayed on which channel at a certain time."  Appx116 at 1:15-17.  For example, the 2022 NFL season had 272 games across 18 weeks:  each week had an average of five time slots, most games were played on Sunday and subject to certain requirements, and each could be broadcasted to approximately 200 regional markets.  Appx43 (¶23).  Those variables yield over one million possible network maps per week of the NFL schedule.  *Id.*  Naturally, selecting the optimal map to maximize viewership presents a significant technical challenge.  Choosing an optimal schedule for live events—*e.g.*, "concert tours, comedy tours, speaking tours, and campaign rallies," Appx144 at 1:18-19—is comparably daunting.

3

Before Recentive's innovative technology, businesses seeking to identify an optimal television network map were stuck with a process that was "entirely manual, static and incapable of responding to changing conditions, fixed on one default configuration and unable to consider multiple possible schedule permutations or configurations, and unable to forecast the impact of a proposed schedule change." Appx116 ('811 patent) at 1:23-29; Appx128 ('957 patent) at 1:31-36.  To generate maps and schedules, businesses were forced to rely on "crude and suboptimal generalizations about viewers' preferences within a given region."  Appx43-44 (¶23).  There was no way to do what Recentive's software does: "iterating over every possible map, predicting the outcome of each to identify the optimal map."  *Id.*

The conventional shortcomings were not for lack of computers, software, or algorithms that could capture and organize voluminous quantities of data very quickly.  Rather, the technical problem was that the algorithm could not function dynamically—that is, to use that mountain of relevant data in a way that would generate an optimal map and automatically update; a "static" algorithm that is "fixed on one default configuration" is incapable of accounting for the highly dynamic nature of these events and data relevant to event scheduling, and cannot optimize network maps or event schedules.  Appx41 (¶18).

The patents-in-suit are focused on solving the technical problem of *how* to implement a process for generating network maps and live event schedules that

functions "dynamically," in lieu of the "static" processes of the prior art. Appx41-42 (¶¶18, 21). Recentive solved that technical problem by creating software using "machine learning" to implement "a specific process of prioritizing certain parameters and automatically updating the map in real time based on certain criteria to optimize the network map." Appx47-48 (¶28). As their preambles make clear, the patents-in-suit are directed to a "*method for dynamically* generating a network map" or a "*method of dynamically* generating an event schedule." Appx120 ('811 Patent) at 9:66-67; Appx132 ('957 Patent) at 10:8-9; Appx150 ('367 Patent) at 14:2-3; Appx169 ('960 Patent) at 14:12-13 (emphases added). Likewise, Recentive's patents "disclose and claim a specific process of generating improved event schedules by prioritizing certain event parameters and target features and iteratively training the machine learning model to improve accuracy." Appx53 (¶33).

Recentive's method involves "iteratively train[ing]" the algorithm to "find useful patterns" across vast amounts of specific claimed data structures relevant to network maps, and "to then apply these patterns to create updated optimized network maps and event schedules in real-time." Appx41-42 (¶¶ 18, 22). Using the prior conventional approach, humans (even assisted by powerful computers) lacked the technical ability to identify these useful patterns and to use them to generate optimal maps and schedules. Appx48, Appx52-53 (¶30, 33); *see* Appx48, Appx53 (¶¶29, 34) (alleging that the claimed machine learning "techniques do not mimic mental

processes, but are separate structures or architectures that receive, process, and generate data in a unique manner").

Recentive's predictive tool thus approaches the scheduling problem from a different angle than did the prior art. Instead of groping toward an optimal map through subjective "generalizations about viewers' preferences," Recentive's approach is to "iterat[e] over every possible map" until the algorithm has learned to identify "useful patterns" that allow it to predict the optimal map. Appx42-44 (¶¶22-23). The result is a marked improvement. Recentive's platform is dynamically updated, customizable, and far more accurate: Its novel methods "provide users the ability to generate and optimize network maps and event schedules based on user selected parameters and real time data"; and Recentive's "automated techniques … are dynamically updated based on changing conditions." Appx42 (¶¶20-21). Recentive's software achieves "prediction accuracy over 98%, which empowers users to make informed business decisions." Appx44 (¶23).

## II.    The patents-in-suit.

The four patents at issue in this case are directed to Recentive's predictive software tool. Those four patents can be divided into two families: the Machine Learning Training Patents (the '367 patent and '960 patents) and the Network Map Patents (the '811 and '957 patents). *See* Appx44, Appx49 (dividing the four patents-in-suit into two families).

## A.      The Machine Learning Training Patents.

The Machine Learning Training Patents are entitled "Systems and Methods for Determining Event Schedules" and share a specification.  Appx144 ('367 patent); Appx163 ('960 patent); Appx41, Appx49 (¶¶15-16, 31).[1]  These patents "disclose and claim a specific process of generating improved event schedules by prioritizing certain event parameters and target features and iteratively training the machine learning model to improve accuracy."  Appx53 (¶33).  The '367 patent was issued on July 12, 2022 and the '960 patent was issued on December 27, 2022.  Appx41 (¶¶15-16).

The claims' language details a highly specific method for dynamically generating an optimal live event schedule: (1) "receiving one or more event parameters for series of live events" and "one or more event target features associated with the series of live events"; (2) "providing the one or more event parameters and the one or more event target features to a machine learning (ML) model, wherein the ML model is at least one of a neural network ML model and a support vector ML model"; (3) "iteratively training the ML model to identify relationships between different event parameters and the one or more event target features"; (4) "receiving … one or more user-specific event parameters for a future series of live events" and "prioritized event target features"; (5) providing the

_____

[1] The '960 patent is a continuation of the '367 patent.  Appx49 (¶31).

customized parameters and features to the trained ML model; (6) "generating, via the trained ML model, a schedule for the future series of live events that is optimized relative to the one or more prioritized event target features"; (7) providing "real-time change to the trained ML model to improve the accuracy of the trained ML model"; (8) "updating, via the trained ML model, the schedule for the future series of live events." Appx150 at 14:2-45; *see* Appx169 at 14:12-60.

In short, the Machine Learning Training Patents spell out a specific machine learning technique (not machine learning generally) that proceeds in particular steps, including iteratively training the machine learning model on certain data to identify useful patterns and relationships and then using the trained model in a way that dynamically generates an optimized event schedule by customizing the model with certain user-specific weights and updating it with real-time changes.

The machine learning limitations in the Machine Learning Training Patents proved essential for patentability during prosecution. In an Office Action dated September 9, 2021, applying guidance developed by the Patent Office based on this Court's Section 101 cases, the '367 patent claims were rejected under Section 101 as "directed to an abstract idea without significantly more." Appx273. In an interview with the Examiner on February 4, 2022, "[t]he Examiner indicated that claim 1 would overcome the 35 U.S.C. § 101 rejection if amended to specify at least one type of machine learning model and clarify that the machine learning model is

iteratively trained." Appx512. The Examiner further indicated in an Advisory Action dated February 28, 2022 that claim 1 of the '367 patent would overcome the Section 101 rejection if amended to "positively recite the type of machine learning model applied, positively recite the re-training of the machine learning model (a) at the occurrence of an event/trigger or (b) iteratively until a minimum level of accuracy is achieved that results in the improved accuracy of the model and/or improved functioning of a computer." Appx531.

Recentive amended the claims accordingly. Appx531-32. After considering these amendments, the Examiner concluded that Recentive's "amendment is sufficient to overcome the 35 U.S.C. 101 rejection" and allowed the patent. Appx546. The Examiner explained that "the claims are directed to patent-eligible subject matter because the claims, as amended, include additional technical elements that allow the recited limitations for a computer-implemented method of dynamically generating an event schedule." Appx547.

## B.    The Network Map Patents.

The Network Map Patents share a title—"Systems and Methods for Automatically and Dynamically Generating a Network Map"—and have the same specification. Appx116, Appx128; *see* Appx44 (¶24).[2] The Network Map Patents

---

[2] The '957 Patent is a continuation of, and claims priority to, the '811 patent. Appx46 (¶26).

"are directed to an improvement in the functioning of generating network maps." Appx44 (¶25); *see* Appx116 at 2:66-67 ('811 patent specification stating that "[e]mbodiments of the present invention are directed to an improved technique for generating a network map."); Appx129 at 3:10-11 (same for '957 patent). The '811 patent was issued on February 2, 2021 and the '957 patent was issued on March 23, 2021.  Appx40 (¶¶13-14).

The Network Map Patents claim "[a] computer-implemented method for dynamically generating a network map," which comprises a series of steps: (1) "receiving a schedule for a first plurality of live events scheduled to start at a first time and a second plurality of live events scheduled to start at a second time"; (2) "generating, based on that schedule, a network map … using a machine learning technique to optimize an overall television rating across the first plurality of live events and the second plurality of live events"; (3) "automatically updating the network map on demand and in real time based on a change to at least one of (i) the schedule and (ii) underlying criteria"; and (4) "using the network map to determine for each station" the precise schedule.  Appx120 at 9:66-10:33; Appx132 at 10:8-40.

The specifications explain that the invention involves "a computer algorithm designed to optimize a particular parameter, such as overall television ratings for the NFL across all games, ratings for the NFL with a particular affiliate (CBS or FOX), ratings for the NFL in a particular market, with a particular audience, or at a

particular time." Appx117 at 3:10-15; Appx129 at 3:20-26. The computer algorithm may be developed using a "suitable machine learning technique," including "a gradient boosted random forest, a regression, a neural network, a decision tree, a support vector machine, [or] a Bayesian network," and "[t]he machine learning technique can be trained using any suitable training data." Appx117 at 3:21-28; Appx129 at 3:32-39.

As with the other family, the machine learning limitations in the Network Map Patents were essential for patentability during prosecution. In an Office Action dated January 31, 2020, applying the same Patent Office guidance, the claims of the '811 patent were rejected under Section 101 as being "directed to an abstract idea without significantly more" and "not integrated into a practical application." Appx450. In response, Recentive amended pending claim 1 to require generating a network map "using a machine learning technique and data," which is updated "on demand and in real time" based on "a user entered change to … the underlying criteria." Appx459. The Examiner concluded that, with this amendment, the claims are directed to patentable subject matter under Section 101.

## III.    Procedural history.

Fox is one of the largest broadcasters of sports and live event content in the country and, since at least 2018, has been aware of Recentive's software platform and technology. Appx38 (¶4). Rather than work with Recentive, however, Fox

began building its own internal predictive analytics platform to optimize scheduling of live sporting events. Appx39 (¶5). Recentive specifically alleges that "Fox is using infringing predictive analytics software to optimize scheduling and broadcasts of NFL games on its regional stations." *Id.*

Recentive filed this action on November 29, 2022 against Fox Corporation and Fox Broadcasting Company, alleging patent infringement of the Network Map Patents. Appx29. Fox moved to dismiss under Section 101, ECF No. 9, after which Recentive filed the operative amended complaint, adding Fox Sports Productions, LLC as a defendant and claims of infringement for the Machine Learning Training Patents. Appx37-70. On March 21, 2023, Fox again moved to dismiss all claims on the ground that they are not directed to eligible subject matter under Section 101. ECF No. 19. Recentive opposed the motion and the district court heard oral argument on September 7, 2023. Appx33-35.

On September 19, 2023, the district court issued its memorandum opinion granting Fox's motion to dismiss. Appx1-27. The court first rejected Recentive's argument that dismissal was improper without any claim construction and given the existence of factual disputes. Appx10. The court acknowledged that it was obliged to accept Recentive's factual allegations as true—including that machine learning systems process data differently than humans do and that it would be impossible for a human to independently perform Recentive's invention. Appx11. But the district

court determined that these factual questions did not impede dismissal. *Id.* The district court also agreed with Fox that "claim 1 of the '811 patent is representative of the Network Map Patents" and "claim 1 of the '367 patent is representative of the Machine Learning Training patents." Appx14-15.[3]

Next, the district court analyzed whether the patents-in-suit are directed to eligible subject matter. It concluded that "the Network Map Patents and the Machine Learning Training Patents are directed to the abstract ideas of producing network maps and event schedules, respectively, using known generic mathematical techniques." Appx16. The court cited no evidence that the specific machine learning methods identified in the claims were "*generic* mathematical techniques." Instead, the court premised this conclusion on its belief that "[t]he relevant question is whether the machine learning processes are mathematical algorithms" at all. Appx18. Having confined itself to this question, the district court reasoned that "[b]ecause machine learning is algorithmic in nature, the Court finds that the patents-in-suit are directed to an abstract idea." *Id.* The district court further asserted, without citation or analysis, that "the patents-in-suit do not improve technical functioning; the patents-in-suit merely use a computer as a tool to perform network mapping and event scheduling." Appx19.

---

[3] For purposes of this appeal, Recentive does not challenge the district court's decision on representativeness.

At *Alice* step two, the district court rejected Recentive's argument that the inventive concept is "the use of machine learning algorithms to generate network maps and optimize event schedules." Appx24. According to the district court, that inventive concept "is merely the abstract idea—applying machine learning to optimization of network maps and event schedules." *Id.* The district court reasoned that the machine learning techniques described in the patents-in-suit "are broad, functionally described, well-known techniques, not inventive concepts." Appx25 (footnote omitted). The court therefore granted the motion to dismiss for failing to claim patent-eligible subject matter under Section 101. *Id.*

Finally, the district court denied Recentive's request for leave to amend on the ground that any amendment "would be futile" because "[t]he claims of the patents say what they say" and an amended complaint "would not change the Court's § 101 analysis." Appx26.

## SUMMARY OF ARGUMENT

I.     At the first step of the *Alice* framework, the patents-in-suit are directed to a specific method of dynamically generating network maps and event schedules using machine learning techniques. The prior art processes were static, locked into a single configuration, and relied on crude generalizations. Consequently, those conventional methods were far less accurate in predicting optimal maps and schedules than Recentive's innovative method. The patents-in-suit are directed to a

specific method of generating network maps and schedules that works differently than the prior art—*i.e.*, a method for generating maps and schedules dynamically, rather than statically—and thereby improves the functionality of the existing software. Under this Court's precedents, that is not an abstract idea.

The district court reached the opposite conclusion because it committed a familiar mistake: It zoomed out too much, to the point of missing the trees for the forest. In the district court's view, the patents-in-suit are focused on the abstract idea of generating maps and schedules, using machine learning as merely a tool. In fact, however, the focus of the claims is on a specific and innovative way of generating maps and schedules—a specified technique for generating them dynamically based on specific types of data, which is a marked improvement over the prior art static process. The district court should not have painted the claims in such broad strokes. Compounding this error, the district court inappropriately resolved factual and claim-construction disputes against Recentive at the motion to dismiss stage by rejecting Recentive's arguments that the claim language did not refer to generic techniques and that machine learning techniques do not mimic mental processes.

Confirming their patentability, the asserted claims resemble several claims that this Court held were directed to eligible subject matter. In a series of cases beginning with *Enfish*, this Court has repeatedly held that software innovations that

claim a different and improved way of functioning than the prior art are not directed to an abstract idea. The asserted claims fit comfortably in that mold. Ignoring these cases, the district court instead looked to this Court's "data manipulation" cases. But those cases are inapposite because they involved claims that failed to identify a specific way to improve the technology's functionality. The claims here do just that.

If more were needed, this Court should look to persuasive authority from the United States Patent and Trademark Office's Manual of Patent Examining Procedure. That guidance document includes, as an example of claims that do not recite an abstract idea, "a method of training a neural network for facial detection." The example provided there is closely analogous to the patents-in-suit, and the district court's effort to distinguish it is unconvincing.

II.    If this Court reaches *Alice* step two, it should hold that there is at least a factual dispute as to whether the asserted claims contain an inventive concept. This Court has repeatedly held that "patentees who adequately allege their claims contain inventive concepts survive a § 101 eligibility analysis under Rule 12(b)(6)." *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1126-27 (Fed. Cir. 2018). Recentive's well-pleaded complaint easily satisfies that standard. Over and over, the complaint plausibly alleges that the claims contain an inventive concept that was anything but routine or conventional. The district court erred in failing to credit those allegations at *Alice* step two.

III.    The district court further erred by denying Recentive leave to amend on the ground of futility.  But the inquiry at *Alice* step two is inherently factual and, at the Rule 12(b)(6) stage, well-pleaded allegations suffice to establish an inventive concept.  Even assuming that the complaint's current allegations are somehow deficient in this respect, the district court provided no basis for asserting that Recentive would be unable to remedy any supposed defect in its pleadings as to inventiveness and conventionality.  Amendment would plainly not be futile.

Moreover, at *Alice* step one, the district court also disregarded Recentive's allegations that machine learning techniques do not mimic human mental processes—these allegations were, according to the district court, merely "conclusory" supported by "ad hoc attorney argument."  That is wrong—those were factual allegations in the complaint that must be taken as true.  But even if the complaint's allegations were conclusory then Recentive should be allowed to cure that deficiency through an amended pleading.  The district court erred in denying leave to amend.

## ARGUMENT

Under Section 101 of the Patent Act, a patent may be obtained for "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof."  35 U.S.C. § 101.  "[T]his provision contains an important implicit exception:  Laws of nature, natural phenomena, and abstract ideas

are not patentable." *Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014) (quotation marks omitted).  In plotting the line between the rule and the exception, both this Court and the Supreme Court have cautioned that claims must not be characterized "at such a high level of abstraction" that "all but ensures the exceptions to § 101 swallow the rule." *Enfish*, 822 F.3d at 1337; *see Alice*, 573 U.S. at 217 ("[W]e tread carefully in construing this exclusionary principle [under § 101] lest it swallow all of patent law.").

Determining subject-matter ineligibility involves a now-familiar two-part test. At step one, the court "determine[s] whether the claims at issue are directed to" an abstract idea at all.  *Alice*, 573 U.S. at 217.  "If the focus of the claim is a specific and concrete technological advance, for example an improvement to a technological process," then the court's "inquiry ends and the claim is eligible." *Adasa Inc. v. Avery Dennison Corp.*, 55 F.4th 900, 908 (Fed. Cir. 2022).  If the challenged claims are directed to a patent-ineligible concept, however, the court proceeds to *Alice* step two and "consider[s] the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent eligible application." *Alice*, 573 U.S. at 217 (citation omitted).

Patent eligibility under Section 101 "can be determined at the Rule 12(b)(6) stage … only when there are no factual allegations that, taken as true, prevent

resolving the eligibility question as a matter of law." *Aatrix Software, Inc. v*, 882 F.3d at 1125 .

The district court erred at both steps of the *Alice* framework. At step one, the district court improperly characterized the claims at too high a level of abstraction and disregarded their claimed advance over the prior art. When properly evaluated, the claims are directed not to an abstract idea, but to specific methods of improving upon an existing technological process by dynamically generating network maps and event schedules. At step two, the court erroneously discounted the complaint's plausible factual allegations that Recentive's patents claim an inventive concept that was decidedly unconventional and not routine in the industry. At the very least, the district court erred by denying leave to amend to add allegations that would establish an inventive concept or that would clarify the distinction between machine learning techniques and mental processes. This Court should reverse.

## I.    Standard of review.

This Court reviews de novo "the district court's determination that the claims at issue do not claim patent-eligible subject matter." *Enfish*, 822 F.3d at 1334; *see Koninklijke KPN N.V. v. Gemalto M2M GmbH*, 942 F.3d 1143, 1149 (Fed. Cir. 2019) ("Patent eligibility under § 101 is a question of law that may contain underlying issues of fact," and this Court "review[s] an ultimate conclusion on patent eligibility de novo.").

Further, this Court "review[s] a district court's Rule 12(b)(6) dismissal under the law of the regional circuit." *Uniloc USA, Inc. v. LG Elecs. USA, Inc.*, 957 F.3d 1303, 1306 (Fed. Cir. 2020). The Third Circuit reviews such a dismissal de novo, "accept[ing] all factual allegations as true, constru[ing] the complaint in the light most favorable to the plaintiff, and determin[ing] whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *FTC v. AbbVie Inc.*, 976 F.3d 327, 351 (3d Cir. 2020) (citation omitted). Under this standard, courts may consider "the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).

A district court's denial of leave to amend is likewise reviewed under the law of the regional circuit. *See Aatrix Software, Inc.*, 882 F.3d at 1126. The Third Circuit reviews a district court's "determination that the amendment would be futile *de novo*," using the same standards of legal sufficiency "as would be applied to a motion to dismiss under Rule 12(b)(6)," while other aspects of the denial of leave to amend are reviewed for abuse of discretion. *Maiden Creek Assocs., L.P. v. U.S. Dep't of Transp.*, 823 F.3d 184, 189 (3d Cir. 2016).

## II.    The asserted claims are directed to eligible subject matter.

The claims' language, their specifications, and the complaint's well-pleaded allegations all establish that the Network Map Patents and the Machine Learning

Training Patents are directed to specific "improved methods and systems" to the existing technological processes of generating network maps and event schedules. Appx41 (¶18).   Under this Court's precedents, such methods are patent-eligible subject matter, not an abstract idea.   The district court's contrary conclusion was erroneous.

### A.  The asserted claims are directed to a specific method of improving a technological process.

Under *Alice* step one, "an invention is not rendered ineligible for patent simply because it involves an abstract concept."  *Alice*, 573 U.S. at 217; *accord Parker v. Flook*, 437 U.S. 584, 590 (1978) ("[A] process is not unpatentable simply because it contains … a mathematical algorithm.")   Rather, the court looks to the claims' "character as a whole" and considers them "in light of the specification," in order to ascertain "the focus of the claimed advance over the prior art."  *Enfish*, 822 F.3d at 1335 (citation omitted).   Thus, the question is not whether "the claims *involve* a patent-ineligible concept" but whether their "character *as a whole* is directed to excluded subject matter."  *Id.* (citation omitted; emphases added).

At this step, claims are patent-eligible when they "recite a specific means or method that solves a problem in an existing technological process," *Koninklijke*, 942 F.3d at 1150, such as claims "directed to a specific implementation of a solution to a problem in the software arts."  *Enfish*, 822 F.3d at 1339.   In contrast, claims are directed to ineligible subject matter when their focus is "on a process that qualifies

as an 'abstract idea'"—*e.g.*, "a fundamental economic practice or mathematical equation"—"for which computers are invoked merely as a tool." *Id.* at 1336, 1339.

Applying this distinction, this Court has "routinely held software claims patent eligible under *Alice* step one when they are directed to improvements to the functionality of a computer or network platform itself." *Uniloc USA, Inc.*, 957 F.3d at 1307; *accord McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016); *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1303 (Fed. Cir. 2018); *Ancora Techs. Inc. v. HTC Am. Inc.*, 908 F.3d 1343, 1347-49 (Fed. Cir. 2018). That is the case here.

> **1.    A fair reading of the claim language, specifications, and the complaint shows that the patents-in-suit are not directed to an abstract idea.**

Under the principles described above, all of the patents-in-suit are unmistakably directed to specific methods that improve technological processes.

### a.    The Machine Learning Training Patents.

The Machine Learning Training Patents are directed to a specific implementation of a solution to a software problem. The preambles of the Machine Learning Training Patents explicitly focus on a "*method of dynamically* generating an event schedule." Appx150 ('367 patent) at 14:2-3; Appx169 ('960 patent) at 14:12-13 (emphasis added); *see, e.g.*, *Weisner v. Google LLC*, 51 F.4th 1073, 1084 (Fed. Cir. 2022) (looking to the claims' preambles as part of the "claim language"

to determine the claims' "focus").

To that end, the Machine Learning Training Patents claim a specific implementation process that lists detailed instructions about how to use the "machine learning (ML) model," which must be "at least one of a neural network ML model and a support vector ML model." Appx150 at 14:16-20, Appx169 at 14:23-27. This process includes: "iteratively training the ML model to identify relationships between the one or more event parameters and the one or more event target features using historical data corresponding to one or more previous series of live events, wherein such iterative training improves the accuracy of the ML model"; providing "one or more user-specific event parameters and the one or more user-specific event weights to the trained ML model"; and "providing [a] real-time change to the trained ML model to improve the accuracy of the trained ML model." Appx150 at 14:16-43; Appx169 at 14:23-53.

There can be little doubt that the Machine Learning Training Patents are directed to "a specific improvement in the computer system-generated event schedule" methods of the prior art. Appx53 (¶34). As the specifications state, these patents focus on "improved techniques for scheduling live events." Appx144 at 1:40-46; Appx163 at 1:48-54. Indeed, this process of dynamically generating an event schedule using a machine learning technique was invented precisely to "overcome many of the negative features in the current manual process." Appx52

(¶33).  That conventional process did not allow for "properly consider[ing]" the "wide variety of factors that may need to be considered (e.g., competing events, expenses, ticket prices, weather, performer availability, venue availability, etc.)." Appx144 at 1:26-33; Appx163 at 1:38-41.  The Machine Learning Training Patents thus fall in the heartland of claims whose focus is "a specific means or method that solves a problem in an existing technological process." *Koninklijke*, 942 F.3d at 1150.

### b.    The Network Map Patents.

As the Network Map Patents' specifications explain, the prior art processes were "static and incapable of responding to changing conditions, fixed on one default configuration and unable to consider multiple possible schedule permutations or configurations, and unable to forecast the impact of a proposed schedule change."  Appx116 at 1:23-29; Appx128 at 1:31-36.  The Network Map Patents improved these existing technological processes by, as the preambles plainly state, inventing a "*method for dynamically* generating a network map."  Appx120 at 9:66-67; Appx132 at 10:8-9 (emphasis added).

The Network Map Patents do more than recite the idea of generating an optimal map.  They "disclose and claim *a specific process* of prioritizing certain parameters and automatically updating the map in real time based on certain criteria to optimize the network map."  Appx48 (¶28) (emphasis added).  The claim language

lays out this specific process in detail. *See* pp. 9-11, *supra*. For instance, the second and third steps of the claimed process involve "generating, based on [the received] schedule, a network map … using a machine learning technique to optimize an overall television rating" and "automatically updating the network map on demand and in real time based on a change to at least one of (i) the schedule and (ii) underlying criteria." *Id.*; Appx120 at 9:66-10:33; Appx132 at 10:8-31.

Further clarifying the particular implementation method claimed by the Network Map Patents, the specifications add that the machine learning technique is used to develop "a computer algorithm designed to optimize a particular parameter." Appx117 at 3:10-15; Appx129 at 3:21-26. And the complaint supplies still more detail to this process: The machine learning techniques "automatically collect and analyze vast amounts of information to find useful patterns, and … then apply these patterns to create updated optimized network maps and event schedules in real-time … by iterating over every possible map, predicting the outcome of each to identify the optimal map." Appx42-43 (¶¶22-23).

On these facts, it is apparent that the Network Map Patents are "directed to a specific implementation of a solution to a problem in the software arts," *Enfish*, 822 F.3d at 1339—*i.e.*, how to dynamically generate a network map, which provides enhanced functionality and greater accuracy at predicting an optimal map than the prior art's static process. In other words, the Network Map Patents "are directed to

25

improvements to the functionality of a … network platform itself," *Uniloc USA, Inc.*, 957 F.3d at 1307, by innovating a specific process in which the network map is generated dynamically and with real-time updating capabilities that allow Recentive's software platform to better predict an optimal map.

### 2. The district court improperly considered the claims at too high a level of abstraction and ignored the claimed advance over the prior art.

In reaching a contrary conclusion, the district court did precisely what this Court has warned against: "describing the claims at such a high level of abstraction and untethered from the language of the claims," which "all but ensures that the exceptions to § 101 swallow the rule." *Enfish*, 822 F.3d at 1337. The district court concluded that "the Network Map Patents and the Machine Learning Training Patents are directed to the abstract ideas of producing network maps and event schedules, respectively, using known generic mathematical techniques." Appx16; *see also* Appx19 ("[T]he patents-in-suit do not improve technical functioning; the patents-in-suit merely use a computer as a tool to perform network mapping and event scheduling.").

Even if generating optimal maps and schedules were abstract ideas, the claims are not directed merely to implementing the generation of such maps and schedules using a generic computer. As discussed, the claims involve specific steps for generating maps and schedules using identified machine-learning structures and data

sets. The district court's birds'-eye description ignores the explicit claim language—as well as the added context provided in the specifications and the well-pleaded complaint—which sharpens the claims' focus on *dynamically* generating network maps and event schedules through a specific method that improves upon the prior-art processes that were static and therefore less accurate. *See* pp. 4-11, *supra*. In mischaracterizing the "focus" of the patents-in-suit, the district court improperly glossed over both the claim language and "the claimed advance over the prior art." *Enfish*, 822 F.3d at 1335.

The district court's second pass at describing "the abstract idea" is also mistakenly pitched at too high a level of generality: "applying machine learning to optimization of network maps and event schedules." Appx24. Again, the claim language and specifications reveal a focus that is far more precise: using machine learning techniques as part of a *specific* process of dynamically generating network maps and schedules that have particular functional improvements upon the prior art, which is static rather than dynamic. *See* pp. 4-11, *supra*. And the Machine Learning Training Patents claim *particular* machine learning techniques, not machine learning techniques generally. *See* pp. 7-9, *supra*; *see also* Appx49 (¶31) (noting that the Machine Learning Training Patents claim "additional technical features" not claimed in the other family). To be sure, the asserted claims do "apply[] machine learning to optimization of network maps and event schedules." But the claimed

advance over the prior art is far more specific than that: The claims recite a method for doing so through a carefully described, ordered process that focuses on generating the maps and schedules with specific dynamic functionality, in contrast to conventional techniques. *See* pp. 7-11, *supra*. When considered at the appropriate level of specificity, the patents-in-suit are not directed to abstract ideas.

The district court also placed significant weight on the fact that "the machine learning processes are mathematical algorithms," asserting that "[b]ecause machine learning is algorithmic in nature, the Court finds that the patents-in-suit are directed to an abstract idea." Appx18. This reasoning is misguided. The Supreme Court long ago made "clear that a process is not unpatentable simply because it contains … a mathematical algorithm." *Parker*, 437 U.S. at 590. The patents-in-suit *involve* machine learning algorithms, but they are not *directed to* machine learning in the abstract. Rather, they are directed to particular methods for dynamically generating network maps and schedules in a manner that improves upon conventional static processes. *See* pp. 4-11, *supra*. Whether machine learning is algorithmic in nature is a red herring.

Equally off base is the district court's contention that "the patents-in-suit do not claim a specific machine learning technique but a broad application of machine learning to perform predictive analytics in a field." Appx23. As to the Machine Learning Patents, that is simply wrong: Those patents *do* recite specific machine

learning techniques.  *See* Appx169 at 14:12-60 ("wherein the ML model is at least one of a neural network ML model and a support vector ML model").  Accordingly, "[a]t step one, the district court erred by failing to separately analyze these patents." *Weisner*, 51 F.4th at 1084.

Moreover, the patents-in-suit need not claim a specific machine learning technique to be directed to a non-abstract idea because the machine learning techniques claimed by the patents-in-suit are not themselves the focus of the claims—they simply form one part of the specific processes to which the claims are directed.  *See* pp. 4-11, *supra*.  And the *way* that machine learning is used in Recentive's patents to dynamically generate optimal network maps and event schedules is, indeed, highly specific.  *See* pp. 7-11, *supra*.

### 3. The district court erroneously resolved factual and claim-construction disputes against Recentive at the pleading stage.

In addition to the errors discussed above, the district court inappropriately resolved factual and claim-construction disputes against Recentive on a Rule 12(b)(6) motion—without any basis in the record for the construction it adopted. This Court has repudiated that practice, holding that whenever "there are claim construction disputes at the Rule 12(b)(6) stage, … the court must proceed by adopting the non-moving party's constructions, … or the court must resolve the disputes to whatever extent is needed to conduct the § 101 analysis, which may well be less than a full, formal claim construction."  *Aatrix Software Inc.*, 882 F.3d at

1125 (citations omitted); *see also Bancorp Servs., L.L.C. v. Sun Life Assurance Co. of Can. (U.S.)*, 687 F.3d 1266, 1273 (Fed. Cir. 2012) (noting that "it will ordinarily be desirable—and often necessary—to resolve claim construction disputes prior to a § 101 analysis"). And this Court has also emphasized that "plausible factual allegations may preclude dismissing a case under § 101 where, for example, nothing on the record refutes those allegations as a matter of law or justifies dismissal under Rule 12(b)(6)." *Aatrix Software, Inc.*, 882 F.3d at 1125 (quotation marks, brackets, and omission deleted).

Here, the district court prematurely determined that the machine learning techniques claimed by Recentive's patents are merely "known generic mathematical techniques." Appx16. In the court below, Recentive argued that several terms in the asserted claims—including "machine language technique," a "trained ML model," and "iteratively training the ML model to identify relationships between different event parameters and … event target features using historical data"— should be construed as non-generic techniques that, through the steps outlined in the claims, are specially adapted to dynamically generating optimized network maps and event schedules. Appx392. But the district court determined that "Recentive has not provided any proposed claim construction" and that there was no "factual dispute that would preclude the Court from reaching the § 101 analysis" because "iterative training can itself be a generic part of machine learning, a generic technique."

Appx10-11. In effect, the district court decided that the claim language relating to machine learning should be construed as referring to generic techniques, not specialized ones as Recentive had urged.

Nothing in the record—and the district court cited nothing beyond argument from Fox's counsel at the hearing—supports the district court's determination that, for example, "iteratively training the ML model to identify" the specific kinds of "relationships" claimed in the patents is "a generic technique." Perhaps iterative training "can" be a generic technique, as the district court observed. Appx11. But whether it *is* a generic technique, as used in the asserted claims, is a question of claim construction and a factual dispute. Those disputes should have been resolved in Recentive's favor at the motion to dismiss stage.

The district court also asserted that Recentive's well-pleaded allegations "that the patents-in-suit do not mimic mental processes and that machine learning techniques are unique are the sorts of 'mere conclusory statements' that a Court may disregard at the 12(b)(6) stage." Appx10 (citation omitted). Moreover, the district court waved away Recentive's argument "that machine learning algorithms process information differently from the human brain, in that 'humans process data qualitatively, rather than quantitatively,'" whereas "machine learning can identify patterns and details imperceptible to humans." Appx18. The court incorrectly dismissed this as "ad hoc attorney argument" that was not in the complaint. *Id.* n.4.

The complaint clearly alleges that machine learning methods can "automatically collect and analyze vast amounts of information to find useful patterns, and … then apply these patterns to create updated optimized network maps and event schedules in real-time" in a way that "a human" simply cannot do.  Appx42-43 (¶22).  These allegations are neither conclusory nor attorney argument—they are factual allegations that must be taken as true at the motion to dismiss stage.[4]

### B.    This Court's precedents confirm that the patents-in-suit are directed to eligible subject matter.

Lacking any "definitive rule to determine what constitutes an 'abstract idea,'" this Court has sometimes "found it sufficient to compare claims at issue to those claims already found to be directed to an abstract idea in previous cases."  *Enfish*, 822 F.3d at 1334.  An examination of this Court's precedents confirms that the patents-in-suit are not directed to an abstract idea.

*Enfish* is particularly instructive here.  That case concerned a "self-referential database" that stored computer information differently than the prior art "relational" database.  *Id.* at 1332-33.  This new method allowed "for faster searching of data than would be possible with the relational model," "more effective storage of data," and "more flexibility in configuring the database"—it could be "configured on-the-

---

[4] If the allegations were conclusory, moreover, the district court should have granted leave to amend so Recentive could allege these facts with greater specificity.  The district court erred in failing to do so.  *See* p. 48, *infra*.

fly." *Id.* at 1333. "The district court concluded that the claims were directed to the abstract idea … of organizing information using tabular formats." *Id.* at 1337 (quotation marks omitted). But this Court reversed, admonishing against "describing the claims at such a high level of abstraction and untethered from the language of the claims." *Id.* Instead, this Court relied on the specification's explanation that "the self-referential table functions differently than conventional database structures," and "that the claimed invention achieves other benefits over conventional databases, such as increased flexibility, faster search times, and smaller memory requirements." *Id.* Accordingly, *Enfish* held that "the self-referential table … is a specific type of data structure designed to improve the way a computer stores and retrieves data in memory," and therefore "the claims are directed to a specific implementation of a solution to a problem in the software arts"—not an abstract idea. *Id.* at 1339.

Like the claims in *Enfish*, the patents-in-suit claim a specific invention that functions differently than the conventional processes—*i.e.*, they generate maps and schedules dynamically, not statically—and that new method improves the software's functionality by allowing for real-time updates, enhanced flexibility and customization, and greater accuracy in predicting an optimal map. *See* pp. 4-6, *supra*. This Court's *Enfish* decision thus reinforces the view that the patents-in-suit pass muster at *Alice* step one.

Since *Enfish*, this Court has repeatedly held that software innovations that claim a different—and better—way of functioning than the prior art are not directed to an abstract idea. In *Finjan*, for example, this Court emphasized that *Enfish* rested on the fact that "the self-referential database … did more than allow computers to perform familiar tasks with greater speed and efficiency; it actually permitted users to launch and construct databases *in a new way*." 879 F.3d at 1305 (emphasis added). Building on that reasoning, *Finjan* explained that a "'behavior-based' approach to virus scanning" was different than the "traditional 'code-matching' systems, which simply look for the presence of known viruses." *Id.* at 1304. Because that claimed method "employs a new kind of file that enables a computer security system to do things it could not do before," *Finjan* held that the claims were "directed to a non-abstract improvement in computer functionality, rather than the abstract idea of computer security writ large." *Id.* at 1305.

To similar effect, this Court held in *Koninklijke* that "the claimed invention is … directed to a non-abstract improvement because it employs *a new way* of generating check data that enables the detection of persistent systematic errors in data transmissions that prior art systems were previously not equipped to detect." 942 F.3d at 1151 (emphasis added). And in *Uniloc*, this Court held that simply adding an "additional data field" in a communication system—hardly the most technically advanced innovation—was "directed to a patent-eligible improvement to

computer functionality" because it "change[d] the normal operation of the communication system itself to 'overcome a problem specifically arising in the realm of computer networks.'" 957 F.3d at 1307-08 (quoting *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257-58 (Fed. Cir. 2014)); *see also Ancora Techs.,* 908 F.3d at 1348 (invention is "a non-abstract computer-functionality improvement if done by a specific technique that departs from earlier approaches to solve a specific computer problem").

Also on point is this Court's decision in *McRO*, 837 F.3d 1299. That case involved claims directed to a process for lip-synching animated characters. Under the prior art, "an animator's process was driven by subjective determinations rather than specific, limited mathematical rules." *Id.* at 1314. The invention used "rules to automatically set a keyframe at the correct point to depict more realistic speech, achieving results similar to those previously achieved manually by animators." *Id.* at 1307. The Court emphasized that the automated method was a fundamentally "distinct process" than the "task previously performed by humans," and that "the claimed computer-automated process and the prior method were [not] carried out in the same way." *Id.* at 1314. Concluding that the claim used automated "rules in a process specifically designed to achieve an improved technological result in conventional industry practice," this Court held that it was "not directed to an abstract idea." *Id.* at 1316.

The reasoning of *Enfish*, *Finjan*, *Koninklijke*, *Uniloc*, and *McRO* fully applies here. As described above, both the Network Map Patents and the Machine Learning Training Patents are directed to improving the functionality of the existing technological processes and software by *dynamically* generating network maps and event schedules, with the aid of machine learning techniques that iteratively train the algorithm to recognize patterns that conventional approaches would overlook and then apply them to predict an optimal map or schedule. *See* pp. 4-6, *supra*. The conventional, prior-art methods and associated software, in contrast, were static and unable to update in real-time or recognize useful patterns—and they were far less accurate as a predictive tool. *See id.* Recentive's dynamic process differs fundamentally from the prior art, which relied on "crude and suboptimal generalizations about viewers' preferences within a given region." Appx43-44 (¶23). Because the asserted claims focus on such a concrete, new way of generating network maps and event schedules that functions differently than and improves upon conventional methods, this Court's precedents teach that the claims are not directed to an abstract idea.

The district court did not meaningfully grapple with much of this precedent. Instead, it primarily relied (*see* Appx16-20) on two decisions in holding that the patents-in-suit are directed to an abstract idea: *Electric Power Group, LLC v. Alstom S.A.*, 830 F.3d 1350 (Fed. Cir. 2016) and *Trinity Info Media, LLC I Covalent, Inc.*,

72 F.4th 1355 (Fed. Cir. 2023).  This reliance is misplaced.

The district court (*see* Appx16-18) cited *Electric Power Group* for the propositions that "collecting information, analyzing it, and displaying certain results of the collection and analysis" is a "familiar class of claims 'directed to' a patent-ineligible concept," and that courts "have treated analyzing information by steps people go through in their minds, or by mathematical algorithms, without more, as essentially mental processes within the abstract-idea category."  830 F.3d at 1353-54.  But that "without more" qualification is important.  As discussed above, the patents-in-suit are directed to a unique and specific process of dynamically generating maps and schedules—not merely to running data through an algorithm that mimics mental processes.  *See* pp. 4-6, *supra*.

Moreover, this Court has since clarified that *Electric Power Group* and other "data manipulation" cases had a specific defect: there was not "sufficient recitation of *how* the purported invention improved the functionality of a computer," because "the 'improvement' captured by those claims was recited at such a level of result-oriented generality that those claims amounted to a mere implementation of an abstract idea on a computer, not the specific way to improve the functionality of a computer."  *Koninklijke*, 942 F.3d at 1152 (emphasis in original); *see id.* at 1152-53 (distinguishing *Digitech Image Technologies, LLC v. Electronics for Imaging, Inc.*, 758 F.3d 1344 (Fed. Cir. 2014) and similar "data manipulation" cases on the same

ground); *see also SRI Int'l, Inc. v. Cisco Sys., Inc.*, 930 F.3d 1295, 1304 (Fed. Cir. 2019) ("The *Electric Power* claims were drawn to using computers as tools to solve a power grid problem, rather than improving the functionality of computers and computer networks themselves."). In stark contrast, the asserted claims, the patents' specifications, and the well-pleaded allegations in the complaint recite in detail a specific method for improving the functionality of the existing processes of generating network maps and event schedules. *See* pp. 4-11, *supra*.[5]

For example, the Machine Learning Training Patents explain *how* to improve the software's functionality by inputting certain claimed parameters and features, iteratively training one of two specified machine learning models to accurately identify useful relationships among those parameters and features, and then customizing and updating the parameters and features using the trained machine learning model to generate an optimized schedule. *See* pp. 7-9, *supra*. Going well

---

[5] For similar reasons, two other "data manipulation" cases that the district court relied upon, *see* Appx22, are also inapposite. In *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161 (Fed. Cir. 2018), "the focus of the claims [was] not any improved computer or network, but the improved mathematical analysis," and the claims lacked "the specificity required to transform a claim from one claiming only a result to one claiming a way of achieving it." *Id.* at 1167-68. Similarly, the claims in *In re Bd. of Trustees of Leland Stanford Junior Univ.*, 991 F.3d 1245 (Fed. Cir. 2021) were "directed to the use of mathematical calculations and statistical modeling," claiming only "generic steps of implementing and processing calculations" without any specific "practical application." *Id.* at 1250. Moreover, the party in that case "forfeited its argument that greater computational efficiency renders claim 1 patent eligible." *Id.* at 1251.

beyond a general result-oriented description, these claims recite a specific method for achieving the desired result. The Network Map Patents similarly recite a series of specific steps—receiving the schedule and events, using a machine learning technique to generate an optimized map, and customizing and updating the map—that describe *how* to dynamically generate the optimal network map. *See* pp. 9-11, *supra*. That is what was absent in the "data manipulation" cases relied upon by Fox and the district court.

*Trinity* is even further afield. That case stands for the proposition that "claims can be directed to an abstract idea even if the claims … require operations that a human could not perform as quickly as a computer." 72 F.4th at 1364. But in *Trinity* "the problem facing the inventor was how to perform the abstract idea of matching based on questioning, not an improvement to computer technology." *Id.* at 1363. It is no surprise that invoking super-human computing power did not alter the focus of the claims given that they were not directed to improving computer or software technology at all, but rather to an abstract concept of question-matching.

Here, in contrast, the claims emphatically do focus on an improvement to software technology—a focus that is evident from the claim language, the specifications, and the complaint. *See* pp. 4-11, *supra*. That the claimed "techniques do not mimic mental processes" and that "it would be impossible for a human to produce near-simultaneous updates to network maps or event schedules based on

real-time data," Appx42, Appx48 (¶¶20, 29), only serves to underscore that focus on technological improvement. *See SRI Int'l, Inc.*, 930 F.3d at 1304 (holding that a claim that "improve[d] the technical functioning of the computer and computer networks by reciting a specific technique for improving computer network security" was not directed to an abstract concept when "the human mind is not equipped to detect suspicious activity by using network monitors and analyzing network packets as recited by the claim").

Attempting to distinguish *SRI*, the district court asserted that "humans can engage in the mathematical techniques to perform machine learning (albeit slowly)—they would not need a new network packet-sensing organ like they would in *SRI*." Appx19. But this assertion contradicts the well-pleaded allegations in the complaint that machine learning "techniques do not mimic mental processes, but are separate structures or architectures that receive, process, and generate data in a unique manner" and that the patents' "claimed collection, analysis, and application of patterns in real-time is an unconventional approach to network map and event schedule generation that … achieves a better result than what a human could perform alone." Appx43 (¶22), Appx48 (¶29). As the district court earlier recognized it was required to "accept[] Recentive's factual allegations as true at this stage." Appx11.

**C.    Persuasive guidance from the Manual of Patent Examining Procedures removes any doubt that the patents-in-suit are directed to eligible subject matter.**

The United States Patent and Trademark Office's Manual of Patent Examining Procedure ("MPEP") provides additional support for the asserted claims' patentability.  *See* MPEP (9th ed.; rev. July 2022; pub. Feb. 2023).  While this guidance is not binding and will not be followed "[t]o the extent the Office Guidance contradicts or does not fully accord with [this Court's] caselaw," *In re Rudy*, 956 F.3d 1379, 1382 (Fed. Cir. 2020), there is no such contradiction or disagreement here.  *See* pp. 32-40, *supra* (discussing this Court's precedent).  Indeed, the current version of the MPEP proclaims that its analysis "distills the relevant case law" and is "firmly rooted in Supreme Court precedent as well as Federal Circuit decisions interpreting that precedent."  MPEP § 2106.04(a).

Section 2106.04(a)(1) of the MPEP contains several "hypothetical examples of claims that do not recite … an abstract idea."  The seventh example is:

> a method of training a neural network for facial detection comprising: collecting a set of digital facial images, applying one or more transformations to the digital images, creating a first training set including the modified set of digital facial images; training the neural network in a first stage using the first training set, creating a second training set including digital non-facial images that are incorrectly detected as facial images in the first stage of training; and training the neural network in a second stage using the second training set.

MPEP § 2106.04(a)(1), Example vii.[6]

This example is strikingly similar to the asserted claims—particularly the asserted claims of the Machine Learning Training Patents. *See* pp. 7-9, *supra*. The district court struggled to distinguish this example, ultimately rejecting it as "not directly analogous" on the grounds that, unlike the MPEP example, the asserted claims "do not involve improving a prior art machine learning technique but, rather, only relate to the application of machine learning techniques to a manual process." Appx13. But the fact that there was no prior art machine learning technique for generating network maps and event schedules *supports* finding that the asserted claims are directed to improving existing processes, because that shows that the technological improvement is not just one of degree but of kind. This MPEP example is highly persuasive here and further confirms that the patents-in-suit are not directed to an abstract idea.

### III.    At *Alice* step two, there is at the very least a factual dispute about whether the asserted claims involve an inventive concept.

Recognizing that some "software-related patents" present "close calls about how to characterize what the claims are directed to," this Court has sometimes jumped ahead to find eligibility under *Alice* step two, without resolving the step-one

---

[6] *Available at:* https://www.uspto.gov/web/offices/pac/mpep/mpep-2100.pdf. In the district court, the parties and the court discussed the substantially identical example "Example 39" of the previous version of the MPEP. *See* Appx434-35 (text of Example 39).

inquiry. *BASCOM Global Internet Servs. v. AT&T Mobility LLC,* 827 F.3d 1341, 1348-49 (Fed. Cir. 2016) (citation omitted); *see also CosmoKey Solutions GmbH & Co. KG v. Duo Security LLC*, 15 F.4th 1091, 1097 (Fed. Cir. 2021) (similar).  In other cases, this Court has held that the claim was patent-eligible under step two even after concluding that it was directed to an abstract idea at step one. *See, e.g.*, *Weisner*, 51 F.4th at 1085 (reversing district court's step two decision "on the pleadings").  This Court can and should reverse under *Alice* step one.  But if it reaches *Alice* step two, it should hold that there is at least a factual dispute as to whether the asserted claims contain an inventive concept.

If a claim is directed to an abstract idea at step one, it may nevertheless be found patent eligible at step two if the claim recites "an inventive concept" that is "something more than the application of an abstract idea using 'well-understood, routine, and conventional activities previously known to the industry.'" *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1316 (Fed. Cir. 2019) (citation omitted).  "Whether something is well-understood, routine, and conventional to a skilled artisan at the time of the patent is a factual determination." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1369 (Fed. Cir. 2018).  This Court has "held that patentees who adequately allege their claims contain inventive concepts survive a § 101 eligibility analysis under Rule 12(b)(6)." *Aatrix Software, Inc.*, 882 F.3d at 1126-27.

Here, even assuming that the claims are directed to an abstract idea, the well-

pleaded complaint plausibly alleges that the claims contain an inventive concept that was anything but routine or conventional. For example, the complaint alleges that Recentive's claimed methods were "a significant improvement over conventional static maps used to schedule and broadcast events prior to Recentive's invention." Appx38 (¶2). Contrasting Recentive's approach with the prior art, the complaint zeroes in on a litany of "drawbacks" plaguing "conventional network map and event schedule technology," including that "conventional processes" were "static," "fixed on one default configuration," "unable to prioritize certain parameters or target criteria in the creation of event schedules, could not be iteratively trained, and were not capable of collecting and analyzing social media data to forecast the impact on the future series of live events." Appx41 (¶18). The complaint unambiguously and plausibly alleges that Recentive improved upon the "historic approaches" by using machine learning to dynamically generate optimized maps and schedules based on real-time data and update them based on changing conditions. Appx42-44 (¶¶21-23); *see Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1301-02 (Fed. Cir. 2016) (claims directed to "a technological solution to a technological problem" are valid at step two).

Despite these many well-pleaded allegations that the asserted claims contain an inventive concept that was not routine and conventional, the district court reasoned that there is no inventive concept because "it is undisputed that Recentive

did not invent machine learning." Appx24; *see* Appx25 n.7 ("Recentive has failed to identify any allegation in its [First Amended Complaint] or any of the specifications of the patents-in-suit where it alleges that it invented machine learning, or that machine learning was anything other than well-known at the time of patenting."). Obviously, Recentive did not invent machine learning. But it *did* invent the specific and innovative uses of machine learning to dynamically generate network maps and schedules to which the claims are directed.

That is what matters. The step two inquiry requires looking at the claims as "an ordered combination," *McRO*, 837 F.3d at 1313, not at "machine learning" in isolation. *See BASCOM*, 827 F.3d at 1350 ("The inventive concept inquiry requires more than recognizing that each claim element, by itself, was known in the art" because "an inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces."); *Alice*, 573 U.S. at 218 n.3 (at step two, courts must consider the claims "both individually and in combination," which "is consistent with the general rule that patent claims 'must be considered as a whole'" (citation omitted)). The inventive concept in the patents-in-suit is the specific method of applying machine learning, as described in the patents, to generate optimal network maps and event schedules dynamically, departing from the existing static processes. The complaint makes clear that this method was not remotely among the "well-understood, routine, and conventional activities

previously known to the industry." *Cellspin Soft, Inc.*, 927 F.3d at 1316 (citation omitted).[7]

In *Cellspin*, this Court held that "plausible and specific factual allegations that aspects of the claims are inventive are sufficient" to defeat a motion to dismiss under Section 101. *Id.* at 1317. In particular, this Court held that when a party "made specific, plausible factual allegations about why aspects of its claimed inventions were not conventional," such as by alleging that its novel process was "non-existent prior to its inventions," that "[t]he district court erred by not accepting those allegations as true." *Id.* at 1317-18. *Cellspin* added that the district court "further erred by ignoring the principle, implicit in *Berkheimer* and explicit in *Aatrix*, that factual disputes about whether an aspect of the claims is inventive may preclude dismissal at the pleadings stage under § 101." *Id.* at 1318. The decision below committed those same errors and should be reversed for the same reasons.

## IV. The district court further erred in denying leave to amend.

Even assuming that the district court correctly resolved both *Alice* steps, it undoubtedly should have granted leave to amend. In the Third Circuit, "[a] district

---

[7] Indeed, even if it were somehow proper to evaluate "machine learning" standing alone as the inventive concept, the complaint plausibly alleges that machine learning software was not a conventional or routine technique "*known to the industry*" of television network mapping and live event scheduling, even if it was known in other industries. *Cellspin Soft, Inc.*, 927 F.3d at 1316 (citation omitted) (emphasis added). *See* Appx41-42 (¶¶18-22) (alleging that the industry's conventional methods were "static," "could not be iteratively trained," and did not use machine learning).

court may deny leave to amend a complaint where it is apparent from the record that '(1) the moving party has demonstrated undue delay, bad faith or dilatory motives, (2) the amendment would be futile, or (3) the amendment would prejudice the other party.'" *U.S. ex rel. Schumann v. Astrazeneca Pharm. L.P.*, 769 F.3d 837, 849 (3d Cir. 2014) (citation omitted). The district court invoked only futility, and that is the only possible basis for denying leave here.

The district court's error on this score is most readily apparent at *Alice* step two. As just discussed, that inquiry turns on factual questions concerning inventiveness and conventionality for which well-pleaded allegations must be taken as true. *See* pp. 43-46, *supra*. Thus, "patentees who adequately allege their claims contain inventive concepts survive a § 101 eligibility analysis under Rule 12(b)(6)." *Aatrix Software, Inc.*, 882 F.3d at 1126-27. The district court provided no basis for asserting that, if granted leave to amend, Recentive would be unable to remedy any supposed defect in its pleadings as to inventiveness and conventionality. Instead, the district court rested on the contention that "[t]he claims of the patents say what they say. Amending the First Amended Complaint would not change the Court's § 101 analysis. Thus, Recentive's amendments would be futile." Appx26.

That reasoning cannot be reconciled with this Court's decisions in *Cellspin*, *Berkheimer*, and *Aatrix* that the *Alice* step two inquiry is a factual one which may often turn on the complaint's allegations, not solely on the claims. *See* p. 46, *supra*.

47

Indeed, *Aatrix* reversed a district court's denial of leave to amend a first amended complaint (and vacated its dismissal under Rule 12(b)(6)) when new allegations would preclude the district court "at the Rule 12(b)(6) stage that the claimed elements were well-understood, routine, or conventional," because amendment "would not have been futile."  882 F.3d at 1129-30.  The same applies here.

Moreover, at *Alice* step one the district court disregarded Recentive's well-pleaded allegations that machine learning techniques "do not mimic mental processes" because they can "find useful patterns" imperceptible to humans, Appx42, Appx 48 (¶¶22, 29), as "conclusory" and "ad hoc attorney argument." Appx10; Appx18 n.4.  Those characterizations are incorrect.  *See* pp. 31-32, *supra*. But even assuming that Recentive did not properly allege the qualitative differences between machine learning techniques and human mental processes, the district court erred in denying leave to amend the complaint so that Recentive could cure those purported pleading deficiencies.

# CONCLUSION

For the reasons given above, this Court should reverse the district court's dismissal under Rule 12(b)(6). In the alternative, this Court should vacate the district court's judgment and remand with instructions to grant Recentive's request for leave to file a second amended complaint.

Respectfully submitted,

*/s/ David J. Zimmer*

Alexandra D. Valenti
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
Tel.: 212.813.8800
Fax.: 212.202.4038

Robert Frederickson III
David J. Zimmer
Jesse Lempel
GOODWIN PROCTER LLP
100 Northern Ave.
Boston, MA 02210
Tel.: 617.570.1000
Fax.: 617.523.1231

December 22, 2023

*Counsel for Plaintiff-Appellant
Recentive Analytics, Inc.*

**CERTIFICATE OF SERVICE**

I, David J. Zimmer, hereby certify that on December 22, 2023, I caused a copy of the foregoing and any attachments and addenda to be served on counsel of record for Appellees through ECF service.

*/s/ David J. Zimmer*
David J. Zimmer

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Circuit Rule 32(b)(1). This brief contains 11,344 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). This brief has been prepared in a proportionally spaced typeface, 14-point Times New Roman font, using Microsoft Word 2016.


*/s/ David J. Zimmer*
David J. Zimmer

# ADDENDUM

# ADDENDUM
# TABLE OF CONTENTS

<u>Page</u>

Memorandum Opinion (ECF No. 36) ........................................................... Appx1-27

Order Granting Defendants' Motion to Dismiss (ECF No. 37) ...................... Appx28

U.S. Patent No. 10,911,811 (ECF No. 13-2)........................................... Appx111-121

U.S. Patent No. 10,958,957 (ECF No. 13-3)........................................... Appx123-133

U.S. Patent No. 11,386,367 (ECF No. 13-4)........................................... Appx135-152

U.S. Patent No. 11,537,960 (ECF No. 13-5)........................................... Appx154-171

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| RECENTIVE ANALYTICS, INC.<br><br>Plaintiff,<br><br>v.<br><br>FOX CORPORATION, a Delaware Corporation; FOX BROADCASTING COMPANY, LLC, a Delaware limited liability company; FOX SPORTS PRODUCTIONS, LLC, a Delaware limited liability company,<br><br>Defendants. | Civil Action No. 22-1545-GBW |

---

John W. Shaw, Karen E. Keller, Nathan R. Hoeschen, SHAW KELLER LLP, Wilmington, Delaware; Robert Frederickson III, GOODWIN PROCTER LLP, Boston, Massachusetts; Alexandra D. Valenti, Jenevieve N. Nutovits, GOODWIN PROCTER LLP, New York, New York; Alison Siedor, GOODWIN PROCTER LLP, Washington, DC

*Counsel for Plaintiff*

Francis DiGiovanni, Thatcher A. Rahmeier, FAEGRE DRINKER BIDDLE & REATH LLP, Wilmington, Delaware; Michael E. Zeliger, Ranjini Acharya, PILLSBURY WINTHROP SHAW PITTMAN LLP, Palo Alto, California; Evan Finkel, Michael S. Horikawa, PILLSBURY WINTHROP SHAW PITTMAN LLP, Los Angeles, California

*Counsel for Defendants*

**<u>MEMORANDUM OPINION</u>**

September 19, 2023
Wilmington, Delaware

GREGORY B. WILLIAMS
UNITED STATES DISTRICT JUDGE

Plaintiff Recentive Analytics, Inc. ("Recentive") alleges that certain products of Defendants Fox Corporation, Fox Broadcasting Company, and Fox Sports Productions (together, "Fox") infringe United States Patent Nos. 10,911,811 ("the '811 patent"), 10,958,957 ("the '957 patent"), 11,386,367 ("the '367 patent") and 11,537,960 ("the '960 patent") (collectively, "the patents-in-suit").[1] D.I. 13 ¶¶ 13-16. Fox moves to dismiss Recentive's First Amended Complaint ("FAC") pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. D.I. 19 (the "Motion"). Fox argues that the claims of the patents-in-suit do not claim patent-eligible subject matter under 35 U.S.C. § 101. *Id.* The Court heard oral argument on Fox's motion on September 7, 2023. D.I. 33. For the reasons stated below, the Court grants Fox's Motion.

## I.    BACKGROUND

The '811 patent is entitled "Systems and Methods for Automatically and Dynamically Generating a Network Map." The '957 patent is a continuation of the '811 patent and shares the same title and specification. These two patents (collectively, the "Network Map Patents") are directed to methods for generating network maps (effectively, television schedules). Prior to the Network Map Patents, Recentive alleges that conventional techniques were "static and incapable of responding to changing conditions." '811 patent at 1:24-29. Furthermore, conventional network mapping processes were "unable to prioritize certain parameters or target criteria in the

---

[1] The patents-in-suit were attached to Recentive's First Amended Complaint as Exhibits A-D. *See* D.I. 13, Exs. A-D. For clarity, the Court will cite to the relevant patent-in-suit rather than the exhibit.

creation of event schedules, could not be iteratively trained, and were not capable of collecting and

analyzing social media data to forecast the impact on the future series of live events." D.I. 13 ¶ 18.

The patented process improves on the prior art by allowing dynamic updating of the network map

based on changing conditions and optimizing the scheduling process using machine learning

techniques. '811 patent at 1:35-47; *id.* at claim 1.

Claim 1 of the '811 patent recites:

> A computer-implemented method for dynamically generating a network map, the method comprising:
>
>> receiving a schedule for a first plurality of live events scheduled to start at a first time and a second plurality of live events scheduled to start at a second time;
>>
>> generating, based on the schedule, a network map mapping the first plurality of live events and the second plurality of live events to a plurality of television stations for a plurality of cities,
>>
>>> wherein each station from the plurality of stations corresponds to a respective city from the plurality of cities,
>>>
>>> wherein the network map identifies for each station (i) a first live event from the first plurality of live events that will be displayed at the first time and (ii) a second live event from the second plurality of live events that will be displayed at the second time, and
>>>
>>> wherein generating the network map comprises using a machine learning technique to optimize an overall television rating across the first plurality of live events and the second plurality of live events;
>>
>> automatically updating the network map on demand and in real time based on a change to at least one of (i) the schedule and (ii) underlying criteria,
>>
>>> wherein updating the network map comprises updating the mapping of the first plurality of live events and the second plurality of live events to the plurality of television stations; and

2

**Appx3**

> using the network map to determine for each station (i) the first live
> event from the first plurality of live events that will be displayed at
> the first time and (ii) the second live event from the second plurality
> of live events that will be displayed at the second time.

*See* '811 patent at claim 1.

Claim 12 of the '811 patent is nearly identical to claim 1, adding only the limitation "one or more computer processors programmed to perform operations comprising." *Id.* at claim 12. The '957 patent is nearly identical, except that rather than being directed to "live events," it is directed to "events." *See* D.I. 19, Ex. B (a comparison of the independent claims of the '811 patent with the '957 patent). Both Network Map Patents recite a computer-implemented method of receiving a schedule of events in two different time slots, assigning those events for each slot to multiple TV stations, using machine learning to optimize TV ratings, and updating the network map on demand and in real time. The Network Map Patents do not disclose a particular computer system to perform the method, but rather a "generic computing device." *See, e.g.*, '811 patent at 5:4; '957 patent at 5:15. Similarly, they do not provide any details of the machine learning algorithms, but merely recite that "any suitable machine learning technique can be used." *See, e.g.*, '811 patent at 3:23; '957 patent at 3:34.

The '367 and '960 patents (collectively, the "Machine Learning Training Patents") share a specification and a title ("Systems and Methods for Determining Event Schedules"). The Machine Learning Training Patents are directed to optimizing event schedules and improve over the prior art by considering "competing events, expenses, ticket prices, weather, performer availability, venue availability, etc." '367 patent at 1:26-33. The Machine Learning Training Patents claim to solve this problem by generating a schedule through a machine learning model, which has been trained to optimize target features based on input parameters. *Id.* at 2:18-20. This model has been

**Appx4**

iteratively trained to recognize how to optimize the target features. *Id.* at claim 1. The schedule can be dynamically updated. *Id.* at 1:63-67. Claim 1 of the '367 patent recites:

> A computer-implemented method of dynamically generating an event schedule, the method comprising:
>
>> receiving one or more event parameters for series of live events, wherein the one or more event parameters comprise at least one of venue availability, venue locations, proposed ticket prices, performer fees, venue fees, scheduled performances by one or more performers, or any combination thereof;
>>
>> receiving one or more event target features associated with the series of live events, wherein the one or more event target features comprise at least one of event attendance, event profit, event revenue, event expenses, or any combination thereof;
>>
>> providing the one or more event parameters and the one or more event target features to a machine learning (ML) model, wherein the ML model is at least one of a neural network ML model and a support vector ML model;
>>
>> iteratively training the ML model to identify relationships between different event parameters and the one or more event target features using historical data corresponding to one or more previous series of live events, wherein such iterative training improves the accuracy of the ML model;
>>
>> receiving, from a user, one or more user-specific event parameters for a future series of live events to be held in a plurality of geographic regions;
>>
>> receiving, from the user, one or more user-specific event weights representing one or more prioritized event target features associated with the future series of live events;
>>
>> providing the one or more user-specific event parameters and the one or more user-specific event weights to the trained ML model;
>>
>> generating, via the trained ML model, a schedule for the future series of live events that is optimized relative to the one or more prioritized event target features;
>>
>> detecting a real-time change to the one or more user-specific event parameters;
>>
>> providing the real-time change to the trained ML model to improve the accuracy of the trained ML model; and

**Appx5**

> updating, via the trained ML model, the schedule for the future series of live events such that the schedule remains optimized relative to the one or more prioritized event target features in view of the real-time change to the one or more user-specific event parameters.

*See* '367 patent at claim 1.

Claim 9 of the '367 patent is very similar to claim 1, just adding the limitation "one or more computer systems programmed to perform operations comprising." *Id.* at claim 9. Claims 11 and 19, instead of dealing with a "series of live events," involve "live events comprising performances by a plurality of performers." *Id.* at claims 11; 19. The '960 patent is nearly identical, except that instead of being directed to a "plurality of geographic locations" it is directed to "a plurality of performers" at a single venue. *See* '960 at claim 1.

## II.    LEGAL STANDARDS

### a.  Motion to Dismiss

To state a claim on which relief can be granted, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief . . . ." Fed. R. Civ. P. 8(a)(2). Such a claim must plausibly suggest "facts sufficient to 'draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Doe v. Princeton Univ.*, 30 F.4th 335, 342 (3d Cir. 2022) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Klotz v. Celentano Stadtmauer & Walentowicz LLP*, 991 F.3d 458, 462 (3d Cir. 2021) (quoting *Iqbal*, 556 U.S. at 678). But the Court will "'disregard legal conclusions and recitals of the elements of a cause of action supported by mere conclusory statements.'" *Princeton Univ.*, 30 F.4th at 342 (quoting *Davis v. Wells Fargo*, 824 F.3d 333, 341 (3d Cir. 2016)). Under Rule

12(b)(6), the Court must accept as true all factual allegations in the complaint and view those facts in the light most favorable to the plaintiff. *See Fed. Trade Comm'n v. AbbVie Inc*, 976 F.3d 327, 351 (3d Cir. 2020).

### b. Patent-Eligible Subject Matter

Patentability under 35 U.S.C. § 101 is a threshold legal issue. *Bilski v. Kappos*, 561 U.S. 593, 602 (2010). The § 101 inquiry is properly raised at the pleading stage if it is apparent from the face of the patent that the asserted claims are not directed to eligible subject matter. *Cleveland Clinic Found. v. True Health Diagnostics LLC*, 859 F.3d 1352, 1360 (Fed. Cir. 2017), *cert. denied*, 138 S. Ct. 2621 (2018); *see also SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1166 (Fed. Cir. 2018) (stating that patent eligibility "may be, and frequently has been, resolved on a Rule 12(b)(6) or (c) motion"); *FairWarning IP, LLC v. Iatric Sys., Inc.*, 839 F.3d 1089, 1097 (Fed. Cir. 2016) (stating that "it is possible and proper to determine patent eligibility under 35 U.S.C. § 101 on a Rule 12(b)(6) motion" (quoting *Genetic Techs. Ltd. v. Merial L.L.C.*, 818 F.3d 1369, 1373-74 (Fed. Cir. 2016)); *Voter Verified, Inc. v. Election Sys. & Software LLC*, 887 F.3d 1376, 1379 (Fed. Cir. 2018) (affirming Rule 12(b)(6) dismissal based on § 101 patent ineligibility). This is, however, appropriate "only when there are no factual allegations that, taken as true, prevent resolving the eligibility question as a matter of law." *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1128 (Fed. Cir. 2018).

Section 101 of the Patent Act defines patent-eligible subject matter. It states, "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101. The Supreme Court has held that there are exceptions to § 101. "Laws of nature, natural phenomena, and abstract ideas are not patentable."

*Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014) (internal quotation marks and citation omitted). "[I]n applying the § 101 exception, [the court] must distinguish between patents that claim the 'building blocks' of human ingenuity and those that integrate the building blocks into something more[] thereby 'transforming' them into a patent-eligible invention. The former 'would risk disproportionately tying up the use of the underlying' ideas and are therefore ineligible for patent protection. The latter pose no comparable risk of pre-emption, and therefore remain eligible for the monopoly granted under our patent laws." *Id.* at 217 (cleaned up).

The Supreme Court's *Alice* decision established a two-step framework for determining patent-eligibility under § 101. In the first step, the court must determine whether the claims at issue are directed to a patent-ineligible concept. *Id.* In other words, are the claims directed to a law of nature, natural phenomenon, or abstract idea? *Id.* If the answer to the question is "no," then the patent is not invalid for teaching ineligible subject matter under § 101. If the answer to the question is "yes," then the court proceeds to step two, where it considers "the elements of each claim both individually and as an ordered combination" to determine if there is an "inventive concept—i.e., an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Id.* at 217-18 (alteration in original). "A claim that recites an abstract idea must include 'additional features' to ensure that the [claim] is more than a drafting effort designed to monopolize the [abstract idea]." *Id.* at 221 (internal quotation marks and citation omitted). Further, "the prohibition against patenting abstract ideas cannot be circumvented by attempting to limit the use of [the idea] to a particular technological environment." *Id.* at 222 (quoting *Bilski*, 561 U.S. at 610-11). Thus, "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Id.* at 223.

**Appx8**

## III.   DISCUSSION

### a.   Claim Construction and Factual Disputes

Recentive asserts that "resolution of this issue before claim construction and expert discovery is premature." D.I. 20 at 2. Fox replies that Recentive did not provide its own claim construction, nor explain why any claim construction would render the claims eligible for patent protection. D.I. 23 at 1.

The § 101 eligibility inquiry is a matter of law for the Court to determine. *See Bilski*, 561 U.S. at 602. "At the pleading stage, to the extent the § 101 question of law is informed by subsidiary factual issues, those facts are to be construed in the light most favorable to Plaintiff." *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, C.A. No. 14-1006-RGA, 2016 WL 4373698, at *3 (D. Del. Aug. 15, 2016), *aff'd*, 874 F.3d 1329 (Fed. Cir. 2017) (citations omitted). The Court need not undergo claim construction before performing a § 101 analysis. *Int'l Bus. Machines Corp. v. Zynga Inc.*, C.A. No. 22-590-GBW, 2022 WL 17177735, at *4 (D. Del. Nov. 23, 2022) ("There is no bright-line rule that a court must construe terms in the asserted patent before it performs a § 101 analysis.") (citing *Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Canada (U.S.)*, 687 F.3d 1266, 1273-74 (Fed. Cir. 2012)). Dismissal is appropriate when a plaintiff has failed to identify claim terms requiring a construction that could affect the patent-ineligibility analysis. *Cleveland Clinic Found. v. True Health Diagnostics LLC*, 859 F.3d 1352, 1360 (Fed. Cir. 2017) ("[I]t was appropriate for the district court to determine that the [asserted] patents were ineligible under § 101 at the motion to dismiss stage" when the patentee "provided no proposed construction of any terms or proposed expert testimony that would change the § 101 analysis").

The Court agrees with Fox that Recentive has not provided any proposed claim construction or an explanation of why any proposed claim construction would alter the § 101 analysis.[2] Thus, the Court continues to the § 101 analysis undeterred.

Recentive also argues that factual disputes prevent resolution of the § 101 dispute at the pleadings stage. D.I. 20 at 9-10. The first factual dispute Recentive raises stems from Recentive's assertion in its FAC that machine learning techniques "do not mimic mental processes, but are separate structures or architectures that receive, process, and generate data in a unique manner." *Id.* at 10 (citing D.I. 13 ¶¶ 29, 34). In its Motion, Fox argues that "contrary to Recentive's assertions, however, these limitations simply reflect manipulating and organizing data using known mathematical techniques." D.I. 19 at 12. Recentive responds that Fox's argument constitutes a factual contradiction with Recentive's statement in its FAC, thereby requiring denial of Fox's Motion. D.I. 20 at 9.

At the outset, the Court notes that Recentive's assertions that the patents-in-suit do not mimic mental processes and that machine learning techniques are unique are the sorts of "mere conclusory statements" that a Court may disregard at the 12(b)(6) stage. *Doe*, 30 F.4th at 342. Furthermore, these statements do not necessarily contradict. It can be true that machine learning techniques generate data in a manner distinct from the human mind, while still being true that machine learning algorithms use known mathematical techniques to do so. Thus, in addition to being mere conclusory statements, there is no factual contradiction here that would prevent the

---

[2] During oral argument, Recentive claimed that their briefing included a claim construction for the term "generating" that incorporated the display limitations removed during prosecution. September 7 Hearing Rough Transcript at 37. The Court disagrees. Even if it did provide a construction, Recentive has not provided any explanation for how this construction would change the § 101 analysis.

**Appx10**

Court from reaching the § 101 analysis. To the extent that Fox is arguing that machine learning does not have separate structures that process data in a manner different from the human mind, the Court draws all assumptions in favor of Recentive at this stage.

The second factual dispute that Recentive identifies is with respect to Fox's argument that machine learning techniques are generic. Recentive argues that the patents' recitation of "iteratively training" the machine learning models constitutes a factual allegation that requires resolution. D.I. 20 at 9. Again the Court does not find any factual dispute that would preclude the Court from reaching the § 101 analysis: iterative training can itself be a generic part of machine learning, a generic technique. *See* September 7 Hearing Rough Transcript at 41 ("[W]hat's described is iteratively training the machine learning model to identify relationships, and then generating via the trained ML model a schedule. What's being described here is what machine learning models do.").

Lastly, Recentive argues dismissal is inappropriate because of allegations in its FAC that the amount of data to be collected would make it "impossible for a human to produce near-simultaneous updates to network maps," that machine learning produces "a better result than what a human could perform alone" and that machine leaning provides a "better and more optimized event schedule than what a human could achieve without the claimed techniques." D.I. 13 at ¶¶ 20, 22, 33. Recentive argues this contradicts Fox's assertions that the patents-in-suit are directed toward the "automation of an entirely manual process." D.I. 20 at 10. The Court accepts Recentive's factual allegations as true at this stage but ultimately finds they do not change the analysis.

10

### b. Patent Office Guidance

The parties dispute the relevance of the United States Patent and Trademark Office's ("PTO") guidance to the pending § 101 analysis. Recentive identifies the PTO's Subject Matter Eligibility Example 39 "Method for Training a Neural Network for Facial Detection" as evidence that the patents-in-suit claim patent-eligible subject matter and urges the Court not to "upend" this guidance. D.I. 20 at 18. Fox urges the Court to ignore the guidance, asserting that the Court need not defer to the PTO. D.I. 23 at 4 (citing *Fitbit Inc. v. AliphCom*, C.A. No. 16-118, 2017 WL 819235, at *18 (N.D. Cal. Mar. 2, 2017) (courts "need not defer to the examiner's conclusions on patent eligibility" in determining eligibility)).

PTO guidance "is not, itself, the law of patent eligibility, does not carry the force of law, and is not binding on our patent eligibility analysis." *In re Rudy*, 956 F.3d 1379, 1382 (Fed. Cir. 2020). "While we greatly respect the PTO's expertise on all matters relating to patentability, including patent eligibility, we are not bound by its guidance." *Cleveland Clinic Found. v. True Health Diagnostics LLC*, 760 F. App'x 1013, 1020 (Fed. Cir. 2019). Indeed, courts in this District have previously confronted the PTO's examples and declined to defer to their findings or conclusions. *See, e.g.*, *Citrix Sys., Inc. v. Avi Networks, Inc.*, 363 F. Supp. 3d 511, 516 n.2 (D. Del. 2019) (acknowledging the similarity of the case to a PTO example but coming out the other way).

While the Court is not required to defer to Example 39 or the PTO's guidance, the Court has closely reviewed Example 39 and concludes that the present analysis does not conflict with Example 39, despite Recentive's cursory analogies. Example 39 relates to a neural network training patent and describes a set of novel methods to improve prior art neural networks—e.g., an expanded training set using mathematical transformations and the minimization of false positives

11

using a distinctive training method. D.I. 21, Ex. D at 8-9. The patents-in-suit, unlike Example 39, do not involve improving a prior art machine learning technique but, rather, only relate to the application of machine learning techniques to a manual process. *Compare id.* at 8 (claiming the use of an expanded training set and a novel training method) *with* '811 patent at 3:21-30 (noting that "any suitable machine learning technique can be used") *and* '367 patent at claim 1 (describing only the use of either a support vector model or a neural network, with no further detail). As such, the PTO's guidance that "[w]hile some of the limitations may be based on mathematical concepts, the mathematical concepts are not recited in the claims" is not relevant here—Recentive recites those very mathematical concepts in its claims (by stating to apply generic machine learning techniques to a pre-existing process). D.I. 21, Ex. D at 9; *see* '811 patent at claim 1; '367 patent at claim 1. In short, the patents-in-suit are not directly analogous to Example 39. Thus, the PTO guidance is not relevant to the Court's § 101 analysis of the patents-in-suit.

### c. **Representativeness**

The parties dispute whether Fox has proven representativeness. The Court finds that it has. Courts may treat a claim as representative if all the claims are "substantially similar and linked to the same abstract idea." *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343, 1348 (Fed. Cir. 2014). "Courts may [also] treat a claim as representative in certain situations, such as if the patentee does not present any meaningful argument for the distinctive significance of any claim limitations not found in the representative claim or if the parties agree to treat a claim as representative." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1365 (Fed. Cir. 2018). Courts will find a claim representative if "all of the challenged claims relate to the same abstract idea" and none of the other "claims add one or more inventive concepts that would result in patent eligibility." *Cronos Techs., LLC v. Expedia, Inc.*, C.A. No. 13-1538-LPS, 2015 WL 5234040, at

12

*2 (D. Del. Sept. 8, 2015). Courts have declined to rule on a § 101 motion to dismiss when the accused infringer failed to meet its burden to show that its choice of representative claim is proper. *Id.* at *3-4.

Fox asserts that claim 1 of the '811 patent is representative of the Network Map Patents. D.I. 19 at 3. Claim 1 of the '811 patent recites generating a network map by "receiving" a schedule of events, "generating" a network map divided by cities, wherein "generating the network map comprises using a machine learning technique to optimize an overall television rating," "automatically updating" the network map based on demand in real time, and "using the network map" to determine for each station the schedule. *See* '811 patent at claim 1. In its briefing, Fox explains why each of the other claims in the Network Map Patents are directed to the same abstract idea recited in claim 1, and why these other claims contain no inventive step. D.I. 19 at 2-4, 18-20. For example, Fox argues that claim 6 of the '811 patent (requiring generating the network map based on weather, news, or gambling data) fails because "collecting and analyzing specific types of information from specific types of information sources (including real time measurements) . . . does nothing significant to differentiate a process from ordinary mental processes." D.I. 19 at 18-19 (quoting *Power Analytics Corporation v. Operation Technology, Inc.*, C.A. No. 16-1955, 2017 WL 5468179, at *5 (C.D. Cal. July 13, 2017)).

Recentive briefly criticizes Fox's efforts to prove representativeness, stating that Fox "glosses over the dependent claims and provides only rote explanations . . . ." D.I. 20 at 19. Other than dependent claim 10 of the '811 patent, Recentive has not provided a meaningful argument as to any other claim and, thus, has "waived any argument that those claims should be analyzed separately." *Affinity Labs of Texas, LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1264 n.4 (Fed. Cir. 2016).

**Appx14**

Dependent claim 10 of the '811 patent recites "[t]he method of claim 1, wherein the automatically updating step comprises generating multiple network maps based on multiple user entered changes." '811 patent at claim 10. Recentive notes that, "rather than generating a single map," the process claimed in dependent claim 10 generates "an extensive repository of maps" which is "simultaneously generated based on multiple input changes." D.I. 20 at 20.[3] This, Recentive argues, is sufficient to confer patent eligibility. Fox responds that precedent dictates that "analyzing multiple inputs, 'including real time measurements,' 'does nothing significant to differentiate a process from ordinary mental processes.'" D.I. 23 at 10 (quoting *Power Analytics*, 2017 WL 5468179, at *5). Claim 10 has two limitations: generating multiple maps, and generating those multiple maps based on multiple input changes. Neither of these limitations meaningfully alters the Court's § 101 analysis. Creating several network maps is substantially similar to creating one network map—if the latter is abstract, so is the former. Similarly, generating maps using input changes is not meaningfully different from the process in claim 1 of the '811 patent. Therefore, the Court concludes that claim 1 of the '811 patent is representative of the Network Map Patents.

Fox asserts that claim 1 of the '367 patent is representative of the Machine Learning Training patents. D.I. 19 at 5. Recentive does not dispute this beyond the broad allegation that Fox glossed over the dependent claims. D.I. 20 at 19. As such, Recentive has waived any argument that claim 1 of the '367 patent does not represent the Machine Learning Training Patents and the Court finds that claim 1 of the '367 patent is representative.

---

[3] The Court notes it is highly dubious whether merely repeating the language of the dependent claim and asserting it is not representative constitutes a "meaningful argument for the distinctive significance of any claim limitations." *Berkheimer*, 881 F.3d at 1365.

#### d. Patent-eligible Subject Matter

##### i. *Alice* Step 1

The Court must first determine whether claim 1 of the '811 patent (and, thus, the Network Map Patents which it represents) and claim 1 of the '367 patent (and, thus, the Machine Learning Training Patents which it represents) are directed to abstract ideas. For the reasons stated below, the Court finds that the Network Map Patents and the Machine Learning Training Patents are directed to the abstract ideas of producing network maps and event schedules, respectively, using known generic mathematical techniques.

Recentive claims that the "central inventive contribution" of the Network Map Patents that renders the claims patent-eligible is the "application of trained machine learning algorithms to generate network maps that are dynamically updated and optimized in real-time." *Id.* at 8. Recentive claims that the central inventive concept for the Machine Learning Training Patents is using those machine learning algorithms to generate "event schedules that are dynamically updated and optimized in real-time." *Id.* at 8-9. Both Recentive and Fox largely treat the two sets of patents together. *E.g.*, D.I. 19 at 16-17; D.I. 20 at 9-10. The Court will do the same.

The Supreme Court and the Federal Circuit have provided some guideposts as to what constitutes an "abstract idea." For example, claims that recite "'method[s] of organizing human activity' are not patent-eligible because they are abstract ideas." *Smartflash LLC v. Apple Inc.*, 680 F. App'x 977, 982 (Fed. Cir. 2017) (quoting *Alice*, 573 U.S. 208 at 220). "[A] process that employs mathematical algorithms to manipulate existing information to generate additional information" is an abstract idea. *Digitech Image Techs. LLC v. Elecs. for Imaging, Inc.*, 758 F.3d 1344, 1351 (Fed. Cir. 2014); *see also Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016) ("[C]ollecting information, analyzing it, and displaying certain results of the

15

collection and analysis" is a "familiar class of claims directed to a patent-ineligible concept"). Claims that are "'directed to an improvement to computer functionality'" are not abstract, while claims "'simply adding conventional computer components to well-known business practices'" are abstract. *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 612 (Fed. Cir. 2016) (quoting *Enfish*, 822 F.3d at 1335-38). In deciding questions of patent eligibility and, specifically, in navigating the parameters of an abstract idea, it is proper for courts to compare the claims at issue to those previously analyzed in other judicial decisions. *See, e.g.*, *Elec. Power Grp.*, 830 F.3d at 1351-54; *see also Enfish*, 822 F.3d at 1334 (allowing courts to "compare claims at issue to those claims already found to be directed to an abstract idea in previous cases").

The Court finds that claim 1 of the '811 patent recites four steps: (1) a collecting step, i.e., receiving current schedules of events; (2) an analyzing step, i.e., using a machine learning algorithm to create a network map; (3) an updating step, i.e. updating the network map based on real time information; and (4) a using step, i.e. using that network map to determine for each station which event will be shown.

The Court finds that claim 1 of the '367 patent also recites four steps: (1) a collecting step, i.e., receiving event parameters (e.g., venue locations, fees) and target features (e.g., event revenue); (2) a training step, i.e., feeding this data into a machine learning model and training it to identify relationships; (3) an output step, i.e., inputting characteristics of future live events and receiving from the machine learning model an optimized schedule; and (4) an updating step, i.e., detecting changes to the inputs and feeding those inputs to the machine learning model to re-optimize the schedule.

Both the Network Map Patents and the Machine Learning Training Patents "collect[] information, analyz[e] it, and display[] certain results of the collection," a "familiar class of claims

16

directed to a patent-ineligible concept." *Elec. Power Grp., LLC*, 830 F.3d at 1353. Recentive makes three arguments to differentiate the patents-in-suit from those patents previously found to claim patent-ineligible subject matter. First, Recentive argues that machine learning algorithms are unique since they process information differently from how the human brain could or would. Second, Recentive argues that humans could not perform the patented processes, because the data and algorithms are too complex. Third, Recentive analogizes to the Federal Circuit decision in *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299 (Fed. Cir. 2016), wherein the patents-in-suit were directed to a concrete application of mathematical rules, not the rules themselves. Each of these arguments fails.

Recentive contends that machine learning algorithms process information differently from the human brain, in that "humans process data qualitatively, rather than quantitatively."[4] D.I. 20 at 12. It notes that machine learning can identify patterns and details imperceptible to humans, and thereby optimizes maps in a different way than the human brain would or could. *Id.* However, this argument misses the point. It is irrelevant whether a human making a network map would run a support vector machine in their brain. The relevant question is whether the machine learning processes are mathematical algorithms. "[Courts] have treated analyzing information by steps people go through in their minds, *or by mathematical algorithms*, without more, as essentially mental processes within the abstract-idea category." *Elec Power Grp.*, 830 F.3d at 1354 (emphasis added). Because machine learning is algorithmic in nature, the Court finds that the patents-in-suit are directed to an abstract idea.

---

[4] The Court also notes this is ad hoc attorney argument, and not in the specification of the patents or the complaint.

**Appx18**

Recentive next argues that the patents are eligible because the claimed processes require too much data and computing power for the human brain to do. D.I. 20 at 12 ("[T]he number of possible solutions is far beyond what a human could process."). Recentive cites *SRI Int'l, Inc. v. Cisco Systems, Inc.*, 930 F.3d 1295, 1304 (Fed. Cir. 2019) for the proposition that when the "human mind is not equipped" to engage in the patented process, the process is not abstract. In *SRI*, the Federal Circuit held that, because the human mind was not equipped to engage in network monitoring of specific network packets, the patented claims were eligible. *SRI*, 930 F.3d at 1304. Unlike in *SRI*, humans can engage in the mathematical techniques to perform machine learning (albeit slowly)—they would not need a new network packet-sensing organ like they would in *SRI*. *See* D.I. 13 ¶ 20 ("[B]y the time a human had collected the data, analyzed it, and produced a revised network map or event schedule, the data would be obsolete"—implying that humans can indeed do these steps, it will just take longer). Indeed, the Court in *SRI* expressly limited its decision to cases involving improvement of technology, emphasizing that "the claims here are not directed to using a computer as a tool—that is, automating a conventional idea on a computer. Rather, the representative claim improves the technical functioning of the computer and computer networks by reciting a specific technique for improving computer network security." *SRI*, 930 F.3d at 1304. In contrast, the patents-in-suit do not improve technical functioning; the patents-in-suit merely use a computer as a tool to perform network mapping and event scheduling.

Recentive's argument flies in the face of recent Federal Circuit precedent that holds that a human being incapable of matching processing speed does not make an abstract process patent-eligible. *Trinity Info Media, LLC I Covalent, Inc.*, 72 F.4th 1355, 1363-65 (Fed. Cir. 2023). In *Trinity*, the asserted patents relate to "a poll-based networking system that connects users based on similarities as determined through poll answering and provides real-time results to the users."

18

**Appx19**

*Id.* at 1358. The patentee argued that humans could not engage in the same process, since humans cannot "perform nanosecond comparisons and aggregate result values with huge numbers of polls and members." *Id.* at 1363-64. The Federal Circuit rejected this argument for two reasons. First, the arguments were not "tethered to the asserted claims, which do not require nanosecond comparisons or aggregating huge numbers of polls and members." *Id.* at 1363. Second, the Federal Circuit noted as follows:

> [A]lthough a human could not "detect[ ] events on an interconnected electric power grid in real time over a wide area and automatically analyz[e] the events on the interconnected electric power grid," we nevertheless found such claims to be directed to an abstract idea in *Electric Power Group.* 830 F.3d at 1351, 1353–54. Similarly, a human could not communicate over a computer network without the use of a computer, yet we held that claims directed to enabling "communication over a network" were focused on an abstract idea in *ChargePoint.* 920 F.3d at 766–67. Likewise, Trinity's asserted claims can be directed to an abstract idea even if the claims require generic computer components or require operations that a human could not perform as quickly as a computer.

*Id.* at 1364. The same analysis employed by the Court in *Trinity* applies in the instant case. First, the patents-in-suit do not require that the machine learning process be complex—indeed they claim "regression" and "decision tree[s]" as relevant machine learning processes. D.I. 20 at 12. The patents-in-suit do not require a certain quantity of input data.[5] Thus, based solely on the claim language, the patents-in-suit do not require the sorts of processing limitations Recentive asserts.

Second, the fact that a human cannot literally do the claimed process is not a barrier when the process itself is abstract. Just as a human cannot literally communicate over a computer network, humans cannot literally run a machine learning algorithm. However, each process remains abstract, as they are directed to an abstract idea. While *Trinity* does not involve machine

---

[5] While the patents-in-suit do require "real-time" updating, so did the patents in *Trinity.* D.I. 20 at 17; *see Trinity*, 72 F. 4th at 1358. Furthermore, claims that require "automatic, real-time analysis" "are merely directed to using generic computer components to add efficiency and speed to the abstract idea." *Nice Sys. Ltd. v. Clickfox, Inc.*, 207 F. Supp. 3d 393, 401 (D. Del. 2016).

learning, this Court finds its reasoning highly persuasive. Similar to *Trinity*, the Court finds that the claims of the patents-in-suit can be directed to an abstract idea even if the claims require generic machine learning or operations that a human could not perform as quickly as a computer using machine learning.

In its last argument to distinguish the Federal Circuit's precedent that algorithmic processes are unpatentable, Recentive analogizes the patents-in-suit to those in *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299 (Fed. Cir. 2016). *McRO* involved patents directed to automating rules sets for lip-synching animation. *Id.* at 1313. The Federal Circuit held that the use of an unconventional rule set distinguished the patents from the prior art human methods, as long as the application of the rules created a tangible result (the sequence of animated characters). *Id.* at 1315. The Federal Circuit emphasized that the genus of rules improved the prior subjective process, rendering the claims patent-eligible. *Id.* at 1316.

Fox distinguishes *McRO* for the following three reasons. First, it points to countervailing Federal Circuit precedent that held various optimization techniques to be unpatentable. D.I. 23 at 7-8. Second, it points to the fact that *McRO* dealt with the replacement of an artistic, subjective, process, while the claimed invention replaces an imperfect objective process. *Id.* at 8. Third, it points to the requirement in *McRO* that the rules be "unconventional." *Id.* (quoting *McRO*, 837 F.3d at 1303). When considered in combination, the Court finds that these three factors are sufficient to distinguish *McRO*. Notably, the Federal Circuit has generally been hesitant to expand *McRO* beyond its facts. *See, e.g.*, *Enco Sys., Inc. v. DaVincia, LLC*, 845 F. App'x 953, 957 (Fed. Cir. 2021) (distinguishing *McRO* because the claims were "limited to rules with specific characteristics and set out meaningful requirements for the first set of rules"); *Sanderling Mgmt. Ltd. v. Snap Inc.*, 65 F.4th 698, 703 (Fed. Cir. 2023) (similar); *FairWarning IP, LLC v. Iatric Sys.,*

**Appx21**

*Inc.*, 839 F.3d 1089, 1094 (Fed. Cir. 2016) (distinguishing *McRO* on the grounds that the prior art was artistically driven, rather than quantitatively optimized).

Fox highlights two cases that distinguish and limit *McRO*: *In re Bd. Of Trustees of Leland Stanford Junior Univ.*, 991 F.3d 1245 (Fed. Cir. 2021) ("*Stanford*") and *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161 (Fed. Cir. 2018). D.I. 23 at 7. In *Stanford*, the patent was directed to a computerized method of inferring certain genetic data during sequencing. The Federal Circuit found the claims directed to patent-ineligible subject matter. *Stanford*, 991 F.3d at 1250. It reasoned that the "generic steps of implementing and processing calculations with a regular computer do not change the character of [the claim] from an abstract idea into a practical application." *Id.* That court distinguished *McRO* on the grounds that it "involve[d] practical, technological improvements extending beyond improving the accuracy of a mathematically calculated statistical prediction." *Id.* at 1251. Similarly, in *SAP*, the Federal Circuit found claims directed to statistically analyzing investment information and reporting the results to be abstract. *SAP*, 898 F.3d at 1161. Specifically, the Federal Circuit distinguished *McRO* on the grounds that *McRO* was directed "to the creation of something physical," unlike the quantitative predictions in *SAP*. *Id.*

The Court agrees with Fox that the claims of the patents-in-suit are more analogous to those in *SAP* and *Stanford* than those in *McRO*. First, the network maps at issue here appear more analogous to the tangibility level present in *SAP*'s financial models than the animated characters present in *McRO*. Both the models and the schedule are data objects—while the results can be written down, they are less tangible than the created animated characters from *McRO*. Second, changing a process where artists are trying to make a piece of art look good into an algorithmically driven one focused on quantitative prediction is distinct from changing a process where both

**Appx22**

humans and algorithms are trying to maximize TV ratings. *See FairWarning IP* 839 F.3d at 1094 (Fed. Cir. 2016) (distinguishing *McRO* because "[t]he claimed rules in *McRO* transformed a traditionally subjective process performed by human artists into a mathematically automated process executed on computers"). Third, *McRO* claimed specific and unconventional rules, while the rules in the patents-in-suit are admittedly conventional machine learning techniques described in broad functional terms. *See* '811 patent at 3:21-30 (noting that "any suitable machine learning technique can be used" and that it can be "trained using any suitable training data").

The Court's decision is in line with other district courts' analysis of machine learning claims. *Power Analytics Corporation v. Operation Technology, Inc.* involved patents directed to "gathering information, e.g., real-time and predicted data values, and analyzing and updating a model with that information, e.g., comparing the gathered data and evaluating the prediction deviations to update the model" using a "machine learning engine" described in functional terms. C.A. No. 16-1955, 2017 WL 5468179, at \*4-6 (C.D. Cal. July 13, 2017). In *Power Analytics* the court found the claims to be unpatentable since the patent "does not specify how the engine is configured. None of the claims recites a particular structure for how to compare the real-time and predicted values, how to pick the threshold values or how to update the virtual model." *Id.* at \*4; *see also Health Discovery Corp. v. Intel Corp.*, 577 F. Supp. 3d 570 (W.D. Tex. 2021) (holding ineligible a patent on a machine learning algorithm as directed solely to unpatentable mathematical ideas).[6] Similar to *Power Analytics*, the patents-in-suit do not claim a specific machine learning technique but a broad application of machine learning to perform predictive analytics in a field.

---

[6] Recentive distinguishes *Health Discovery*, arguing that *Health Discovery* related to the improvement of a machine learning process, while the patents-in-suit only apply machine learning to an existing idea. D.I. 20 at 13. But this is a reason that the patents-in-suit are *more* abstract than those in *Health Discovery*, not less.

22

Because the claims of both the Network Map Patents and the Machine Learning Training Patents are directed to abstract ideas, the Court proceeds to *Alice* step two.

### ii. *Alice* Step 2

In *Alice* step two, the Court must consider the elements of the claim, both individually and as an ordered combination, to assess whether "the limitations present in the claims represent a patent-eligible application of the abstract idea." *Content Extraction*, 776 F.3d at 1347 (citation omitted). Merely reciting the use of a generic computer or adding the words "apply it with a computer" cannot convert a patent-ineligible abstract idea into a patent-eligible invention. *Alice*, 573 U.S. at 223; *Versata Dev. Grp., Inc. v. SAP Am., Inc.*, 793 F.3d 1306, 1332 (Fed. Cir. 2015). "To save a patent at step two, an inventive concept must be evident in the claims." *RecogniCorp*, 855 F.3d at 1327 (citation omitted).

Recentive contends that "the use of machine learning algorithms to generate network maps and optimize event schedules" is the inventive concept contained in the claims. D.I. 20 at 15-16. Recentive's argument for an inventive concept heavily relies on *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288 (Fed. Cir. 2016). In *Amdocs*, the Federal Circuit held eligible at *Alice* step two patent claims relating to managing data over large networks when they contained "specific enhancing limitations that necessarily incorporated the invention's distributed architecture." *Amdocs*, 841 F.3d at 1301. The court noted that the patents brought an "unconventional technological solution (enhancing data in a distributed fashion) to a technological problem." *Id.* at 1300. However, unlike *Amdocs*, wherein the court credited the patentee for inventing the claimed distributed architecture, here, it is undisputed that Recentive did not invent machine learning. The inventive concept that Recentive identifies is merely the abstract idea— applying machine learning to optimization of network maps and event schedules. Again, however,

23

this is insufficient to convert the patent-ineligible abstract idea into a patent-eligible invention. An inventive concept must be "sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Alice*, 573 U.S. at 217-18 (alteration in original).

The machine learning limitations are described only in broad functional terms and provide little guidance on model parameters or training technique—the Network Map Patents disclose "any suitable machine learning technique," while the Machine Learning Training Patents describe using either a neural network or a support vector model and iteratively training it. *See, e.g.*, '811 patent at 3:21-30; '367 patent at claim 1. These are broad, functionally described, well-known[7] techniques, not inventive concepts. The patents also claim only generic and conventional computing devices, which are insufficient to transform the abstract idea into patent-eligible subject matter. *Alice*, 573 U.S. at 224 ("Given the ubiquity of computers, wholly generic computer implementation is not generally the sort of additional feature that provides any practical assurance that the process is more than a drafting effort designed to monopolize the abstract idea itself."). As such, the Court is unable to identify any transformative inventive concept present in the patents-in-suit at *Alice* step two.

Because the Court has found that the claims of the patents-in-suit are directed to abstract ideas, and that there is no inventive concept, the claims are directed to patent-ineligible subject matter. Accordingly, Fox's motion to dismiss for failing to claim patent-eligible subject matter pursuant to 35 U.S.C. § 101 is granted.

---

[7] Recentive argues that this presents a factual dispute that precludes granting Fox's Motion. D.I. 20 at 17. But Recentive has failed to identify any allegation in its FAC or any of the specifications of the patents-in-suit where it alleges that it invented machine learning, or that machine learning was anything other than well-known at the time of patenting.

### e. Leave to Amend

In the alternative, Recentive requests that, if the Court is inclined to grant Fox's Motion, the Court grant its request for leave to amend its First Amended Complaint. D.I. 20 at 20. "Leave to amend must generally be granted unless equitable considerations render it otherwise unjust." *Arthur v. Maersk, Inc.*, 434 F.3d 196, 204 (3d Cir. 2006); *see also Foman v. Davis*, 371 U.S. 178, 182 (1962). "The Third Circuit has adopted a liberal approach to the amendment of pleadings." *Id.* "In the absence of undue delay, bad faith, or dilatory motives on the part of the moving party, the amendment should be freely granted, unless it is futile or unfairly prejudicial to the non-moving party." *Id.* (citations omitted). An amendment is futile if it "would fail to state a claim upon which relief could be granted." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997). "The standard for assessing futility is the 'same standard for legal sufficiency as applies under [Federal] Rule [of Civil Procedure] Rule 12(b)(6).'" *Great W. Mining & Min. Co. v. Fox Rothschild, LLP*, 615 F.3d 159, 175 (3d Cir. 2010) (quoting *Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000)).

When deciding a Rule 12(b)(6) motion, a court considers "documents that are attached to or submitted with the complaint." *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) (citation omitted). Here, Recentive attached to its FAC the patents-in-suit. D.I. 13, Exs. A-D. Thus, the Court reviewed the patents-in-suit when deciding Fox's Motion. The claims of the patents say what they say. Amending the First Amended Complaint would not change the Court's § 101 analysis. Thus, Recentive's amendments would be futile.

Accordingly, the Court denies Recentive's request for leave to amend its FAC.

25

**Appx26**

## IV.    CONCLUSION

For the reasons stated above, the patents-in-suit are directed to patent-ineligible subject matter under 35 U.S.C. § 101. Thus, the Court grants Fox's Motion to Dismiss (D.I. 18). Separately, the Court finds that any amendment of the First Amended Complaint would be futile and, thus, denies Recentive's request for leave to amend its First Amended Complaint. The Court will enter an Order consistent with this Memorandum Opinion.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

RECENTIVE ANALYTICS, INC.

        Plaintiff,

        v.

FOX CORPORATION, a Delaware
Corporation; FOX BROADCASTING
COMPANY, LLC, a Delaware limited liability
company; FOX SPORTS PRODUCTIONS,
LLC, a Delaware limited liability company,

        Defendants.

Civil Action No. 22-1545-GBW

---

## ORDER

At Wilmington this 19th day of September, 2023 consistent with the Memorandum

Opinion issued this date, **IT IS HEREBY ORDERED** that Defendants Fox Corp., Fox

Broadcasting Co. LLC, and Fox Sports Production LLC's Motion to Dismiss the First Amended

Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(6) and 35 U.S.C. § 101 (D.I. 18) is

**GRANTED**.

                               GREGORY B. WILLIAMS
                          UNITED STATES DISTRICT JUDGE

US010911811B1

## (12) United States Patent
Tabrizi et al.

(10) Patent No.: **US 10,911,811 B1**
(45) Date of Patent: **Feb. 2, 2021**

(54) **SYSTEMS AND METHODS FOR AUTOMATICALLY AND DYNAMICALLY GENERATING A NETWORK MAP**

(71) Applicant: **Recentive Analytics**, Boston, MA (US)

(72) Inventors: **Andysheh Tabrizi**, Boston, MA (US); **Evan Charles Smith**, Lexington, MA (US)

(73) Assignee: **Recentive Analytics**, Boston, MA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **16/598,480**

(22) Filed: **Oct. 10, 2019**

(51) **Int. Cl.**
| | |
|---|---|
| *H04N 21/262* | (2011.01) |
| *H04N 21/84* | (2011.01) |
| *H04N 21/24* | (2011.01) |
| *H04N 21/2187* | (2011.01) |

(52) **U.S. Cl.**
CPC ... *H04N 21/26283* (2013.01); *H04N 21/2187* (2013.01); *H04N 21/24* (2013.01); *H04N 21/84* (2013.01)

(58) **Field of Classification Search**
CPC .............. H04N 21/2187; H04N 21/24; H04N 21/26283; H04N 21/84
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 6,536,041 B1 * | 3/2003 | Knudson | .............. | H04N 21/235 725/39 |
| 2001/0000194 A1* | 4/2001 | Sequeira | .............. | H04N 21/854 725/39 |
| 2005/0088407 A1* | 4/2005 | Bell | .................... | H04N 21/812 345/156 |
| 2019/0297381 A1* | 9/2019 | Chung | ...................... | G06N 3/08 |

OTHER PUBLICATIONS

https://the506.com, "NFL 2011", Apr. 25, 2012, https://the506.com/nflmaps.2011.html, pp. 1-3 (Year: 2012).*

* cited by examiner

*Primary Examiner* — Nicholas T Corbo
(74) *Attorney, Agent, or Firm* — Goodwin Procter LLP

(57) **ABSTRACT**

This application relates to systems and techniques for automatically and/or dynamically generating a network map. The network map can be updated based on a changed condition, which can include, among other things, a change in the underlying schedule and/or underlying data (e.g., weather data, news data, etc.). The network map can be updated in real time and/or in accordance with a predetermined schedule.

**19 Claims, 4 Drawing Sheets**

| station | 1pm game | 4pm game | state | city |
|---|---|---|---|---|
| DWAY | BAL-KC | HOU-LAC | NC | Wilmington |
| EENY | NYJ-NE | PIT-SF | NY | Elmira-corning |
| EKTV | NYJ-NE | PIT-SF | NY | Utica |
| ELOX | ATL-IND | NO-SEA | MS | Biloxi |
| EOHL | CIN-BUF | HOU-LAC | OH | Lima |
| ESVF | BAL-KC | PIT-SF | VA | Harrisonburg |
| GBBJ | BAL-KC | NO-SEA | TN | Jackson |
| KAJ | BAL-KC | HOU-LAC | MT | Kalispell |
| KAUZ | DET-PHI | PIT-SF | TX | Wichita Falls |
| KBAK | DET-PHI | HOU-LAC | CA | Bakersfield |
| KBIM | BAL-KC | PIT-SF | NM | Roswell |
| KBNZ | BAL-KC | PIT-SF | OR | Bend |
| KBOI | CIN-BUF | NO-SEA | ID | Boise |
| KBSD | BAL-KC | NO-SEA | KS | Dodge City/Ensign |
| KBSH | BAL-KC | NO-SEA | KS | Hays |
| KBSL | BAL-KC | NO-SEA | KS | Goodland |
| KBTX | BAL-KC | HOU-LAC | TX | Bryan |
| KBZK | BAL-KC | HOU-LAC | MT | Bozeman |
| KCBS | BAL-KC | HOU-LAC | CA | Los Angeles |
| KCBY | BAL-KC | PIT-SF | OR | Coos Bay |
| KCCI | BAL-KC | HOU-LAC | IA | Des Moines |

# U.S. Patent

**Feb. 2, 2021**    **Sheet 1 of 4**    **US 10,911,811 B1**



FIG. 1A



| station | 1pm game | 4pm game | state | city |
|---------|----------|----------|-------|------|
| DWAY | BAL-KC | HOU-LAC | NC | Wilmington |
| EENY | CIN-BUF | PIT-SF | NY | Elmira-corning |
| EKTV | NYJ-NE | PIT-SF | NY | Utica |
| ELOX | ATL-IND | NO-SEA | MS | Biloxi |
| EOHL | CIN-BUF | HOU-LAC | OH | Lima |
| ESVF | BAL-KC | PIT-SF | VA | Harrisonburg |
| GBBJ | BAL-KC | NO-SEA | TN | Jackson |
| KAJ | BAL-KC | HOU-LAC | MT | Kalispell |
| KAUZ | NYJ-NE | PIT-SF | TX | Wichita Falls |
| KBAK | NYJ-NE | HOU-LAC | CA | Bakersfield |
| KBIM | BAL-KC | PIT-SF | NM | Roswell |
| KBNZ | BAL-KC | PIT-SF | OR | Bend |
| KBOI | CIN-BUF | NO-SEA | ID | Boise |
| KBSD | BAL-KC | NO-SEA | KS | Dodge City/Ensign |
| KBSH | BAL-KC | NO-SEA | KS | Hays |
| KBSL | BAL-KC | NO-SEA | KS | Goodland |
| KBTX | BAL-KC | HOU-LAC | TX | Bryan |
| KBZK | BAL-KC | HOU-LAC | MT | Bozeman |
| KCBS | BAL-KC | HOU-LAC | CA | Los Angeles |
| KCBY | BAL-KC | PIT-SF | OR | Coos Bay |
| KCCI | BAL-KC | HOU-LAC | IA | Des Moines |

FIG. 1B

Appx112

**U.S. Patent**          Feb. 2, 2021          Sheet 2 of 4          US 10,911,811 B1



FIG. 2A

| station | 1pm game | 4pm game | state | city |
|---|---|---|---|---|
| DWAY | BAL-KC | HOU-LAC | NC | Wilmington |
| EENY | NYJ-NE | PIT-SF | NY | Elmira-corning |
| EKTV | NYJ-NE | PIT-SF | NY | Utica |
| ELOX | ATL-IND | NO-SEA | MS | Biloxi |
| EOHL | CIN-BUF | HOU-LAC | OH | Lima |
| ESVF | BAL-KC | PIT-SF | VA | Harrisonburg |
| GBBJ | BAL-KC | NO-SEA | TN | Jackson |
| KAJ | BAL-KC | HOU-LAC | MT | Kalispell |
| KAUZ | DET-PHI | PIT-SF | TX | Wichita Falls |
| KBAK | DET-PHI | HOU-LAC | CA | Bakersfield |
| KBIM | BAL-KC | PIT-SF | NM | Roswell |
| KBNZ | BAL-KC | PIT-SF | OR | Bend |
| KBOI | CIN-BUF | NO-SEA | ID | Boise |
| KBSD | BAL-KC | NO-SEA | KS | Dodge City/Ensign |
| KBSH | BAL-KC | NO-SEA | KS | Hays |
| KBSL | BAL-KC | NO-SEA | KS | Goodland |
| KBTX | BAL-KC | HOU-LAC | TX | Bryan |
| KBZK | BAL-KC | HOU-LAC | MT | Bozeman |
| KCBS | BAL-KC | HOU-LAC | CA | Los Angeles |
| KCBY | BAL-KC | PIT-SF | OR | Coos Bay |
| KCCI | BAL-KC | HOU-LAC | IA | Des Moines |

FIG. 2B

U.S. Patent    Feb. 2, 2021    Sheet 3 of 4    US 10,911,811 B1



FIG. 3A

Map on September 8, 2019:

| station | 1pm game | 4pm game | state | city |
|---|---|---|---|---|
| KABB | SF-WSH | NO-CHI | TX | San Antonio |
| KADN | LAR-ATL | NO-CHI | LA | Lafayette |
| KARD | LAR-ATL | NO-CHI | LA | Monroe |
| KATN | MIN-DET | NO-CHI | AK | Fairbanks |
| KAYU | SF-WSH | BAL-SEA | WA | Spokane |
| KBFX | LAR-ATL | NO-CHI | CA | Bakersfield |
| KBSI | MIN-DET | NO-CHI | KY | Paducah |
| KBTV | SF-WSH | NO-CHI | TX | Beaumont |
| KBVU | SF-WSH | NO-CHI | CA | Eureka |
| KCBA | SF-WSH | NO-CHI | CA | Monterey |
| KCIT | SF-WSH | NO-CHI | TX | Amarillo |
| KCPQ | SF-WSH | BAL-SEA | WA | Seattle |
| KCVU | SF-WSH | NO-CHI | CA | Chico |
| KCYU | SF-WSH | BAL-SEA | WA | Yakima |
| KDFW | AZ-NYG | NO-CHI | TX | Dallas |
| KDFX | LAR-ATL | NO-CHI | CA | Palm Springs |
| KDSM | MIN-DET | NO-CHI | IA | Des Moines |
| KDVR | MIN-DET | NO-CHI | CO | Denver |
| KECY | AZ-NYG | NO-CHI | AZ | Yuma |

FIG. 3B

Map on September 17, 2019:

| station | 1pm game | 4pm game | state | city |
|---|---|---|---|---|
| KABB | SF-WSH | BAL-SEA | TX | San Antonio |
| KADN | LAR-ATL | NO-CHI | LA | Lafayette |
| KARD | LAR-ATL | NO-CHI | LA | Monroe |
| KATN | MIN-DET | NO-CHI | AK | Fairbanks |
| KAYU | AZ-NYG | BAL-SEA | WA | Spokane |
| KBFX | LAR-ATL | NO-CHI | CA | Bakersfield |
| KBSI | MIN-DET | BAL-SEA | KY | Paducah |
| KBTV | SF-WSH | NO-CHI | TX | Beaumont |
| KBVU | SF-WSH | NO-CHI | CA | Eureka |
| KCBA | LAR-ATL | BAL-SEA | CA | Monterey |
| KCIT | SF-WSH | NO-CHI | TX | Amarillo |
| KCPQ | SF-WSH | BAL-SEA | WA | Seattle |
| KCVU | LAR-ATL | NO-CHI | CA | Chico |
| KCYU | AZ-NYG | BAL-SEA | WA | Yakima |
| KDFW | AZ-NYG | BAL-SEA | TX | Dallas |
| KDFX | LAR-ATL | NO-CHI | CA | Palm Springs |
| KDSM | MIN-DET | BAL-SEA | IA | Des Moines |
| KDVR | MIN-DET | NO-CHI | CO | Denver |
| KECY | AZ-NYG | BAL-SEA | AZ | Yuma |

FIG. 3C

**U.S. Patent**     Feb. 2, 2021     Sheet 4 of 4     **US 10,911,811 B1**



FIG. 4

US 10,911,811 B1

**1**

# SYSTEMS AND METHODS FOR AUTOMATICALLY AND DYNAMICALLY GENERATING A NETWORK MAP

## TECHNICAL FIELD

In general, various embodiments of this invention relate to the generation of network maps and, specifically, to a technique for automatically and dynamically generating a network map based on changing conditions.

## BACKGROUND

Many events require the generation of a network map. As used herein, the term network map refers to a schedule that outlines which content will be displayed on which channel at a certain time. As one example, the National Football League® ("NFL") needs to generate a network map for the numerous NFL football games played on Sundays, many of which are played simultaneously. The NFL needs to determine which content (games) will be displayed on which channel (television channels) at which times (usually 1 pm and 4 pm ET). The current system for generating such maps has several negative features. For example, the current process is entirely manual, static and incapable of responding to changing conditions, fixed on one default configuration and unable to consider multiple possible schedule permutations or configurations, and unable to forecast the impact of a proposed schedule change.

Accordingly, there exists a need for an improved technique for generating network maps.

## SUMMARY OF THE INVENTION

This application describes an improved technique for generating a network map that solves many of the drawbacks of conventional techniques. In particular, aspects of the present invention relate to an automated technique for generating a network map. In some instances, the technique is automated such that it is generated based on a computer algorithm designed to optimize a certain parameter (e.g., highest overall projected ratings, highest projected ratings in a particular market, etc.). In addition, in some implementations, the algorithm is based on real time data and the map can be dynamically updated based on changing conditions (e.g., an adjusted schedule, weather data, news data, etc., described in more detail below). In general, this application will describe generation of a network map using the example of the network map required for the NFL's Sunday games. However, the invention is broader than this example and can be applied to the generation of a network map for any type of content (e.g., any sporting event, such as NBA, MLB, NHL, MLS games, the Olympics, golf matches, etc. and non-sporting events such as dramatic television programs, movies, live streaming events, etc.) distributed across any type of channel (e.g., television channels, radio, internet, and in person events (e.g., at music festivals, conventions, etc.)).

In general, in one aspect, embodiments of the invention feature a computer-implemented method for dynamically generating a network map. The method can include the steps of receiving a schedule for a plurality of events; generating a network map based on the schedule; and automatically updating the network map based on at least one of (i) a change to the schedule and (ii) updated data.

In various embodiments, the plurality of events can include sporting events (e.g., NFL games). In some instances, the network map includes a description of which

**2**

event will be displayed on which channel at a particular time. In some cases, the channel includes a television channel. The change to the schedule can include a manual change performed by a user. The updated data can include weather data, news data, gambling data, among many others. In some instances, the step of automatically updating the network map includes optimizing the network map based on a particular parameter (e.g., projected overall rating or projected rating in a certain market). The step of automatically updating the network map can occur in real time. In some implementations, the step of automatically updating the network map can include using a machine learning technique. The method can also include, prior to the receiving step, generating the schedule for the plurality of events. In some cases, the step of generating the schedule can include using a machine learning technique.

In general, in another aspect, embodiments of the invention feature a system for dynamically generating a network map. The system can include one or more computers programmed to perform operations that include: receiving a schedule for a plurality of events; generating a network map based on the schedule; and automatically updating the network map based on at least one of (i) a change to the schedule and (ii) updated data.

In various embodiments, the plurality of events include sporting events. In some instances, the network map includes a description of which event will be displayed on which channel at a particular time. In some cases, the updated data includes weather data, news data, and/or gambling data, among many other types of data. In some implementations, automatically updating the network map includes optimizing the network map based on a particular parameter. The step of automatically updating the network map can occur in real time. In some implementations, the operations can also include, prior to the receiving step, generating the schedule for the plurality of events.

## BRIEF DESCRIPTION OF THE FIGURES

In the drawings, like reference characters generally refer to the same parts throughout the different views. Also, the drawings are not necessarily to scale, emphasis instead generally being placed upon illustrating the principles of the invention. In the following description, various embodiments of the present invention are described with reference to the following drawings, in which:

FIG. **1**A is an example graphical user interface illustrating an NFL Sunday game schedule;

FIG. **1**B is an example network map generated for the schedule shown in FIG. **1**A;

FIG. **2**A is an example graphical user interface illustrating an NFL Sunday game schedule that has been modified from the schedule shown in FIG. **1**A.

FIG. **2**B is an example network map generated for the schedule shown in FIG. **2**A;

FIG. **3**A is an example graphical user interface illustrating another NFL Sunday game schedule;

FIG. **3**B is an example network map generated for the schedule shown in FIG. **3**A at a first point in time;

FIG. **3**C is an example network map generated for the schedule shown in FIG. **3**A at a second point in time, different than the first point in time shown in FIG. **3**B; and

FIG. **4** illustrates an example computer system that can perform certain implementations of the techniques described herein.

## DESCRIPTION

Embodiments of the present invention are directed to an improved technique for generating a network map. As stated

US 10,911,811 B1

**3**

above, the term network map refers to a schedule that outlines which content will be displayed on a certain channel at a certain time. Generally, a network map is based upon an underlying schedule for a plurality of events. For example, the underlying schedule can be a schedule for the NFL's Sunday games, as shown in FIG. 1A. In some instances, the underlying schedule can be generated using a conventional technique, e.g., manually. In other instances, the underlying schedule is generated using an automated technique. For example, the automated technique can include a computer algorithm designed to optimize a particular parameter, such as overall television ratings for the NFL across all games, ratings for the NFL with a particular affiliate (CBS or FOX), ratings for the NFL in a particular market, with a particular audience, or at a particular time. As shown in FIG. 1A, the projected overall ratings for the 1 pm and 4 pm games on each of CBS and FOX are shown in the bottom row and the total overall NFL ratings across all games is centered underneath. Many other parameters are possible and contemplated.

In certain implementations, the computer algorithm can be developed using a machine learning technique. In general, any suitable machine learning technique can be used, for example, a gradient boosted random forest, a regression, a neural network, a decision tree, a support vector machine, a Bayesian network, etc., as just a few examples. The machine learning technique can be trained using any suitable training data. A few non-limiting examples include weather data, news data, and/or gambling data (e.g., odds data generated by sports books).

Regardless of how the underlying schedule is generated, implementations of the present invention can automatically generate a network map that describes which games will be shown on which channels at which time. FIG. 1B shows an example network map for the schedule shown in FIG. 1A. In FIG. 1B the leftmost column lists a television channel (in this example affiliates of CBS or FOX in various cities), the column titled 1 pm game lists the games to be displayed at 1 pm, and the column titled 4 pm game lists the games to be displayed at 4 pm. In some cases, separate network maps can be generated for affiliates of a particular broadcaster (e.g., CBS, FOX, etc.). As shown in FIG. 1A, a user can select a first icon to generate a CBS-affiliate network map and a different icon to generate a FOX-affiliate network map.

In general, the network map can be automatically generated using any suitable technique. In some implementations, the network map is generated so as to optimize a particular parameter. This parameter can be the same parameter or a different parameter as the parameters described above used to generate the underlying schedule. For example, overall television ratings for the NFL across all games, ratings for the NFL with a particular affiliate (CBS or FOX), ratings for the NFL is a particular market, with a particular audience, or at a particular time. The network map can also be generated based on certain criteria or rules (e.g., user submitted rules). In general any rule can be used. As one example a user may say that a particular game cannot be shown in a particular market regardless of what the other data indicates (e.g., NE-BAL can never be shown in Orlando).

In some embodiments, the network map can be dynamically updated based on changing conditions. In general, any changed condition can result in an update to the network map. For example, a change in the underlying schedule can result in an update to the network, as illustrated in FIGS. 2A-2B. FIG. 2A shows a NFL game schedule with a change made from the schedule shown in FIG. 1A. In particular, the DET-PHI game has been moved from the 1 pm FOX slot

**4**

(FIG. 1A) to the 1 pm CBS slot (FIG. 2A). This change in schedule can be done manually by a user or it can be done automatically based on the techniques described above. The change in the underlying schedule can cause an automatic update to the network map, as illustrated in FIG. 2B. With reference to stations KAUZ and KBAK, in the FIG. 1B network map these stations are scheduled to display the NYJ-NE game; however, once the change to the schedule occurs, in the FIG. 2B network maps these stations are scheduled to display the DET-PHI game. This update is made automatically and dynamically because the algorithm used to determine the network map now optimizes the DET-PHI game on the KAUZ and KBAK stations at 1 pm over the NYJ-NE game. Changes to the underlying schedule can also result in other automatic updates. For example, comparing FIG. 1A to FIG. 2A shows that the change in the DET-PHI game resulted in adjusted projections (both for each game slot and the total projections).

The network map can also be dynamically updated based on changing data, e.g., the data underlying the algorithm that automatically generates the network map. In general, changes to any type of data underlying the algorithm can result in a change to the network map. As one non-limiting example to illustrate the concept, the algorithm may rely on weather data and have a preference for displaying games in markets where the weather forecast is cold, because more people are likely stay inside and watch television if the weather is cold. If, however, the weather forecast changes such that a market where it was originally forecast to be cold is now forecast to be warm, the algorithm may determine that a different game should be displayed in that market. Many additional examples are possible, based on any type of changing underlying data.

A comparison of FIGS. 3B and 3C illustrates this concept. The network map shown in FIG. 3B was generated on Sep. 8, 2019 and the network map shown in FIG. 3C was generated on Sep. 17, 2019. The network maps are different without any change to the underlying schedule shown in FIG. 3A. The cause of these changes is changes in the data underlying the algorithm that automatically generates the network map, e.g., weather data, news data, gambling data, etc.

The system can be configured such that the network map is updated in real time. In some instances, the network map may be updated in accordance with a predetermined schedule. For example, the network map can be updated with a predetermined frequency (e.g., every minute, every hour, every day, etc.) until a predetermined amount of time before the games are played (e.g., 1 day, 1 week, etc.) at which point the schedule is locked in. In other instances, the networks can display games based on updates that occur during the games. So, if the underlying data changes mid-game such that a different game should be displayed in a particular market, the network can switch the broadcast at that time.

In some embodiments, the network maps can be archived according to a predetermined schedule (e.g., every hour, every day, etc.). This archiving can allow a user to determine and view how the map has changed over time.

In various embodiments, the inventive system described herein can also automatically generate reports and analytics based on the generated network maps. Example information in these reports can include summary statistics (e.g., percentage of the country that views a particular game, e.g., NE-BAL viewed by 43% of stations, GB-SF viewed by 57% of stations, etc.), thematic trend analysis (e.g., changes in bet

US 10,911,811 B1

5

wagers on a particular team, changes in merchandise sales, etc.), among many other types of information.

Operating Apparatus

FIG. 4 shows an example of a generic computing device 450, which may be used with the techniques described in this disclosure. Computing device 450 includes a processor 452, memory 464, an input/output device such as a display 454, a communication interface 466, and a transceiver 468, among other components. The device 450 may also be provided with a storage device, such as a microdrive or other device, to provide additional storage. Each of the components 450, 452, 464, 454, 466, and 468, are interconnected using various buses, and several of the components may be mounted on a common motherboard or in other manners as appropriate.

The processor 452 can execute instructions within the computing device 450, including instructions stored in the memory 464. The processor may be implemented as a chipset of chips that include separate and multiple analog and digital processors. The processor may provide, for example, for coordination of the other components of the device 450, such as control of user interfaces, applications run by device 450, and wireless communication by device 450.

Processor 452 may communicate with a user through control interface 458 and display interface 456 coupled to a display 454. The display 454 may be, for example, a TFT LCD (Thin-Film-Transistor Liquid Crystal Display) or an OLED (Organic Light Emitting Diode) display, or other appropriate display technology. The display interface 456 may comprise appropriate circuitry for driving the display 454 to present graphical and other information to a user. The control interface 458 may receive commands from a user and convert them for submission to the processor 452. In addition, an external interface 462 may be provided in communication with processor 452, so as to enable near area communication of device 450 with other devices. External interface 462 may provide, for example, for wired communication in some implementations, or for wireless communication in other implementations, and multiple interfaces may also be used.

The memory 464 stores information within the computing device 450. The memory 464 can be implemented as one or more of a computer-readable medium or media, a volatile memory unit or units, or a non-volatile memory unit or units. Expansion memory 474 may also be provided and connected to device 450 through expansion interface 472, which may include, for example, a SIMM (Single In Line Memory Module) card interface. Such expansion memory 474 may provide extra storage space for device 450, or may also store applications or other information for device 450. Specifically, expansion memory 474 may include instructions to carry out or supplement the processes described above, and may include secure information also. Thus, for example, expansion memory 474 may be provided as a security module for device 450, and may be programmed with instructions that permit secure use of device 450. In addition, secure applications may be provided via the SIMM cards, along with additional information, such as placing identifying information on the SIMM card in a non-hackable manner.

The memory may include, for example, flash memory and/or NVRAM memory, as discussed below. In one implementation, a computer program product is tangibly embodied in an information carrier. The computer program product contains instructions that, when executed, perform one or more methods, such as those described above. The infor-

6

mation carrier is a computer- or machine-readable medium, such as the memory 464, expansion memory 474, memory on processor 452, or a propagated signal that may be received, for example, over transceiver 468 or external interface 462.

Device 450 may communicate wirelessly through communication interface 466, which may include digital signal processing circuitry where necessary. Communication interface 466 may in some cases be a cellular modem. Communication interface 466 may provide for communications under various modes or protocols, such as GSM voice calls, SMS, EMS, or MMS messaging, CDMA, TDMA, PDC, WCDMA, CDMA2000, or GPRS, among others. Such communication may occur, for example, through radio-frequency transceiver 468. In addition, short-range communication may occur, such as using a Bluetooth, WiFi, or other such transceiver (not shown). In addition, GPS (Global Positioning System) receiver module 470 may provide additional navigation- and location-related wireless data to device 450, which may be used as appropriate by applications running on device 450.

Device 450 may also communicate audibly using audio codec 460, which may receive spoken information from a user and convert it to usable digital information. Audio codec 460 may likewise generate audible sound for a user, such as through a speaker, e.g., in a handset of device 450. Such sound may include sound from voice telephone calls, may include recorded sound (e.g., voice messages, music files, etc.) and may also include sound generated by applications operating on device 450.

The computing device 450 may be implemented in a number of different forms, as shown in FIG. 4. For example, it may be implemented as a cellular telephone 480. It may also be implemented as part of a smartphone 482, smart watch, personal digital assistant, or other similar mobile device.

Operating Environment

Implementations of the subject matter and the operations described in this specification can be implemented in digital electronic circuitry, or in computer software, firmware, or hardware, including the structures disclosed in this specification and their structural equivalents, or in combinations of one or more of them. Implementations of the subject matter described in this specification can be implemented as one or more computer programs, i.e., one or more modules of computer program instructions, encoded on computer storage medium for execution by, or to control the operation of, data processing apparatus. Alternatively or in addition, the program instructions can be encoded on an artificially generated propagated signal, e.g., a machine-generated electrical, optical, or electromagnetic signal, that is generated to encode information for transmission to suitable receiver apparatus for execution by a data processing apparatus. A computer storage medium can be, or be included in, a computer-readable storage device, a computer-readable substrate, a random or serial access memory array or device, or a combination of one or more of them. Moreover, while a computer storage medium is not a propagated signal, a computer storage medium can be a source or destination of computer program instructions encoded in an artificially generated propagated signal. The computer storage medium can also be, or be included in, one or more separate physical components or media (e.g., multiple CDs, disks, or other storage devices).

The operations described in this specification can be implemented as operations performed by a data processing

US 10,911,811 B1

7

apparatus on data stored on one or more computer-readable storage devices or received from other sources.

The term "data processing apparatus" encompasses all kinds of apparatus, devices, and machines for processing data, including by way of example a programmable processor, a computer, a system on a chip, or multiple ones, or combinations, of the foregoing. The apparatus can include special purpose logic circuitry, e.g., an FPGA (field programmable gate array) or an ASIC (application specific integrated circuit). The apparatus can also include, in addition to hardware, code that creates an execution environment for the computer program in question, e.g., code that constitutes processor firmware, a protocol stack, a database management system, an operating system, a cross-platform runtime environment, a virtual machine, or a combination of one or more of them. The apparatus and execution environment can realize various different computing model infrastructures, such as web services, distributed computing and grid computing infrastructures.

A computer program (also known as a program, software, software application, script, or code) can be written in any form of programming language, including compiled or interpreted languages, declarative or procedural languages, and it can be deployed in any form, including as a stand alone program or as a module, component, subroutine, object, or other unit suitable for use in a computing environment. A computer program may, but need not, correspond to a file in a file system. A program can be stored in a portion of a file that holds other programs or data (e.g., one or more scripts stored in a markup language resource), in a single file dedicated to the program in question, or in multiple coordinated files (e.g., files that store one or more modules, sub programs, or portions of code). A computer program can be deployed to be executed on one computer or on multiple computers that are located at one site or distributed across multiple sites and interconnected by a communication network.

The processes and logic flows described in this specification can be performed by one or more programmable processors executing one or more computer programs to perform actions by operating on input data and generating output. The processes and logic flows can also be performed by, and apparatus can also be implemented as, special purpose logic circuitry, e.g., an FPGA (field programmable gate array) or an ASIC (application specific integrated circuit).

Processors suitable for the execution of a computer program include, by way of example, both general and special purpose microprocessors, and any one or more processors of any kind of digital computer. Generally, a processor will receive instructions and data from a read only memory or a random access memory or both. The essential elements of a computer are a processor for performing actions in accordance with instructions and one or more memory devices for storing instructions and data. Generally, a computer will also include, or be operatively coupled to receive data from or transfer data to, or both, one or more mass storage devices for storing data, e.g., magnetic, magneto optical disks, or optical disks. However, a computer need not have such devices. Moreover, a computer can be embedded in another device, e.g., a mobile telephone, a personal digital assistant (PDA), a mobile audio or video player, a game console, a Global Positioning System (GPS) receiver, or a portable storage device (e.g., a universal serial bus (USB) flash drive), to name just a few. Devices suitable for storing computer program instructions and data include all forms of non volatile memory, media and memory devices, including

8

by way of example semiconductor memory devices, e.g., EPROM, EEPROM, and flash memory devices; magnetic disks, e.g., internal hard disks or removable disks; magneto optical disks; and CD ROM and DVD-ROM disks. The processor and the memory can be supplemented by, or incorporated in, special purpose logic circuitry.

To provide for interaction with a user, implementations of the subject matter described in this specification can be implemented on a computer having a display device, e.g., a CRT (cathode ray tube) or LCD (liquid crystal display) monitor, for displaying information to the user and a keyboard and a pointing device, e.g., a mouse or a trackball, by which the user can provide input to the computer. Other kinds of devices can be used to provide for interaction with a user as well; for example, feedback provided to the user can be any form of sensory feedback, e.g., visual feedback, auditory feedback, or tactile feedback; and input from the user can be received in any form, including acoustic, speech, or tactile input. In addition, a computer can interact with a user by sending resources to and receiving resources from a device that is used by the user; for example, by sending web pages to a web browser on a user's client device in response to requests received from the web browser.

Implementations of the subject matter described in this specification can be implemented in a computing system that includes a back end component, e.g., as a data server, or that includes a middleware component, e.g., an application server, or that includes a front end component, e.g., a client computer having a graphical user interface or a Web browser through which a user can interact with an implementation of the subject matter described in this specification, or any combination of one or more such back end, middleware, or front end components. The components of the system can be interconnected by any form or medium of digital data communication, e.g., a communication network. Examples of communication networks include a local area network ("LAN") and a wide area network ("WAN"), an internetwork (e.g., the Internet), and peer-to-peer networks (e.g., ad hoc peer-to-peer networks).

The computing system can include clients and servers. A client and server are generally remote from each other and typically interact through a communication network. The relationship of client and server arises by virtue of computer programs running on the respective computers and having a client-server relationship to each other. In some implementations, a server transmits data (e.g., an HTML page) to a client device (e.g., for purposes of displaying data to and receiving user input from a user interacting with the client device). Data generated at the client device (e.g., a result of the user interaction) can be received from the client device at the server.

A system of one or more computers can be configured to perform particular operations or actions by virtue of having software, firmware, hardware, or a combination of them installed on the system that in operation causes or cause the system to perform the actions. One or more computer programs can be configured to perform particular operations or actions by virtue of including instructions that, when executed by data processing apparatus, cause the apparatus to perform the actions.

While this specification contains many specific implementation details, these should not be construed as limitations on the scope of any inventions or of what may be claimed, but rather as descriptions of features specific to particular implementations of particular inventions. Certain features that are described in this specification in the context of separate implementations can also be implemented in

US 10,911,811 B1

9

combination in a single implementation. Conversely, various features that are described in the context of a single implementation can also be implemented in multiple implementations separately or in any suitable subcombination. Moreover, although features may be described above as acting in certain combinations and even initially claimed as such, one or more features from a claimed combination can in some cases be excised from the combination, and the claimed combination may be directed to a subcombination or variation of a subcombination.

Similarly, while operations are depicted in the drawings in a particular order, this should not be understood as requiring that such operations be performed in the particular order shown or in sequential order, or that all illustrated operations be performed, to achieve desirable results. In certain circumstances, multitasking and parallel processing may be advantageous. Moreover, the separation of various system components in the implementations described above should not be understood as requiring such separation in all implementations, and it should be understood that the described program components and systems can generally be integrated together in a single software product or packaged into multiple software products.

Thus, particular implementations of the subject matter have been described. Other implementations are within the scope of the following claims. In some cases, the actions recited in the claims can be performed in a different order and still achieve desirable results. In addition, the processes depicted in the accompanying figures do not necessarily require the particular order shown, or sequential order, to achieve desirable results. In certain implementations, multitasking and parallel processing may be advantageous.

Each numerical value presented herein, for example, in a table, a chart, or a graph, is contemplated to represent a minimum value or a maximum value in a range for a corresponding parameter. Accordingly, when added to the claims, the numerical value provides express support for claiming the range, which may lie above or below the numerical value, in accordance with the teachings herein. Absent inclusion in the claims, each numerical value presented herein is not to be considered limiting in any regard.

The terms and expressions employed herein are used as terms and expressions of description and not of limitation, and there is no intention, in the use of such terms and expressions, of excluding any equivalents of the features shown and described or portions thereof. In addition, having described certain embodiments of the invention, it will be apparent to those of ordinary skill in the art that other embodiments incorporating the concepts disclosed herein may be used without departing from the spirit and scope of the invention. The features and functions of the various embodiments may be arranged in various combinations and permutations, and all are considered to be within the scope of the disclosed invention. Accordingly, the described embodiments are to be considered in all respects as only illustrative and not restrictive. Furthermore, the configurations, materials, and dimensions described herein are intended as illustrative and in no way limiting. Similarly, although physical explanations have been provided for explanatory purposes, there is no intent to be bound by any particular theory or mechanism, or to limit the claims in accordance therewith.

What is claimed is:

**1**. A computer-implemented method for dynamically generating a network map, the method comprising:

10

receiving a schedule for a first plurality of live events scheduled to start at a first time and a second plurality of live events scheduled to start at a second time;

generating, based on the schedule, a network map mapping the first plurality of live events and the second plurality of live events to a plurality of television stations for a plurality of cities,

wherein each station from the plurality of stations corresponds to a respective city from the plurality of cities,

wherein the network map identifies for each station (i) a first live event from the first plurality of live events that will be displayed at the first time and (ii) a second live event from the second plurality of live events that will be displayed at the second time, and

wherein generating the network map comprises using a machine learning technique to optimize an overall television rating across the first plurality of live events and the second plurality of live events;

automatically updating the network map on demand and in real time based on a change to at least one of (i) the schedule and (ii) underlying criteria,

wherein updating the network map comprises updating the mapping of the first plurality of live events and the second plurality of live events to the plurality of television stations; and

using the network map to determine for each station (i) the first live event from the first plurality of live events that will be displayed at the first time and (ii) the second live event from the second plurality of live events that will be displayed at the second time.

**2**. The method of claim **1**, wherein the first plurality of live events and the second plurality of live events comprise sporting events.

**3**. The method of claim **2**, wherein the sporting events comprise NFL games.

**4**. The method of claim **1**, wherein the network map comprises a description of which event will be displayed on which station at a particular time.

**5**. The method of claim **1**, wherein the change to the schedule comprises a manual change performed by a user.

**6**. The method of claim **1**, wherein generating the network map comprises generating the network map based on at least one of weather data, news data, or gambling data.

**7**. The method of claim **1**, wherein the step of automatically updating the network map comprises optimizing the network map based on a particular parameter.

**8**. The method of claim **7**, wherein the particular parameter comprises the overall rating or a projected rating in a certain market for the plurality of television stations.

**9**. The method of claim **1**, further comprising, prior to the receiving step, generating the schedule for the first plurality of live events and the second plurality of live events.

**10**. The method of claim **1**, wherein the automatically updating step comprises generating multiple network maps based on multiple user entered changes.

**11**. The method of claim **1**, wherein the first time and the second time occur on a same day.

**12**. A system for dynamically generating a network map, the system comprising:

one or more computer processors programmed to perform operations comprising:

receiving a schedule for a first plurality of live events scheduled to start at a first time and a second plurality of live events scheduled to start at a second time;

US 10,911,811 B1

11

generating, based on the schedule, a network map mapping the first plurality of live events and the second plurality of live events to a plurality of television stations for a plurality of cities,

wherein each station from the plurality of stations corresponds to a respective city from the plurality of cities,

wherein the network map identifies for each station (i) a first live event from the first plurality of live events that will be displayed at the first time and (ii) a second live event from the second plurality of live events that will be displayed at the second time, and

wherein generating the network map comprises using a machine learning technique to optimize an overall television rating across the first plurality of live events and the second plurality of live events;

automatically updating the network map on demand and in real time based on a change to at least one of (i) the schedule and (ii) underlying criteria,

wherein updating the network map comprises updating the mapping of the first plurality of live events and the second plurality of live events to the plurality of television stations; and

using the network map to determine for each station (i) the first live event from the first plurality of live

12

events that will be displayed at the first time and (ii) the second live event from the second plurality of live events that will be displayed at the second time.

13. The system of claim 12, wherein the first plurality of live events and the second plurality of live events comprise sporting events.

14. The system of claim 12, wherein the network map comprises a description of which event will be displayed on which station at a particular time.

15. The system of claim 12, wherein generating the network map comprises generating the network map based on at least one of weather data, news data, or gambling data.

16. The system of claim 12, wherein automatically updating the network map comprises optimizing the network map based on the overall television rating or a projected rating in a certain market for the plurality of television stations.

17. The system of claim 12, wherein the operations further comprise, prior to receiving step, generating the schedule for the first plurality of live events and the second plurality of live events.

18. The system of claim 12, wherein the automatically updating operation comprises generating multiple network maps based on multiple user entered changes.

19. The system of claim 12, wherein the first time and the second time occur on a same day.

*  *  *  *  *

US010958957B1

(12) **United States Patent**           (10) Patent No.:    **US 10,958,957 B1**
Tabrizi et al.                           (45) Date of Patent:    ***Mar. 23, 2021***

(54) **SYSTEMS AND METHODS FOR AUTOMATICALLY AND DYNAMICALLY GENERATING A NETWORK MAP**

(71) Applicant: **Recentive Analytics, Inc.**, Boston, MA (US)

(72) Inventors: **Andysheh Tabrizi**, Boston, MA (US); **Evan Charles Smith**, Lexington, MA (US)

(73) Assignee: **Recentive Analytics, Inc.**, Boston, MA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **17/112,110**

(22) Filed: **Dec. 4, 2020**

**Related U.S. Application Data**

(63) Continuation of application No. 16/598,480, filed on Oct. 10, 2019, now Pat. No. 10,911,811.

(51) **Int. Cl.**
| *H04N 21/262* | (2011.01) |
| *H04N 21/84* | (2011.01) |
| *H04N 21/24* | (2011.01) |
| *H04N 21/2187* | (2011.01) |

(52) **U.S. Cl.**
CPC ... *H04N 21/26283* (2013.01); *H04N 21/2187* (2013.01); *H04N 21/24* (2013.01); *H04N 21/84* (2013.01)

(58) **Field of Classification Search**
CPC ............... H04N 21/2187; H04N 21/24; H04N 21/26283; H04N 21/84
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| 6,536,041 | B1 * | 3/2003 | Knudson | ............... | H04N 21/235 725/39 |
| 2001/0000194 | A1 * | 4/2001 | Sequeira | ............... | H04N 21/854 725/39 |
| 2005/0088407 | A1 * | 4/2005 | Bell | ..................... | H04N 21/812 345/156 |
| 2019/0297381 | A1 * | 9/2019 | Chung | ..................... | G06N 3/08 |

OTHER PUBLICATIONS

https://the506.com, "NFL 2011", Apr. 25, 2012, https://the506.com/nflmaps/2011.html, pp. 1-3 (Year: 2012).*

* cited by examiner

*Primary Examiner* — Nicholas T Corbo
(74) *Attorney, Agent, or Firm* — Goodwin Procter LLP

(57) **ABSTRACT**

This application relates to systems and techniques for automatically and/or dynamically generating a network map. The network map can be updated based on a changed condition, which can include, among other things, a change in the underlying schedule and/or underlying data (e.g., weather data, news data, etc.). The network map can be updated in real time and/or in accordance with a predetermined schedule.

**26 Claims, 4 Drawing Sheets**

| station | 1pm game | 4pm game | state | city |
|---|---|---|---|---|
| DWAY | BAL-KC | HOU-LAC | NC | Wilmington |
| EENY | NYJ-NE | PIT-SF | NY | Elmira-corning |
| EKTV | NYJ-NE | PIT-SF | NY | Utica |
| ELOX | ATL-IND | NO-SEA | MS | Biloxi |
| EOHL | CIN-BUF | HOU-LAC | OH | Lima |
| ESVF | BAL-KC | PIT-SF | VA | Harrisonburg |
| GBBJ | BAL-KC | NO-SEA | TN | Jackson |
| KAJ | BAL-KC | HOU-LAC | MT | Kalispell |
| KAUZ | DET-PHI | PIT-SF | TX | Wichita Falls |
| KBAK | DET-PHI | HOU-LAC | CA | Bakersfield |
| KBIM | BAL-KC | PIT-SF | NM | Roswell |
| KBNZ | BAL-KC | PIT-SF | OR | Bend |
| KBOI | CIN-BUF | NO-SEA | ID | Boise |
| KBSD | BAL-KC | NO-SEA | KS | Dodge City/Ensign |
| KBSH | BAL-KC | NO-SEA | KS | Hays |
| KBSL | BAL-KC | NO-SEA | KS | Goodland |
| KBTX | BAL-KC | HOU-LAC | TX | Bryan |
| KBZK | BAL-KC | HOU-LAC | MT | Bozeman |
| KCBS | BAL-KC | HOU-LAC | CA | Los Angeles |
| KCBY | BAL-KC | PIT-SF | OR | Coos Bay |
| KCCI | BAL-KC | HOU-LAC | IA | Des Moines |

Case 1:22-cv-01545-GBW    Document 13-3    Filed 02/24/23    Page 3 of 12 PageID #: 244

**U.S. Patent**    Mar. 23, 2021    Sheet 1 of 4    **US 10,958,957 B1**



FIG. 1A



FIG. 1B

**U.S. Patent**    Mar. 23, 2021    Sheet 2 of 4    US 10,958,957 B1



FIG. 2A

| station | 1pm game | 4pm game | state | city |
|---------|----------|----------|-------|------|
| DWAY | BAL-KC | HOU-LAC | NC | Wilmington |
| EENY | NYJ-NE | PIT-SF | NY | Elmira-corning |
| EKTV | NYJ-NE | PIT-SF | NY | Utica |
| ELOX | ATL-IND | NO-SEA | MS | Biloxi |
| EOHL | CIN-BUF | HOU-LAC | OH | Lima |
| ESVF | BAL-KC | PIT-SF | VA | Harrisonburg |
| GBBJ | BAL-KC | NO-SEA | TN | Jackson |
| KAJ | BAL-KC | HOU-LAC | MT | Kalispell |
| KAUZ | DET-PHI | PIT-SF | TX | Wichita Falls |
| KBAK | DET-PHI | HOU-LAC | CA | Bakersfield |
| KBIM | BAL-KC | PIT-SF | NM | Roswell |
| KBNZ | BAL-KC | PIT-SF | OR | Bend |
| KBOI | CIN-BUF | NO-SEA | ID | Boise |
| KBSD | BAL-KC | NO-SEA | KS | Dodge City/Ensign |
| KBSH | BAL-KC | NO-SEA | KS | Hays |
| KBSL | BAL-KC | NO-SEA | KS | Goodland |
| KBTX | BAL-KC | HOU-LAC | TX | Bryan |
| KBZK | BAL-KC | HOU-LAC | MT | Bozeman |
| KCBS | BAL-KC | HOU-LAC | CA | Los Angeles |
| KCBY | BAL-KC | PIT-SF | OR | Coos Bay |
| KCCI | BAL-KC | HOU-LAC | IA | Des Moines |

FIG. 2B

**Appx125**



FIG. 3A

Map on September 8, 2019:

| station | 1pm game | 4pm game | state | city |
|---|---|---|---|---|
| KABB | SF-WSH | NO-CHI | TX | San Antonio |
| KADN | LAR-ATL | NO-CHI | LA | Lafayette |
| KARD | LAR-ATL | NO-CHI | LA | Monroe |
| KATN | MIN-DET | NO-CHI | AK | Fairbanks |
| KAYU | SF-WSH | BAL-SEA | WA | Spokane |
| KBFX | LAR-ATL | NO-CHI | CA | Bakersfield |
| KBSI | MIN-DET | NO-CHI | KY | Paducah |
| KBTV | SF-WSH | NO-CHI | TX | Beaumont |
| KBVU | SF-WSH | NO-CHI | CA | Eureka |
| KCBA | SF-WSH | NO-CHI | CA | Monterey |
| KCIT | LAR-ATL | NO-CHI | TX | Amarillo |
| KCPQ | SF-WSH | BAL-SEA | WA | Seattle |
| KCVU | SF-WSH | NO-CHI | CA | Chico |
| KCYU | SF-WSH | BAL-SEA | WA | Yakima |
| KDFW | AZ-NYG | NO-CHI | TX | Dallas |
| KDFX | LAR-ATL | NO-CHI | CA | Palm Springs |
| KDSM | MIN-DET | NO-CHI | IA | Des Moines |
| KDVR | MIN-DET | NO-CHI | CO | Denver |
| KECY | AZ-NYG | NO-CHI | AZ | Yuma |

FIG. 3B

Map on September 17, 2019:

| station | 1pm game | 4pm game | state | city |
|---|---|---|---|---|
| KABB | SF-WSH | BAL-SEA | TX | San Antonio |
| KADN | LAR-ATL | NO-CHI | LA | Lafayette |
| KARD | LAR-ATL | NO-CHI | LA | Monroe |
| KATN | MIN-DET | NO-CHI | AK | Fairbanks |
| KAYU | AZ-NYG | BAL-SEA | WA | Spokane |
| KBFX | LAR-ATL | NO-CHI | CA | Bakersfield |
| KBSI | MIN-DET | NO-CHI | KY | Paducah |
| KBTV | SF-WSH | NO-CHI | TX | Beaumont |
| KBVU | SF-WSH | NO-CHI | CA | Eureka |
| KCBA | LAR-ATL | BAL-SEA | CA | Monterey |
| KCIT | SF-WSH | NO-CHI | TX | Amarillo |
| KCPQ | SF-WSH | BAL-SEA | WA | Seattle |
| KCVU | LAR-ATL | NO-CHI | CA | Chico |
| KCYU | AZ-NYG | BAL-SEA | WA | Yakima |
| KDFW | AZ-NYG | BAL-SEA | TX | Dallas |
| KDFX | LAR-ATL | NO-CHI | CA | Palm Springs |
| KDSM | MIN-DET | BAL-SEA | IA | Des Moines |
| KDVR | MIN-DET | NO-CHI | CO | Denver |
| KECY | AZ-NYG | BAL-SEA | AZ | Yuma |

FIG. 3C



FIG. 4

US 10,958,957 B1

**1**

# SYSTEMS AND METHODS FOR AUTOMATICALLY AND DYNAMICALLY GENERATING A NETWORK MAP

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 16/598,480, filed Oct. 10, 2019, the entire contents of which are incorporated by reference herein.

## TECHNICAL FIELD

In general, various embodiments of this invention relate to the generation of network maps and, specifically, to a technique for automatically and dynamically generating a network map based on changing conditions.

## BACKGROUND

Many events require the generation of a network map. As used herein, the term network map refers to a schedule that outlines which content will be displayed on which channel at a certain time. As one example, the National Football League® ("NFL") needs to generate a network map for the numerous NFL football games played on Sundays, many of which are played simultaneously. The NFL needs to determine which content (games) will be displayed on which channel (television channels) at which times (usually 1 pm and 4 pm ET). The current system for generating such maps has several negative features. For example, the current process is entirely manual, static and incapable of responding to changing conditions, fixed on one default configuration and unable to consider multiple possible schedule permutations or configurations, and unable to forecast the impact of a proposed schedule change.

Accordingly, there exists a need for an improved technique for generating network maps.

## SUMMARY OF THE INVENTION

This application describes an improved technique for generating a network map that solves many of the drawbacks of conventional techniques. In particular, aspects of the present invention relate to an automated technique for generating a network map. In some instances, the technique is automated such that it is generated based on a computer algorithm designed to optimize a certain parameter (e.g., highest overall projected ratings, highest projected ratings in a particular market, etc.). In addition, in some implementations, the algorithm is based on real time data and the map can be dynamically updated based on changing conditions (e.g., an adjusted schedule, weather data, news data, etc., described in more detail below). In general, this application will describe generation of a network map using the example of the network map required for the NFL's Sunday games. However, the invention is broader than this example and can be applied to the generation of a network map for any type of content (e.g., any sporting event, such as NBA, MLB, NHL, MLS games, the Olympics, golf matches, etc. and non-sporting events such as dramatic television programs, movies, live streaming events, etc.) distributed across any type of channel (e.g., television channels, radio, internet, and in person events (e.g., at music festivals, conventions, etc.)).

In general, in one aspect, embodiments of the invention feature a computer-implemented method for dynamically generating a network map. The method can include the steps

**2**

of receiving a schedule for a plurality of events; generating a network map based on the schedule; and automatically updating the network map based on at least one of (i) a change to the schedule and (ii) updated data.

In various embodiments, the plurality of events can include sporting events (e.g., NFL games). In some instances, the network map includes a description of which event will be displayed on which channel at a particular time. In some cases, the channel includes a television channel. The change to the schedule can include a manual change performed by a user. The updated data can include weather data, news data, gambling data, among many others. In some instances, the step of automatically updating the network map includes optimizing the network map based on a particular parameter (e.g., projected overall rating or projected rating in a certain market). The step of automatically updating the network map can occur in real time. In some implementations, the step of automatically updating the network map can include using a machine learning technique. The method can also include, prior to the receiving step, generating the schedule for the plurality of events. In some cases, the step of generating the schedule can include using a machine learning technique.

In general, in another aspect, embodiments of the invention feature a system for dynamically generating a network map. The system can include one or more computers programmed to perform operations that include: receiving a schedule for a plurality of events; generating a network map based on the schedule; and automatically updating the network map based on at least one of (i) a change to the schedule and (ii) updated data.

In various embodiments, the plurality of events include sporting events. In some instances, the network map includes a description of which event will be displayed on which channel at a particular time. In some instances, the updated data includes weather data, news data, and/or gambling data, among many other types of data. In some implementations, automatically updating the network map includes optimizing the network map based on a particular parameter. The step of automatically updating the network map can occur in real time. In some implementations, the operations can also include, prior to the receiving step, generating the schedule for the plurality of events.

## BRIEF DESCRIPTION OF THE FIGURES

In the drawings, like reference characters generally refer to the same parts throughout the different views. Also, the drawings are not necessarily to scale, emphasis instead generally being placed upon illustrating the principles of the invention. In the following description, various embodiments of the present invention are described with reference to the following drawings, in which:

FIG. **1**A is an example graphical user interface illustrating an NFL Sunday game schedule;

FIG. **1**B is an example network map generated for the schedule shown in FIG. **1**A;

FIG. **2**A is an example graphical user interface illustrating an NFL Sunday game schedule that has been modified from the schedule shown in FIG. **1**A;

FIG. **2**B is an example network map generated for the schedule shown in FIG. **2**A;

FIG. **3**A is an example graphical user interface illustrating another NFL Sunday game schedule;

FIG. **3**B is an example network map generated for the schedule shown in FIG. **3**A at a first point in time;

US 10,958,957 B1

3

FIG. **3**C is an example network map generated for the schedule shown in FIG. **3**A at a second point in time, different than the first point in time shown in FIG. **3**B; and

FIG. **4** illustrates an example computer system that can perform certain implementations of the techniques described herein.

DESCRIPTION

Embodiments of the present invention are directed to an improved technique for generating a network map. As stated above, the term network map refers to a schedule that outlines which content will be displayed on a certain channel at a certain time. Generally, a network map is based upon an underlying schedule for a plurality of events. For example, the underlying schedule can be a schedule for the NFL's Sunday games, as shown in FIG. **1**A. In some instances, the underlying schedule can be generated using a conventional technique, e.g., manually. In other instances, the underlying schedule is generated using an automated technique. For example, the automated technique can include a computer algorithm designed to optimize a particular parameter, such as overall television ratings for the NFL across all games, ratings for the NFL with a particular affiliate (CBS or FOX), ratings for the NFL in a particular market, with a particular audience, or at a particular time. As shown in FIG. **1**A, the projected overall ratings for the 1 pm and 4 pm games on each of CBS and FOX are shown in the bottom row and the total overall NFL ratings across all games is centered underneath. Many other parameters are possible and contemplated.

In certain implementations, the computer algorithm can be developed using a machine learning technique. In general, any suitable machine learning technique can be used, for example, a gradient boosted random forest, a regression, a neural network, a decision tree, a support vector machine, a Bayesian network, etc., as just a few examples. The machine learning technique can be trained using any suitable training data. A few non-limiting examples include weather data, news data, and/or gambling data (e.g., odds data generated by sports books).

Regardless of how the underlying schedule is generated, implementations of the present invention can automatically generate a network map that describes which games will be shown on which channels at which time. FIG. **1**B shows an example network map for the schedule shown in FIG. **1**A. In FIG. **1**B the leftmost column lists a television channel (in this example affiliates of CBS or FOX in various cities), the column titled 1 pm game lists the games to be displayed at 1 pm, and the column titled 4 pm game lists the games to be displayed at 4 pm. In some cases, separate network maps can be generated for affiliates of a particular broadcaster (e.g., CBS, FOX, etc.). As shown in FIG. **1**A, a user can select a first icon to generate a CBS-affiliate network map and a different icon to generate a FOX-affiliate network map.

In general, the network map can be automatically generated using any suitable technique. In some implementations, the network map is generated so as to optimize a particular parameter. This parameter can be the same parameter or a different parameter as the parameters described above used to generate the underlying schedule. For example, overall television ratings for the NFL across all games, ratings for the NFL with a particular affiliate (CBS or FOX), ratings for the NFL in a particular market, with a particular audience, or at a particular time. The network map can also be generated based on certain criteria or rules (e.g., user submitted rules). In general any rule can be used. As one example a user may

4

say that a particular game cannot be shown in a particular market regardless of what the other data indicates (e.g., NE-BAL can never be shown in Orlando).

In some embodiments, the network map can be dynamically updated based on changing conditions. In general, any changed condition can result in an update to the network map. For example, a change in the underlying schedule can result in an update to the network, as illustrated in FIGS. **2**A-**2**B. FIG. **2**A shows a NFL game schedule with a change made from the schedule shown in FIG. **1**A. In particular, the DET-PHI game has been moved from the 1 pm FOX slot (FIG. **1**A) to the 1 pm CBS slot (FIG. **2**A). This change in schedule can be done manually by a user or it can be done automatically based on the techniques described above. The change in the underlying schedule can cause an automatic update to the network map, as illustrated in FIG. **2**B. With reference to stations KAUZ and KBAK, in the FIG. **1**B network map these stations are scheduled to display the NYJ-NE game; however, once the change to the schedule occurs, in the FIG. **2**B network maps these stations are scheduled to display the DET-PHI game. This update is made automatically and dynamically because the algorithm used to determine the network map now optimizes the DET-PHI game on the KAUZ and KBAK stations at 1 pm over the NYJ-NE game. Changes to the underlying schedule can also result in other automatic updates. For example, comparing FIG. **1**A to FIG. **2**A shows that the change in the DET-PHI game resulted in adjusted projections (both for each game slot and the total projections).

The network map can also be dynamically updated based on changing data, e.g., the data underlying the algorithm that automatically generates the network map. In general, changes to any type of data underlying the algorithm can result in a change to the network map. As one non-limiting example to illustrate the concept, the algorithm may rely on weather data and have a preference for displaying games in markets where the weather forecast is cold, because more people are likely stay inside and watch television if the weather is cold. If, however, the weather forecast changes such that a market where it was originally forecast to be cold is now forecast to be warm, the algorithm may determine that a different game should be displayed in that market. Many additional examples are possible, based on any type of changing underlying data.

A comparison of FIGS. **3**B and **3**C illustrates this concept. The network map shown in FIG. **3**B was generated on Sep. 8, 2019 and the network map shown in FIG. **3**C was generated on Sep. 17, 2019. The network maps are different without any change to the underlying schedule shown in FIG. **3**A. The cause of these changes is changes in the data underlying the algorithm that automatically generates the network map, e.g., weather data, news data, gambling data, etc.

The system can be configured such that the network map is updated in real time. In some instances, the network map may be updated in accordance with a predetermined schedule. For example, the network map can be updated with a predetermined frequency (e.g., every minute, every hour, every day, etc.) until a predetermined amount of time before the games are played (e.g., 1 day, 1 week, etc.) at which point the network map is locked in. In other instances, the networks can display games based on updates that occur during the games. So, if the underlying data changes mid-game such that a different game should be displayed in a particular market, the network can switch the broadcast at that time.

US 10,958,957 B1

5

In some embodiments, the network maps can be archived according to a predetermined schedule (e.g., every hour, every day, etc.). This archiving can allow a user to determine and view how the map has changed over time.

In various embodiments, the inventive system described herein can also automatically generate reports and analytics based on the generated network maps. Example information in these reports can include summary statistics (e.g., percentage of the country that views a particular game, e.g., NE-BAL viewed by 43% of stations, GB-SF viewed by 57% of stations, etc.), thematic trend analysis (e.g., changes in bet wagers on a particular team, changes in merchandise sales, etc.), among many other types of information.

Operating Apparatus

FIG. 4 shows an example of a generic computing device 450, which may be used with the techniques described in this disclosure. Computing device 450 includes a processor 452, memory 464, an input/output device such as a display 454, a communication interface 466, and a transceiver 468, among other components. The device 450 may also be provided with a storage device, such as a microdrive or other device, to provide additional storage. Each of the components 450, 452, 464, 454, 466, and 468, are interconnected using various buses, and several of the components may be mounted on a common motherboard or in other manners as appropriate.

The processor 452 can execute instructions within the computing device 450, including instructions stored in the memory 464. The processor may be implemented as a chipset of chips that include separate and multiple analog and digital processors. The processor may provide, for example, for coordination of the other components of the device 450, such as control of user interfaces, applications run by device 450, and wireless communication by device 450.

Processor 452 may communicate with a user through control interface 458 and display interface 456 coupled to a display 454. The display 454 may be, for example, a TFT LCD (Thin-Film-Transistor Liquid Crystal Display) or an OLED (Organic Light Emitting Diode) display, or other appropriate display technology. The display interface 456 may comprise appropriate circuitry for driving the display 454 to present graphical and other information to a user. The control interface 458 may receive commands from a user and convert them for submission to the processor 452. In addition, an external interface 462 may be provided in communication with processor 452, so as to enable near area communication of device 450 with other devices. External interface 462 may provide, for example, for wired communication in some implementations, or for wireless communication in other implementations, and multiple interfaces may also be used.

The memory 464 stores information within the computing device 450. The memory 464 can be implemented as one or more of a computer-readable medium or media, a volatile memory unit or units, or a non-volatile memory unit or units. Expansion memory 474 may also be provided and connected to device 450 through expansion interface 472, which may include, for example, a SIMM (Single In Line Memory Module) card interface. Such expansion memory 474 may provide extra storage space for device 450, or may also store applications or other information for device 450. Specifically, expansion memory 474 may include instructions to carry out or supplement the processes described above, and may include secure information also. Thus, for example, expansion memory 474 may be provided as a security module for device 450, and may be programmed with

6

instructions that permit secure use of device 450. In addition, secure applications may be provided via the SIMM cards, along with additional information, such as placing identifying information on the SIMM card in a non-hackable manner.

The memory may include, for example, flash memory and/or NVRAM memory, as discussed below. In one implementation, a computer program product is tangibly embodied in an information carrier. The computer program product contains instructions that, when executed, perform one or more methods, such as those described above. The information carrier is a computer- or machine-readable medium, such as the memory 464, expansion memory 474, memory on processor 452, or a propagated signal that may be received, for example, over transceiver 468 or external interface 462.

Device 450 may communicate wirelessly through communication interface 466, which may include digital signal processing circuitry where necessary. Communication interface 466 may in some cases be a cellular modem. Communication interface 466 may provide for communications under various modes or protocols, such as GSM voice calls, SMS, EMS, or MMS messaging, CDMA, TDMA, PDC, WCDMA, CDMA2000, or GPRS, among others. Such communication may occur, for example, through radio-frequency transceiver 468. In addition, short-range communication may occur, such as using a Bluetooth, WiFi, or other such transceiver (not shown). In addition, GPS (Global Positioning System) receiver module 470 may provide additional navigation- and location-related wireless data to device 450, which may be used as appropriate by applications running on device 450.

Device 450 may also communicate audibly using audio codec 460, which may receive spoken information from a user and convert it to usable digital information. Audio codec 460 may likewise generate audible sound for a user, such as through a speaker, e.g., in a handset of device 450. Such sound may include sound from voice telephone calls, may include recorded sound (e.g., voice messages, music files, etc.) and may also include sound generated by applications operating on device 450.

The computing device 450 may be implemented in a number of different forms, as shown in FIG. 4. For example, it may be implemented as a cellular telephone 480. It may also be implemented as part of a smartphone 482, smart watch, personal digital assistant, or other similar mobile device.

Operating Environment

Implementations of the subject matter and the operations described in this specification can be implemented in digital electronic circuitry, or in computer software, firmware, or hardware, including the structures disclosed in this specification and their structural equivalents, or in combinations of one or more of them. Implementations of the subject matter described in this specification can be implemented as one or more computer programs, i.e., one or more modules of computer program instructions, encoded on computer storage medium for execution by, or to control the operation of, data processing apparatus. Alternatively or in addition, the program instructions can be encoded on an artificially generated propagated signal, e.g., a machine-generated electrical, optical, or electromagnetic signal, that is generated to encode information for transmission to suitable receiver apparatus for execution by a data processing apparatus. A computer storage medium can be, or be included in, a computer-readable storage device, a computer-readable storage substrate, a random or serial access memory array or

US 10,958,957 B1

**7**

device, or a combination of one or more of them. Moreover, while a computer storage medium is not a propagated signal, a computer storage medium can be a source or destination of computer program instructions encoded in an artificially generated propagated signal. The computer storage medium can also be, or be included in, one or more separate physical components or media (e.g., multiple CDs, disks, or other storage devices).

The operations described in this specification can be implemented as operations performed by a data processing apparatus on data stored on one or more computer-readable storage devices or received from other sources.

The term "data processing apparatus" encompasses all kinds of apparatus, devices, and machines for processing data, including by way of example a programmable processor, a computer, a system on a chip, or multiple ones, or combinations, of the foregoing. The apparatus can include special purpose logic circuitry, e.g., an FPGA (field programmable gate array) or an ASIC (application specific integrated circuit). The apparatus can also include, in addition to hardware, code that creates an execution environment for the computer program in question, e.g., code that constitutes processor firmware, a protocol stack, a database management system, an operating system, a cross-platform runtime environment, a virtual machine, or a combination of one or more of them. The apparatus and execution environment can realize various different computing model infrastructures, such as web services, distributed computing and grid computing infrastructures.

A computer program (also known as a program, software, software application, script, or code) can be written in any form of programming language, including compiled or interpreted languages, declarative or procedural languages, and it can be deployed in any form, including as a stand alone program or as a module, component, subroutine, object, or other unit suitable for use in a computing environment. A computer program may, but need not, correspond to a file in a file system. A program can be stored in a portion of a file that holds other programs or data (e.g., one or more scripts stored in a markup language resource), in a single file dedicated to the program in question, or in multiple coordinated files (e.g., files that store one or more modules, sub programs, or portions of code). A computer program can be deployed to be executed on one computer or on multiple computers that are located at one site or distributed across multiple sites and interconnected by a communication network.

The processes and logic flows described in this specification can be performed by one or more programmable processors executing one or more computer programs to perform actions by operating on input data and generating output. The processes and logic flows can also be performed by, and apparatus can also be implemented as, special purpose logic circuitry, e.g., an FPGA (field programmable gate array) or an ASIC (application specific integrated circuit).

Processors suitable for the execution of a computer program include, by way of example, both general and special purpose microprocessors, and any one or more processors of any kind of digital computer. Generally, a processor will receive instructions and data from a read only memory or a random access memory or both. The essential elements of a computer are a processor for performing actions in accordance with instructions and one or more memory devices for storing instructions and data. Generally, a computer will also include, or be operatively coupled to receive data from or transfer data to, or both, one or more mass storage devices

**8**

for storing data, e.g., magnetic, magneto optical disks, or optical disks. However, a computer need not have such devices. Moreover, a computer can be embedded in another device, e.g., a mobile telephone, a personal digital assistant (PDA), a mobile audio or video player, a game console, a Global Positioning System (GPS) receiver, or a portable storage device (e.g., a universal serial bus (USB) flash drive), to name just a few. Devices suitable for storing computer program instructions and data include all forms of non volatile memory, media and memory devices, including by way of example semiconductor memory devices, e.g., EPROM, EEPROM, and flash memory devices; magnetic disks, e.g., internal hard disks or removable disks; magneto optical disks; and CD ROM and DVD-ROM disks. The processor and the memory can be supplemented by, or incorporated in, special purpose logic circuitry.

To provide for interaction with a user, implementations of the subject matter described in this specification can be implemented on a computer having a display device, e.g., a CRT (cathode ray tube) or LCD (liquid crystal display) monitor, for displaying information to the user and a keyboard and a pointing device, e.g., a mouse or a trackball, by which the user can provide input to the computer. Other kinds of devices can be used to provide for interaction with a user as well; for example, feedback provided to the user can be any form of sensory feedback, e.g., visual feedback, auditory feedback, or tactile feedback; and input from the user can be received in any form, including acoustic, speech, or tactile input. In addition, a computer can interact with a user by sending resources to and receiving resources from a device that is used by the user; for example, by sending web pages to a web browser on a user's client device in response to requests received from the web browser.

Implementations of the subject matter described in this specification can be implemented in a computing system that includes a back end component, e.g., as a data server, or that includes a middleware component, e.g., an application server, or that includes a front end component, e.g., a client computer having a graphical user interface or a Web browser through which a user can interact with an implementation of the subject matter described in this specification, or any combination of one or more such back end, middleware, or front end components. The components of the system can be interconnected by any form or medium of digital data communication, e.g., a communication network. Examples of communication networks include a local area network ("LAN") and a wide area network ("WAN"), an internetwork (e.g., the Internet), and peer-to-peer networks (e.g., ad hoc peer-to-peer networks).

The computing system can include clients and servers. A client and server are generally remote from each other and typically interact through a communication network. The relationship of client and server arises by virtue of computer programs running on the respective computers and having a client-server relationship to each other. In some implementations, a server transmits data (e.g., an HTML page) to a client device (e.g., for purposes of displaying data to and receiving user input from a user interacting with the client device). Data generated at the client device (e.g., a result of the user interaction) can be received from the client device at the server.

A system of one or more computers can be configured to perform particular operations or actions by virtue of having software, firmware, hardware, or a combination of them installed on the system that in operation causes or cause the system to perform the actions. One or more computer programs can be configured to perform particular operations

US 10,958,957 B1

9

or actions by virtue of including instructions that, when executed by data processing apparatus, cause the apparatus to perform the actions.

While this specification contains many specific implementation details, these should not be construed as limitations on the scope of any inventions or of what may be claimed, but rather as descriptions of features specific to particular implementations of particular inventions. Certain features that are described in this specification in the context of separate implementations can also be implemented in combination in a single implementation. Conversely, various features that are described in the context of a single implementation can also be implemented in multiple implementations separately or in any suitable subcombination. Moreover, although features may be described above as acting in certain combinations and even initially claimed as such, one or more features from a claimed combination can in some cases be excised from the combination, and the claimed combination may be directed to a subcombination or variation of a subcombination.

Similarly, while operations are depicted in the drawings in a particular order, this should not be understood as requiring that such operations be performed in the particular order shown or in sequential order, or that all illustrated operations be performed, to achieve desirable results. In certain circumstances, multitasking and parallel processing may be advantageous. Moreover, the separation of various system components in the implementations described above should not be understood as requiring such separation in all implementations, and it should be understood that the described program components and systems can generally be integrated together in a single software product or packaged into multiple software products.

Thus, particular implementations of the subject matter have been described. Other implementations are within the scope of the following claims. In some cases, the actions recited in the claims can be performed in a different order and still achieve desirable results. In addition, the processes depicted in the accompanying figures do not necessarily require the particular order shown, or sequential order, to achieve desirable results. In certain implementations, multitasking and parallel processing may be advantageous.

Each numerical value presented herein, for example, in a table, a chart, or a graph, is contemplated to represent a minimum value or a maximum value in a range for a corresponding parameter. Accordingly, when added to the claims, the numerical value provides express support for claiming the range, which may lie above or below the numerical value, in accordance with the teachings herein. Absent inclusion in the claims, each numerical value presented herein is not to be considered limiting in any regard.

The terms and expressions employed herein are used as terms and expressions of description and not of limitation, and there is no intention, in the use of such terms and expressions, of excluding any equivalents of the features shown and described or portions thereof. In addition, having described certain embodiments of the invention, it will be apparent to those of ordinary skill in the art that other embodiments incorporating the concepts disclosed herein may be used without departing from the spirit and scope of the invention. The features and functions of the various embodiments may be arranged in various combinations and permutations, and all are considered to be within the scope of the disclosed invention. Accordingly, the described embodiments are to be considered in all respects as only illustrative and not restrictive. Furthermore, the configurations, materials, and dimensions described herein are

10

intended as illustrative and in no way limiting. Similarly, although physical explanations have been provided for explanatory purposes, there is no intent to be bound by any particular theory or mechanism, or to limit the claims in accordance therewith.

What is claimed is:

**1**. A computer-implemented method for dynamically generating a network map, the method comprising:

obtaining a schedule for a first plurality of events scheduled to start at a first time and a second plurality of events scheduled to start at a second time;

generating, based on the schedule, a network map mapping the first plurality of events and the second plurality of events to a plurality of television stations for a plurality of cities,

wherein each station from the plurality of stations corresponds to a respective city from the plurality of cities,

wherein the network map identifies for each station (i) a first event from the first plurality of events that will be displayed at the first time and (ii) a second event from the second plurality of events that will be displayed at the second time, and

wherein generating the network map comprises using a machine learning technique to optimize an overall television rating across the first plurality of events and the second plurality of events;

automatically updating the network map on demand and in real time based on a change to at least one of (i) the schedule and (ii) underlying criteria,

wherein updating the network map comprises updating the mapping of the first plurality of events and the second plurality of events to the plurality of television stations; and

using the network map to determine for each station (i) the first event from the first plurality of events that will be displayed at the first time and (ii) the second event from the second plurality of events that will be displayed at the second time.

**2**. The method of claim **1**, wherein the first plurality of events and the second plurality of events comprise at least one live event.

**3**. The method of claim **1**, wherein the first plurality of events and the second plurality of events comprise sporting events.

**4**. The method of claim **3**, wherein the sporting events comprise at least one NFL game, NBA game, MLB game, NHL game, MLS game, OLYMPIC event, or golf match.

**5**. The method of claim **1**, wherein the first plurality of events and the second plurality of events comprise non-sporting events.

**6**. The method of claim **5**, wherein the non-sporting events comprise at least one dramatic television program, movie, or live streaming event.

**7**. The method of claim **1**, wherein generating the network map comprises generating the network map based on at least one of weather data, news data, or gambling data.

**8**. The method of claim **1**, wherein the step of automatically updating the network map comprises optimizing the network map based on a particular parameter.

**9**. The method of claim **8**, wherein the particular parameter comprises the overall television rating or a projected rating in a certain market for the plurality of television stations.

**10**. The method of claim **1**, wherein the network map is automatically updated based on the change to the schedule.

Appx132

US 10,958,957 B1

11

**11**. The method of claim **1**, wherein the network map is automatically updated based on the change to the underlying criteria, and wherein the underlying criteria comprise a user-submitted rule.

**12**. The method of claim **1**, further comprising, prior to the obtaining step, generating the schedule for the first plurality of events and the second plurality of events.

**13**. The method of claim **1**, wherein the first time and the second time occur on a same day.

**14**. A system for dynamically generating a network map, the system comprising:

one or more computer processors programmed to perform operations comprising:

obtaining a schedule for a first plurality of events scheduled to start at a first time and a second plurality of events scheduled to start at a second time;

generating, based on the schedule, a network map mapping the first plurality of events and the second plurality of events to a plurality of television stations for a plurality of cities,

wherein each station from the plurality of stations corresponds to a respective city from the plurality of cities,

wherein the network map identifies for each station (i) a first event from the first plurality of events that will be displayed at the first time and (ii) a second event from the second plurality of events that will be displayed at the second time, and

wherein generating the network map comprises using a machine learning technique to optimize an overall television rating across the first plurality of events and the second plurality of events;

automatically updating the network map on demand and in real time based on a change to at least one of (i) the schedule and (ii) underlying criteria,

wherein updating the network map comprises updating the mapping of the first plurality of events and the second plurality of events to the plurality of television stations; and

using the network map to determine for each station (i) the first event from the first plurality of events that will be displayed at the first time and (ii) the second

12

event from the second plurality of events that will be displayed at the second time.

**15**. The system of claim **14**, wherein the first plurality of events and the second plurality of events comprise at least one live event.

**16**. The system of claim **14**, wherein the first plurality of events and the second plurality of events comprise sporting events.

**17**. The system of claim **16**, wherein the sporting events comprise at least one NFL game, NBA game, MLB game, NHL game, MLS game, OLYMPIC event, or golf match.

**18**. The system of claim **14**, wherein the first plurality of events and the second plurality of events comprise non-sporting events.

**19**. The system of claim **18**, wherein the non-sporting events comprise at least one dramatic television program, movie, or live streaming event.

**20**. The system of claim **14**, wherein generating the network map comprises generating the network map based on at least one of weather data, news data, or gambling data.

**21**. The system of claim **14**, wherein the step of automatically updating the network map comprises optimizing the network map based on a particular parameter.

**22**. The system of claim **21**, wherein the particular parameter comprises the overall television rating or a projected rating in a certain market for the plurality of television stations.

**23**. The system of claim **14**, wherein the network map is automatically updated based on the change to the schedule.

**24**. The system of claim **14**, wherein the network map is automatically updated based on the change to the underlying criteria, and wherein the underlying criteria comprise a user-submitted rule.

**25**. The system of claim **14**, the operations further comprising, prior to the obtaining step, generating the schedule for the first plurality of events and the second plurality of events.

**26**. The system of claim **14**, wherein the first time and the second time occur on a same day.

* * * * *

US011386367B1

(12) **United States Patent**   (10) Patent No.: **US 11,386,367 B1**
Tabrizi et al.                 (45) Date of Patent:     **Jul. 12, 2022**

(54) **SYSTEMS AND METHODS FOR DETERMINING EVENT SCHEDULES**

(71) Applicant: **Recentive Analytics, Inc.**, Boston, MA (US)

(72) Inventors: **Andysheh Tabrizi**, Boston, MA (US); **Evan Charles Smith**, Lexington, MA (US)

(73) Assignee: **Recentive Analytics, Inc.**, Boston, MA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **17/332,144**

(22) Filed: **May 27, 2021**

(51) Int. Cl.
  *G06Q 10/06*     (2012.01)
  *G06N 20/00*     (2019.01)

(52) U.S. Cl.
  CPC ...... *G06Q 10/063116* (2013.01); *G06N 20/00* (2019.01)

(58) **Field of Classification Search**
  CPC ....... G06Q 10/06311; G06Q 10/06312; G06Q 10/0631; G06Q 10/067; G06Q 10/06315; G06Q 10/10
  USPC ...................................................... 705/7.16
  See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,925,458 | B2 * | 8/2005 | Scaturro ............... G06Q 30/02 707/999.005 |
| 7,343,312 | B2 | 3/2008 | Capek et al. |
| 8,234,150 | B1 * | 7/2012 | Pickton ............. G06Q 30/0202 705/7.31 |
| 8,433,998 | B2 | 4/2013 | Coffman et al. |
| 8,655,692 | B2 * | 2/2014 | Junkin ................. G06Q 30/08 705/37 |
| 10,614,426 | B2 | 4/2020 | Bellary et al. |
| 2003/0004773 | A1 | 1/2003 | Clark et al. |
| 2009/0292550 | A1 | 11/2009 | Ly |
| 2012/0290339 | A1 * | 11/2012 | Sussman .............. G06Q 10/025 705/5 |
| 2012/0330970 | A1 * | 12/2012 | Bieren ................. G06F 16/951 707/748 |
| 2013/0046580 | A1 * | 2/2013 | Harker ................ G06Q 10/00 705/7.31 |
| 2013/0173317 | A1 * | 7/2013 | Higgy ................. G06Q 10/02 705/5 |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 2743869 A1 | 6/2014 |
| WO | WO-2016108108 A1 | 7/2016 |

OTHER PUBLICATIONS

Chun, Andy Hon Wai, "Using AI for Olympic Equestrian Event Preparation," Association for the Advancement of Artificial Intelligence (www.aaai.org). pp. 1616-1623, 2008. (https://www.aaai.org/Papers/IAAI/2008/IAAI08-001.pdf) (Year: 2008).*

*Primary Examiner* — Charles Guiliano
*Assistant Examiner* — Letoria G Knight
(74) *Attorney, Agent, or Firm* — Goodwin Procter LLP

(57)          **ABSTRACT**

This application relates to systems and methods for generating desired or optimized event schedules. An example computer-implemented method of dynamically generating an event schedule includes: receiving one or more parameters for a series of live events to be held in a plurality of geographic regions; generating a schedule for the series of live events based on the one or more parameters; and automatically updating the schedule based on a change to the one or more parameters.

**20 Claims, 7 Drawing Sheets**



**US 11,386,367 B1**

Page 2

(56)         **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2015/0178691 A1 * | 6/2015 | Lineberger | G06Q 30/0251 |
| | | | 705/7.19 |
| 2016/0110669 A1 * | 4/2016 | Iyer | G06Q 10/06315 |
| | | | 705/7.25 |
| 2017/0236097 A1 | 8/2017 | Smith | |
| 2018/0213273 A1 * | 7/2018 | Carter | H04N 21/25825 |
| 2019/0034837 A1 * | 1/2019 | Lou | G06N 20/00 |
| 2019/0164135 A1 * | 5/2019 | Bellary | G06F 40/30 |
| 2019/0180248 A1 * | 6/2019 | Byun | G06Q 10/1095 |
| 2019/0180297 A1 * | 6/2019 | Bhatia | G06Q 30/0205 |

* cited by examiner

Case 1:22-cv-01545-GBW   Document 13-4   Filed 02/24/23   Page 4 of 19 PageID #: 257

**U.S. Patent**      Jul. 12, 2022      Sheet 1 of 7      **US 11,386,367 B1**



FIG. 1



FIG. 2

Case 1:22-cv-01545-GBW   Document 13-4   Filed 02/24/23   Page 6 of 19 PageID #: 259

**U.S. Patent**    Jul. 12, 2022    Sheet 3 of 7    US 11,386,367 B1



FIG. 3



FIG. 4



FIG. 5

Case 1:22-cv-01545-GBW    Document 13-4    Filed 02/24/23    Page 9 of 19 PageID #: 262



FIG. 6

Case 1:22-cv-01545-GBW   Document 13-4   Filed 02/24/23   Page 10 of 19 PageID #: 263

| Venue | 9/1 | 9/2 | 9/3 | 9/4 | 9/5 | 9/6 | 9/7 | 9/8 | 9/9 |
|---|---|---|---|---|---|---|---|---|---|
| Venue 1 | P1 | | | | | | | | |
| Venue 2 | | | | | | | | | P1 |
| Venue 3 | | | P1 | | | | | | |
| Venue 4 | | P1 | | | | | | | |
| Venue 5 | | | | | P1 | | | | |
| Venue 6 | | | | | | | | | |
| Venue 7 | | | | | | P1 | | P1 | |
| Venue 8 | | | | | | | | | |
| Projection | 221 | 141 | 432 | | 251 | 676 | | 549 | 246 |

700

710

712

714   2,516

FIG. 7

US 11,386,367 B1

# SYSTEMS AND METHODS FOR DETERMINING EVENT SCHEDULES

## TECHNICAL FIELD OF THE INVENTION

In general, the subject matter of this disclosure relates to determining event schedules and, more specifically, to optimizing an event schedule for a series of live events or a set of live events to be held in a plurality of geographic regions.

## BACKGROUND

Celebrities, musicians, politicians, venue owners, venue managers, and other individuals and entities frequently schedule live events that occur in a plurality of different geographic locations over the course of anywhere from a couple of days to many years. Common examples of such events include concert tours, comedy tours, speaking tours, and campaign rallies. For example, a music group may need to determine a schedule (e.g., including dates and locations) for an upcoming concert tour that covers multiple cities, states, or countries over several months. Additionally, an owner or manager of one or more venues may need to determine a schedule for multiple performers who are available to perform at the one or more venues. Scheduling such live events can be difficult due to a wide variety of factors that may need to be considered (e.g., competing events, expenses, ticket prices, weather, performer availability, venue availability, etc.). Failure to properly consider such factors can lead to sub-optimal schedules that generate little interest among consumers and/or result in low attendance or ticket sales.

There is a need for improved systems and methods for scheduling live events involving one or more performers at a plurality of venues in different geographic locations.

## SUMMARY OF THE INVENTION

In various examples, the subject matter of this disclosure relates to improved techniques for scheduling live events for one or more performers in a plurality of geographic locations. In some examples, computer-implemented systems and methods can determine an optimized schedule for a proposed series of live events involving a performer in a plurality of geographic locations (e.g., a concert tour). The systems and methods can receive a variety of input parameters related to the proposed series of live events (e.g., performer availability, venue availability, projected ticket prices, etc.) and can generate a schedule (e.g., using machine learning) that optimizes one or more target features (e.g., total attendance or attendance by a particular demographic segment) for one or more of the live events. Additionally or alternatively, the computer-implemented systems and methods can determine an optimized schedule for proposed live events involving multiple performers in a plurality of geographic locations. The systems and methods can receive a variety of input parameters related to the proposed live events (e.g., performer availability, venue availability, projected ticket prices, etc.) and can generate a schedule (e.g., using machine learning) that optimizes one or more target features (e.g., total attendance) for one or more of the live events. In various examples, a generated schedule can be updated when one or more of the input parameters change. Such updates can be based on real-time data (e.g., real-time input parameters) and, in some instances, the schedule can be dynamically updated in response to changes in this data.

In general, in one aspect, the subject matter described in this specification relates to a computer-implemented method of dynamically generating an event schedule. The method includes: receiving one or more parameters for a series of live events to be held in a plurality of geographic regions; generating a schedule for the series of live events based on the one or more parameters; and automatically updating the schedule based on a change to the one or more parameters.

In certain examples, the one or more parameters can include a tentative schedule for the series of live events. The series of live events can include a tour for a band, a music group, an author, a performer, a comedian, a politician, an activist, and/or a speaker. Generating the schedule can include maximizing a revenue and/or a total attendance for the series of live events and/or a single event from the series of live events. Generating the schedule can include maximizing a revenue and/or a total attendance at the series of live events for a demographic segment. Generating the schedule can include providing the one or more parameters to a machine learning model. Generating the schedule can include choosing a venue, a date, and/or a time for each live event in the series of live events. The step of automatically updating the schedule can include using a machine learning model to update the schedule based on the change to the one or more parameters. The geographic regions can be or include a country, a state, and/or a city.

In another aspect, the subject matter described in this specification relates to a system. The system includes one or more computer systems programmed to perform operations including: receiving one or more parameters for a series of live events to be held in a plurality of geographic regions; generating a schedule for the series of live events based on the one or more parameters; and automatically updating the schedule based on a change to the one or more parameters.

In another aspect, the subject matter described in this specification relates to a computer-implemented method of dynamically generating an event schedule. The method includes: receiving one or more parameters for a plurality of live events including performances by a plurality of performers, the one or more parameters including a list of the performers and a list of available venues in a plurality of geographic regions; generating a schedule for the live events based on the one or more parameters; and automatically updating the schedule based on a change to the one or more parameters.

In certain examples, generating the schedule includes maximizing a total attendance for the plurality of live events and/or a single event from the plurality of live events. Generating the schedule can include maximizing a total attendance at the plurality of live events for a demographic segment. The one or more parameters can include at least one date for the plurality of live events. The plurality of performers can include a band, a music group, an author, a comedian, a politician, an activist, and/or a speaker. Generating the schedule can include providing the one or more parameters to a machine learning model. Generating the schedule can include assigning (i) a first performer from the list of performers to a first venue from the list of available venues and (ii) a second performer from the list of performers to a second venue from the list of available venues. The step of automatically updating the schedule can include using a machine learning model to update the schedule based on the change to the one or more parameters. The geographic regions can be or include a country, a state, and/or a city.

In another aspect, the subject matter described in this specification relates to a system. The system includes one or

US 11,386,367 B1

**3**

more computer systems programmed to perform operations including: receiving one or more parameters for a plurality of live events including performances by a plurality of performers, the one or more parameters including a list of the performers and a list of available venues in a plurality of geographic regions; generating a schedule for the live events based on the one or more parameters; and automatically updating the schedule based on a change to the one or more parameters.

Elements of embodiments described with respect to a given aspect of the invention can be used in various embodiments of another aspect of the invention. For example, it is contemplated that features of dependent claims depending from one independent claim can be used in apparatus, systems, and/or methods of any of the other independent claims.

BRIEF DESCRIPTION OF THE DRAWINGS

In the drawings, like reference characters generally refer to the same parts throughout the different views. Also, the drawings are not necessarily to scale, emphasis instead generally being placed upon illustrating the principles of the invention. In the following description, various embodiments of the present invention are described with reference to the following drawings, in which:

FIG. 1 is a schematic diagram of a system for determining schedules for live events, in accordance with certain examples;

FIG. 2 is a block diagram of a method of generating a schedule for a series of live events involving a single performer, in accordance with certain examples;

FIG. 3 is a flowchart of a method of generating a schedule for a series of live events involving a single performer, in accordance with certain examples;

FIG. 4 is a block diagram of a method of generating a schedule for live events involving multiple performers, in accordance with certain examples; and

FIG. 5 is a flowchart of a method of generating a schedule for live events involving multiple performers, in accordance with certain examples;

FIG. 6 is a schematic diagram of a graphical user interface presenting a schedule of live events involving multiple performers and multiple venues, in accordance with certain examples; and

FIG. 7 is a schematic diagram of a graphical user interface presenting a schedule for a series of live events involving a single performer and multiple venues, in accordance with certain examples.

DETAILED DESCRIPTION

In certain examples, a "performer" can be or include an individual or group of individuals who entertain, perform for, and/or speak to an audience, either in person or through a remote connection (e.g., video or audio transmission). The performer can be or include, for example, a musician, a band, a music group, a singer, an artist, a comedian, a theater troupe, an actor, an author, a politician, a speaker, an activist, an acrobat, an athlete, or other individual or group of individuals who may perform for an audience.

In certain examples, a "venue" can be or include a stadium, an amphitheater, a theater, a club, a bar, a park, a cruise ship, a convention center, an exposition center, a town square, or any other building, structure, or location, either public or private, where a performer can perform for an audience.

**4**

In certain examples, a "live event" can be or include a live performance by a performer for an audience. The live event can be or include, for example, a concert, a musical performance, a speech, a comedy performance, or any other type of event performed for an audience that witnesses the live event in person or through a remote connection (e.g., video or audio transmission).

In certain examples, a "series" of live events can be or include multiple live events that occur in different geographical locations over a period of time, such as a day, a week, a month, or a year. For example, a series of live events can be a tour for a music group (or other performer) that performs in different venues, in different geographic regions (e.g., cities, states, or countries), over a period of weeks or months.

FIG. 1 illustrates an example system 100 for scheduling live events, such as a series of performances (e.g., concerts) by a performer (e.g., a musician or band) in different geographic regions (e.g., different cities, states, or countries). A server system 112 provides functionality for determining schedules for the live events based on a variety of inputs, as described herein. The server system 112 includes software components and databases that can be deployed at one or more data centers 114 in one or more geographic locations, for example. The server system 112 software components can include, for example, a performer module 116 and a venue module 118. The server system 112 can include subcomponents that can execute on the same or on different individual data processing apparatus. The server system 112 databases can include a performance data 120 database, though it is understood that any number of databases can be included. The databases can reside in one or more physical storage systems. The software components and data will be further described below.

An application, such as, for example, a web-based or other software application can be provided as an end-user application to allow users to interact with the server system 112. The software application or components thereof can be accessed through a network 124 (e.g., the Internet) by users of client devices, such as a smart phone 126, a personal computer 128, a smart phone 130, a tablet computer 132, and a laptop computer 134. Other client devices are possible.

The performer module 116 can include software components that support the software application by, for example, determining a desired or optimal schedule for a series of live events for a performer. For example, the performer module 116 can receive input parameters for a proposed series of live events for the performer and, based on the parameters, determine the desired or optimal schedule for the live events (e.g., using a machine learning model). The performer module 116 can update the schedule based on a change to the input parameters. For example, a performer or an agent or representative of the performer can use the software application to access the performer module 116 and determine a desired or optimal schedule for the performer's live events.

Similarly, the venue module 118 can include software components that support the software application by, for example, determining a desired or optimal schedule for a plurality of live events involving a plurality of performers at one or more venues. For example, the venue module 118 can receive input parameters for proposed performances at a venue and, based on the parameters, determine the desired or optimal schedule for the live events at the venue (e.g., using a machine learning model). The venue module 118 can update the schedule based on a change to the input parameters. For example, a manager or owner of one or more venues can use the software application to access the venue

US 11,386,367 B1

**5**

module **118** and determine a desired or optimal schedule for the one or more venues (e.g., over a specified date range).

The performance data **120** database can store and provide data for the software application and/or can provide data to or receive data from the performance model **116** and the venue module **118**. The data can include, for example, information related to performers, venues, and associated live events. For example, the data can include information related to performance dates (e.g., proposed dates for a concert tour), performer availability (e.g., dates when an artist is available or not already booked), venue availability (e.g., dates when a venue is available or not already booked), financial data (e.g., ticket prices, artist fees, venue fees, etc.), demographics (e.g., demographic data for ticket holders or other consumers), travel data (e.g., travel expenses and/or distances traveled by a performer for a proposed series of live events), social media data (e.g., data related to performer popularity), or any combination thereof.

FIG. **2** depicts an example method **200** in which the performer module **116** is used to schedule a series of live events for a performer. Parameters **202** for a proposed series of live events are provided (step **204**) as inputs to the performer module **116**. Such input parameters **202** can be, include, or relate to, for example: a proposed or tentative schedule for the series of live events, a proposed range of dates for the live events, a proposed set of locations for the live events (e.g., including cities, states, and/or countries), venue availability (e.g., dates and/or times when one or more venues are available to host one or more of the live events in the proposed locations), venue locations (e.g., an address for each venue), proposed ticket prices (e.g., for each available venue or available seat in each venue), cost information (e.g., venue fees, travel expenses, etc.), scheduled performances by the same performer or other performers (e.g., a competing band in the same geographic region), weather data (e.g., average temperatures for a venue at a proposed time), or any combination thereof. The input parameters **202** can be retrieved from the performance data **120** database, can be manually entered by users, and/or can be retrieved from other sources (e.g., a database or website operated by a third party, such as a venue manager). In some instances, for example, a user may specify the dates when the performer is available to perform.

In the depicted example, the performer module **116** uses the input parameters **202** to determine and output (step **206**) a desired or optimal schedule **208** for the series of live events **206**. The schedule **208** can be or include, for example, a schedule for the series of live events that optimizes, maximizes, or minimizes one or more target features for the live events. Such target features can include, for example, attendance at one or more of the live events (e.g., a total attendance or attendance by a particular demographic), a profit for one or more of the live events, a revenue for one or more of the live events, and/or costs or expenses for one or more of the live events. A user of the software application can specify the target features that should be considered by the performer module **116**. Additionally or alternatively, each target feature can be assigned a weight that indicates an importance of the target feature. For example, a user may choose to weigh attendance for a particular demographic segment more heavily than total attendance or revenue. Such weights can allow the performer module **116** to determine the schedule **208** based on particular combinations of target features that may be of interest.

In some embodiments, the performer module **116** includes or utilizes a machine learning model **210** or other predictive tool for determining the desired or optimal schedule **208**. In

**6**

general, any suitable machine learning technique can be used, such as, for example: a gradient boosted random forest, a regression, a neural network, a decision tree, a support vector machine, a Bayesian network, other type of technique. The machine learning model **210** can be trained using a set of training data. The training data can be or include, for example, historical data from previous live events or series of live events. Such data can include information related to the input parameters **202** (e.g., dates, venue locations, ticket prices, social media data, etc.) and the target features (e.g., attendance, revenue, expenses, etc.). In general, the machine learning model **210** can be trained to recognize how to optimize, maximize, or minimize one or more of the target features based on a given set of input parameters. Once trained, the machine learning model **210** can receive the input parameters **202** as input, generate the optimized schedule, and provide the schedule **208** as output. To generate the schedule, the performer module **116** and/or the machine learning model **210** can choose a venue, a date, and/or a time for the live events (e.g., for each live event) in the series of live events.

In some examples, after the schedule **208** has been determined, the performer module **116** can receive (step **212**) one or more updates or changes **214** to the input parameters. These parameter changes **214** can include, for instance, changes to venue availability, ticket prices, expenses, performer availability, weather conditions, other input parameters, or any combination thereof. The performer module **116** can then update the schedule **208** in response to the parameter changes **214**. For example, if a higher capacity venue becomes available, the schedule **208** can be updated to replace a lower capacity venue with the higher capacity venue. Such a change could result in a new schedule **208** that is preferred over an original or previous schedule **208**. For example, the new schedule **208** may achieve a better optimization of one or more of the target features (e.g., revenue, attendance, expenses, travel times, etc.). In some embodiments, the performer module **116** can search for and/or receive the parameter changes **214** on a regular schedule or at periodic intervals (e.g., every hour, day, week, or month). Alternatively or additionally, the performer module **116** can receive parameter changes **214** when prompted to do so by a user. For instance, the user can use a client device to instruct the performer module **116** to retrieve the parameter changes **214** and/or can enter the parameter changes **214** manually. In some examples, the schedule **208** can be updated based on real-time data (e.g., real-time parameter changes **214**) and, in some instances, the schedule **208** can be dynamically updated in response to changes in this data.

FIG. **3** is a flowchart of a computer-implemented method **300** of dynamically generating an event schedule, in accordance with certain embodiments. One or more parameters for a series of live events to be held in a plurality of geographic locations are received (step **302**). A schedule for the series of live events is generated (step **304**) based on the one or more parameters. The schedule is automatically updated (step **306**) based on a change to the one or more parameters.

FIG. **4** depicts an example method **400** in which the venue module **118** is used to schedule live events for a plurality of performers at one or more venues. Parameters **402** for proposed live events involving the plurality of performers are provided (step **404**) as inputs to the venue module **118**. Such input parameters **402** can be, include, or relate to, for example: a proposed or tentative schedule for the live events at the one or more venues, a proposed range of dates for the live events, a proposed set of locations for the live events

US 11,386,367 B1

**7**

(e.g., including cities, states, and/or countries), venue availability (e.g., dates and/or times when one or more venues are available to host one or more of the live events in the proposed locations), venue locations (e.g., an address for each venue), proposed ticket prices (e.g., for each available venue or available seat in each venue), cost information (e.g., artist fees, vendor fees, etc.), scheduled performances by the same performer or other performers (e.g., a competing band in the same geographic region), weather data (e.g., average temperatures for a venue at a proposed time), or any combination thereof. The input parameters **402** can be retrieved from the performance data **120** database, can be manually entered by users, and/or can be retrieved from other sources (e.g., a database or website operated by a third party, such as a manager of a venue or performer). In some embodiments, for example, a user may specify a set of available performers, a set of available venues, and/or a range of dates for one or more performances.

In the depicted example, the venue module **118** can use the input parameters **402** to determine and output (step **406**) a desired or optimized schedule **408** for the live events involving multiple performers at one or more venues. The schedule **408** can cover, for example, a plurality of performers and a plurality of venues (e.g., in different cities, states, countries, or other geographic regions) for a period of time that can range from a day to multiple weeks, months, or years. In some examples, the schedule **408** can be or include a schedule of live events for a plurality of venues owned or managed by a single user or entity. Alternatively or additionally, the schedule **408** can be a schedule for a plurality of performers who are managed by a single user or entity. Many other types of schedules **408** are possible. In some embodiments, multiple events on the schedule **408** can be scheduled to occur concurrently (e.g., two performers performing at the same time in different venues).

In various examples, the schedule **408** can be or include, for example, a schedule for the live events (by multiple performers at one or more venues) that optimizes, maximizes, or minimizes one or more target features for the live events. Such target features can include, for example, attendance at one or more of the live events (e.g., a total attendance or attendance by a particular demographic), a profit for one or more of the live events, a revenue for one or more of the live events, and/or costs or expenses for one or more of the live events. A user of the software application can specify the target features that should be considered by the venue module **118**. Additionally or alternatively, each target feature can be assigned a weight that indicates an importance of the target feature. For example, a user may choose to weigh attendance for a particular demographic segment more heavily than total attendance or revenue. Such weights can allow the performer module **118** to determine the schedule **408** based on particular combinations of target features that may be of interest.

In various implementations, the venue module **118** includes or utilizes a machine learning model **410** or other predictive tool for determining the desired or optimal schedule **408**. In general, any suitable machine learning technique can be used, such as, for example: a gradient boosted random forest, a regression, a neural network, a decision tree, a support vector machine, a Bayesian network, other type of technique. The machine learning model **410** can be trained using a set of training data. The training data can be or include, for example, historical data from previous live events or series of live events. Such data can include information related to the input parameters **402** (e.g., dates, venue locations, ticket prices, social media data, etc.) and

**8**

the target features (e.g., attendance, revenue, expenses, etc.). In general, the machine learning model **410** can be trained to recognize how to optimize, maximize, or minimize one or more of the target features based on a given set of input parameters. Once trained, the machine learning model **410** can receive the input parameters **402** as input, generate the optimized schedule, and provide the schedule **408** as output. To generate the schedule, the venue module **118** and/or the machine learning model **410** can choose a performer, a venue, a date, and/or a time for the live events (e.g., for each live event).

In some examples, after the schedule **408** has been determined, the venue module **118** can receive (step **412**) one or more updates or changes **414** to the input parameters. These parameter changes **414** can include, for instance, changes to venue availability, ticket prices, expenses, performer availability, weather conditions, other input parameters, or any combination thereof. The venue module **118** can then update the schedule **408** in response to the parameter changes **414**. For example, if a performer becomes unavailable, the venue module **118** can update the schedule **408** to include a substitute performer. Such a change could result in a new schedule **408** that is preferred over an original or previous schedule **408**. For example, the new schedule **408** may achieve a better optimization of one or more of the target features (e.g., revenue, attendance, expenses, travel times, etc.). In some embodiments, the venue module **118** can search for and/or receive the parameter changes **414** on a regular schedule or at periodic intervals (e.g., every hour, day, week, or month). Alternatively or additionally, the venue module **118** can receive parameter changes **414** when prompted to do so by a user. For instance, the user can use a client device to instruct the venue module **118** to retrieve the parameter changes **414** and/or can enter the parameter changes **414** manually. In some examples, the schedule **408** can be updated based on real-time data (e.g., real-time parameter changes **414**) and, in some instances, the schedule **408** can be dynamically updated in response to changes in this data.

FIG. 5 is a flowchart of a computer-implemented method **500** of dynamically generating an event schedule, in accordance with certain examples. One or more parameters for a plurality of live events are received (step **502**). The live events can be or include performances by a plurality of performers, and the one or more parameters can include a list of the performers and a list of available venues in a plurality of geographic regions. A schedule for the live events is generated (step **504**) based on the one or more parameters. The schedule is automatically updated (step **506**) based on a change to the one or more parameters.

Advantageously, the systems and methods disclosed herein can allow performers, venue owners, promoters, and other individuals or entities to create optimized schedules for live events, including a series of live events by a single performer (e.g., a concert tour) or a collection of live events by multiple performers at one or more venues. The schedules can be optimized for profit, revenue, expenses, travel, attendance, other target features, or any combination thereof (e.g., based on weights assigned to the target features). In some embodiments, input parameters for the performer module **116** and/or the venue module **118** (e.g., the input parameters **202** and/or **402**) can be or include social media activity data. Such data can be mined or analyzed to determine how popular a performer may be. For example, the performer module **116** and/or the venue module **118** can use such data to determine performer popularity or demand in one or more geographic regions. This can allow the per-

US 11,386,367 B1

9

former module 116 and/or the venue module 118 to make more accurate predictions for ticket sales, attendance, and/or appropriate ticket prices. Such predictions can be made or used by the performer module 116 and/or the venue module 118 when generating the optimized schedules 208 and/or 408.

Advantageously, the systems and methods described herein represent and/or achieve a significant improvement in computer functionality. For example, use of the performer module 116 and the venue module 118 (and the associated machine learning models 210 and 410) can improve the accuracy and/or automation of data processing. In various instances, for example, the performer module 116 and venue module 118 are developed and trained to receive a wide variety and quantity of data (e.g., the input parameters) and to consider a variety of target features when generating desired or optimized schedules for live events. Such schedules can be updated, as needed, when any changes to the input parameters or target features are received. By training the performer module 116 and the venue module 118 to generate optimized schedules automatically and update the schedules dynamically, in response to real-time changes in data, the input parameters and target features can be processed and considered more efficiently and accurately, compared to prior approaches.

FIG. 6 depicts an example of an optimized schedule 600 (e.g., created using the venue module 118) for a plurality of venues 610 (labeled Venues 1 through 15) and a plurality of performers (labeled P1 through P9) over a range of dates (e.g., September 1st through September 10th). The schedule 600 in this example is presented as a table, with a first column listing the venues 610 and each remaining column representing a date from the range of dates (e.g., consecutive dates over a time period or a subset of dates, such as weekend dates, for the time period). Each row in the table represents a different venue from the plurality of venues 610. In the depicted example, the schedule 600 identifies the dates when the performers are scheduled to perform and the venues where the performances are scheduled to occur. For example, performer P1 is scheduled to perform on 9/1 at Venue 11, and performer P2 is scheduled to perform on 9/2 at Venue 3. Some performers can appear multiple times in the schedule 600. For example, performer P2 is also scheduled to perform on 9/6 at Venue 5. The list of venues 610 can include a listing of available venues for the performers during the date range. Some of the venues 610 in this example (e.g., Venue 2) are not selected to host any performances in the schedule 600. The venues 610 can be located in different geographic regions (e.g., cities, states, or countries) or in the same geographic region.

In some embodiments, the schedule 600 may list one or more target features that were optimized or calculated by the venue module 118 when generating the schedule 600. In the depicted example, a revenue target feature 612 is presented for several of the columns (e.g., columns associated with at least one performance), and a total revenue target feature 614 is presented for the entire schedule 600 (e.g., for all dates and scheduled performances). Other target features, such as cost, attendance, and/or demographics for attendees can be presented in the schedule 600 in addition to or instead of the revenue target feature 612 and/or the total revenue target feature 614.

In certain examples, a graphical user interface for the schedule 600 can include various user interface buttons, such as, for example, an optimal button 616, a reset button 618, a CSV button 620, a save button 622, and/or a load button 624. By selecting the reset button 618, for example,

10

the user can clear the schedule 600 of all or almost all of its values or information. By selecting the save button 622, the user can save a copy of the current schedule 600 (e.g., to a user client device or to a server computer). The load button 624 can be selected to import a schedule that was previously generated or saved. The CSV button 620 can be used to create a CSV file or a spreadsheet file that includes data from the schedule 600. Alternatively, in some examples, the CSV button 620 can be used to load a CSV file or a spreadsheet file to create or present the schedule 600 or a different schedule.

FIG. 7 depicts an example of an optimized schedule 700 (e.g., created using the performer module 116) for a series of live events involving a single performer (labeled P1) and a plurality of venues 710 (labeled Venues 1 through 8) over a range of dates (e.g., September 1st through September 9th). The schedule 700 in this example is presented as a table, with a first column listing the venues 710 and each remaining column representing a date from the range of dates (e.g., consecutive dates over a time period or a subset of dates, such as weekend dates, for the time period). Each row in the table represents a different venue from the plurality of venues 710. In the depicted example, the schedule 700 identifies the dates and venues for each scheduled performance by the performer P1. For example, the performer P1 is scheduled to perform on 9/1 at Venue 1 and on 9/2 at Venue 4. Some dates (e.g., 9/4 and 9/7) do not have any performances scheduled for the performer P1. Also, while the depicted example indicates the performer P1 is performing in no more than one venue on any given date, it is understood that the performer could be scheduled to perform in multiple venues on the same date, if scheduling permits. The list of venues 710 can include a listing of available venues for the performer during the date range. One of the venues 710 in this example (e.g., Venue 6) is not selected to host any performances in the schedule 700.

In certain embodiments, the schedule 700 may list one or more target features that were optimized or calculated by the venue module 118 when generating the schedule 700. For example, one or more target features (e.g., revenue, cost, and/or attendance) can be presented for one or more dates in or near a bottom row 712 of the schedule 700. Additionally or alternatively, a total target feature 714 (e.g., total revenue, cost, and/or total attendance) can be presented for the entire schedule 700 (e.g., all dates and scheduled performances). A graphical user interface for the schedule 700 can include one or more buttons (not shown) that allow a user to reset the schedule 700, generate a CSV or spreadsheet file with the schedule information, save the schedule, or load a different schedule.

Implementations of the subject matter and the operations described in this specification can be implemented in digital electronic circuitry, or in computer software, firmware, or hardware, including the structures disclosed in this specification and their structural equivalents, or in combinations of one or more of them. Implementations of the subject matter described in this specification can be implemented as one or more computer programs, i.e., one or more modules of computer program instructions, encoded on computer storage medium for execution by, or to control the operation of, data processing apparatus. Alternatively or in addition, the program instructions can be encoded on an artificially generated propagated signal, e.g., a machine-generated electrical, optical, or electromagnetic signal, that is generated to encode information for transmission to suitable receiver apparatus for execution by a data processing apparatus. A computer storage medium can be, or be included in, a

US 11,386,367 B1

11

computer-readable storage device, a computer-readable storage substrate, a random or serial access memory array or device, or a combination of one or more of them. Moreover, while a computer storage medium is not a propagated signal, a computer storage medium can be a source or destination of computer program instructions encoded in an artificially-generated propagated signal. The computer storage medium can also be, or be included in, one or more separate physical components or media (e.g., multiple CDs, disks, or other storage devices).

The operations described in this specification can be implemented as operations performed by a data processing apparatus on data stored on one or more computer-readable storage devices or received from other sources.

The term "data processing apparatus" encompasses all kinds of apparatus, devices, and machines for processing data, including by way of example a programmable processor, a computer, a system on a chip, or multiple ones, or combinations, of the foregoing. The apparatus can include special purpose logic circuitry, e.g., an FPGA (field programmable gate array) or an ASIC (application-specific integrated circuit). The apparatus can also include, in addition to hardware, code that creates an execution environment for the computer program in question, e.g., code that constitutes processor firmware, a protocol stack, a database management system, an operating system, a cross-platform runtime environment, a virtual machine, or a combination of one or more of them. The apparatus and execution environment can realize various different computing model infrastructures, such as web services, distributed computing and grid computing infrastructures.

A computer program (also known as a program, software, software application, script, or code) can be written in any form of programming language, including compiled or interpreted languages, declarative or procedural languages, and it can be deployed in any form, including as a stand-alone program or as a module, component, subroutine, object, or other unit suitable for use in a computing environment. A computer program may, but need not, correspond to a file in a file system. A program can be stored in a portion of a file that holds other programs or data (e.g., one or more scripts stored in a markup language document), in a single file dedicated to the program in question, or in multiple coordinated files (e.g., files that store one or more modules, sub-programs, or portions of code). A computer program can be deployed to be executed on one computer or on multiple computers that are located at one site or distributed across multiple sites and interconnected by a communication network.

The processes and logic flows described in this specification can be performed by one or more programmable processors executing one or more computer programs to perform actions by operating on input data and generating output. The processes and logic flows can also be performed by, and apparatus can also be implemented as, special purpose logic circuitry, e.g., an FPGA (field programmable gate array) or an ASIC (application-specific integrated circuit).

Processors suitable for the execution of a computer program include, by way of example, both general and special purpose microprocessors, and any one or more processors of any kind of digital computer. Generally, a processor will receive instructions and data from a read-only memory or a random access memory or both. The essential elements of a computer are a processor for performing actions in accordance with instructions and one or more memory devices for storing instructions and data. Generally, a computer will also

12

include, or be operatively coupled to receive data from or transfer data to, or both, one or more mass storage devices for storing data, e.g., magnetic disks, magneto-optical disks, optical disks, or solid state drives. However, a computer need not have such devices. Moreover, a computer can be embedded in another device, e.g., a mobile telephone, a personal digital assistant (PDA), a mobile audio or video player, a game console, a Global Positioning System (GPS) receiver, or a portable storage device (e.g., a universal serial bus (USB) flash drive), to name just a few. Devices suitable for storing computer program instructions and data include all forms of non-volatile memory, media and memory devices, including, by way of example, semiconductor memory devices, e.g., EPROM, EEPROM, and flash memory devices; magnetic disks, e.g., internal hard disks or removable disks; magneto-optical disks; and CD-ROM and DVD-ROM disks. The processor and the memory can be supplemented by, or incorporated in, special purpose logic circuitry.

To provide for interaction with a user, implementations of the subject matter described in this specification can be implemented on a computer having a display device, e.g., a CRT (cathode ray tube) or LCD (liquid crystal display) monitor, for displaying information to the user and a keyboard and a pointing device, e.g., a mouse, a trackball, a touchpad, or a stylus, by which the user can provide input to the computer. Other kinds of devices can be used to provide for interaction with a user as well; for example, feedback provided to the user can be any form of sensory feedback, e.g., visual feedback, auditory feedback, or tactile feedback; and input from the user can be received in any form, including acoustic, speech, or tactile input. In addition, a computer can interact with a user by sending documents to and receiving documents from a device that is used by the user; for example, by sending web pages to a web browser on a user's client device in response to requests received from the web browser.

Implementations of the subject matter described in this specification can be implemented in a computing system that includes a back-end component, e.g., as a data server, or that includes a middleware component, e.g., an application server, or that includes a front-end component, e.g., a client computer having a graphical user interface or a Web browser through which a user can interact with an implementation of the subject matter described in this specification, or any combination of one or more such back-end, middleware, or front-end components. The components of the system can be interconnected by any form or medium of digital data communication, e.g., a communication network. Examples of communication networks include a local area network ("LAN") and a wide area network ("WAN"), an inter-network (e.g., the Internet), and peer-to-peer networks (e.g., ad hoc peer-to-peer networks).

The computing system can include clients and servers. A client and server are generally remote from each other and typically interact through a communication network. The relationship of client and server arises by virtue of computer programs running on the respective computers and having a client-server relationship to each other. In some implementations, a server transmits data (e.g., an HTML page) to a client device (e.g., for purposes of displaying data to and receiving user input from a user interacting with the client device). Data generated at the client device (e.g., a result of the user interaction) can be received from the client device at the server.

While this specification contains many specific implementation details, these should not be construed as limita-

US 11,386,367 B1

13

tions on the scope of any inventions or of what may be claimed, but rather as descriptions of features specific to particular implementations of particular inventions. Certain features that are described in this specification in the context of separate implementations can also be implemented in combination in a single implementation.

Conversely, various features that are described in the context of a single implementation can also be implemented in multiple implementations separately or in any suitable subcombination. Moreover, although features may be described above as acting in certain combinations and even initially claimed as such, one or more features from a claimed combination can in some cases be excised from the combination, and the claimed combination may be directed to a subcombination or variation of a subcombination.

Similarly, while operations are depicted in the drawings in a particular order, this should not be understood as requiring that such operations be performed in the particular order shown or in sequential order, or that all illustrated operations be performed, to achieve desirable results. In certain circumstances, multitasking and parallel processing may be advantageous. Moreover, the separation of various system components in the implementations described above should not be understood as requiring such separation in all implementations, and it should be understood that the described program components and systems can generally be integrated together in a single software product or packaged into multiple software products.

Thus, particular implementations of the subject matter have been described. Other implementations are within the scope of the following claims. In some cases, the actions recited in the claims can be performed in a different order and still achieve desirable results. In addition, the processes depicted in the accompanying figures do not necessarily require the particular order shown, or sequential order, to achieve desirable results. In certain implementations, multitasking and parallel processing may be advantageous.

Each numerical value presented herein, for example, in a table, a chart, or a graph, is contemplated to represent a minimum value or a maximum value in a range for a corresponding parameter. Accordingly, when added to the claims, the numerical value provides express support for claiming the range, which may lie above or below the numerical value, in accordance with the teachings herein. Absent inclusion in the claims, each numerical value presented herein is not to be considered limiting in any regard.

The terms and expressions employed herein are used as terms and expressions of description and not of limitation, and there is no intention, in the use of such terms and expressions, of excluding any equivalents of the features shown and described or portions thereof. In addition, having described certain embodiments of the invention, it will be apparent to those of ordinary skill in the art that other embodiments incorporating the concepts disclosed herein may be used without departing from the spirit and scope of the invention. The features and functions of the various embodiments may be arranged in various combinations and permutations, and all are considered to be within the scope of the disclosed invention. Accordingly, the described embodiments are to be considered in all respects as only illustrative and not restrictive. Furthermore, the configurations, materials, and dimensions described herein are intended as illustrative and in no way limiting. Similarly, although physical explanations have been provided for explanatory purposes, there is no intent to be bound by any particular theory or mechanism, or to limit the claims in accordance therewith.

14

What is claimed is:

1. A computer-implemented method of dynamically generating an event schedule, the method comprising:

receiving one or more event parameters for series of live events, wherein the one or more event parameters comprise at least one of venue availability, venue locations, proposed ticket prices, performer fees, venue fees, scheduled performances by one or more performers, or any combination thereof;

receiving one or more event target features associated with the series of live events, wherein the one or more event target features comprise at least one of event attendance, event profit, event revenue, event expenses, or any combination thereof;

providing the one or more event parameters and the one or more event target features to a machine learning (ML) model, wherein the ML model is at least one of a neural network ML model and a support vector ML model;

iteratively training the ML model to identify relationships between different event parameters and the one or more event target features using historical data corresponding to one or more previous series of live events, wherein such iterative training improves the accuracy of the ML model;

receiving, from a user, one or more user-specific event parameters for a future series of live events to be held in a plurality of geographic regions;

receiving, from the user, one or more user-specific event weights representing one or more prioritized event target features associated with the future series of live events;

providing the one or more user-specific event parameters and the one or more user-specific event weights to the trained ML model;

generating, via the trained ML model, a schedule for the future series of live events that is optimized relative to the one or more prioritized event target features;

detecting a real-time change to the one or more user-specific event parameters;

providing the real-time change to the trained ML model to improve the accuracy of the trained ML model; and

updating, via the trained ML model, the schedule for the future series of live events such that the schedule remains optimized relative to the one or more prioritized event target features in view of the real-time change to the one or more user-specific event parameters.

2. The method of claim 1, wherein the one or more user-specific event parameters comprise a tentative schedule for the future series of live events.

3. The method of claim 1, wherein the future series of live events comprises a tour for at least one of a band, a music group, an author, a performer, a comedian, a politician, an activist, or a speaker.

4. The method of claim 1, wherein generating the schedule for the future series of live events that is optimized relative to the one or more prioritized target features comprises generating a schedule that maximizes at least one of a revenue or a total attendance for at least one of the future series of live events or a single event from the future series of live events.

5. The method of claim 1, wherein generating the schedule for the future series of live events that is optimized relative to the one or more prioritized target features comprises generating a schedule that maximizes at least one of

US 11,386,367 B1

**15**

a revenue or a total attendance at the future series of live events for a particular demographic segment.

**6**. The method of claim **1**, wherein generating the schedule for the future series of live events that is optimized relative to the one or more prioritized target features comprises choosing at least one of a venue, a date, or a time for each live event in the future series of live events.

**7**. The method of claim **1**, wherein the geographic regions comprise at least one of a country, a state, or a city.

**8**. The method of claim **1**, wherein detecting the real-time change to the one or more user-specific event parameters includes collecting and/or analyzing social media data related to the future series of live events.

**9**. A system comprising:

one or more computer systems programmed to perform operations comprising:

receiving one or more event parameters for series of live events, wherein the one or more event parameters comprise at least one of venue availability, venue locations, proposed ticket prices, performer fees, venue fees, scheduled performances by one or more performers, or any combination thereof;

receiving one or more event target features associated with the series of live events, wherein the one or more event target features comprise at least one of event attendance, event profit, event revenue, event expenses, or any combination thereof;

providing the one or more event parameters and the one or more event target features to a machine learning (ML) model, wherein the ML model is at least one of a neural network ML model and a support vector ML model;

iteratively training the ML model to identify relationships between different event parameters and the one or more event target features using historical data corresponding to one or more previous series of live events, wherein such iterative training improves the accuracy of the ML model;

receiving, from a user, one or more user-specific event parameters for a future series of live events to be held in a plurality of geographic regions;

receiving, from the user, one or more user-specific event weights representing one or more prioritized event target features associated with the future series of live events;

providing the one or more user-specific event parameters and the one or more user-specific event weights to the trained ML model;

generating, via the trained ML model, a schedule for the future series of live events that is optimized relative to the one or more prioritized event target features;

detecting a real-time change to the one or more user-specific event parameters;

providing the real-time change to the trained ML model;

providing the real-time change to the trained ML model to improve the accuracy of the trained ML model; and

updating, via the trained ML model, the schedule for the future series of live events such that the schedule remains optimized relative to the one or more prioritized event target features in view of the real-time change to the one or more user-specific event parameters.

**10**. The system of claim **9**, wherein detecting the real-time change to the one or more user-specific event parameters

**16**

includes collecting and/or analyzing social media data related to the future series of live events.

**11**. A computer-implemented method of dynamically generating an event schedule, the method comprising:

receiving one or more event parameters for live events comprising performances by a plurality of performers, wherein the one or more event parameters comprise at least one of a list of the performers, a list of available venues in a plurality of geographic regions, proposed ticket prices, performer fees, venue fees, scheduled performances by one or more performers, or any combination thereof;

receiving one or more event target features associated with live events, wherein the one or more event target features comprise at least one of event attendance, event profit, event revenue, event expenses, or any combination thereof;

providing the one or more event parameters and the one or more event target features to a machine learning (ML) model, wherein the ML model is at least one of a neural network ML model and a support vector ML model;

iteratively training the ML model to identify relationships between different event parameters and the one or more event target features using historical data corresponding to a plurality of previous live events, wherein such iterative training improves the accuracy of the ML model apply;

receiving, from a user, one or more user-specific event parameters for a plurality of future live events to be held in a plurality of geographic regions;

receiving, from the user, one or more user-specific event weights representing one or more prioritized event target features associated with the plurality of future live events;

providing the one or more user-specific event parameters and the one or more user-specific event weights to the trained ML model;

generating, via the trained ML model, a schedule for the plurality of future live events that is optimized relative to the one or more prioritized event target features;

detecting a real-time change to the one or more user-specific event parameters;

providing the real-time change to the trained ML model to improve the accuracy of the trained ML model; and

updating, via the trained ML model, the schedule for the plurality of future live events such that the schedule remains optimized relative to the one or more prioritized event target features in view of the real-time change to the one or more user-specific event parameters.

**12**. The method of claim **11**, wherein generating the schedule for the plurality of future live events that is optimized relative to the one or more prioritized target features comprises generating a schedule that maximizes a total attendance for at least one of the plurality of future live events or a single event from the plurality of future live events.

**13**. The method of claim **11**, wherein generating the schedule for the plurality of future live events that is optimized relative to the one or more prioritized target features comprises generating a schedule that maximizes a total attendance at the plurality of future live events for a particular demographic segment.

**14**. The method of claim **11**, wherein the one or more user-specific event parameters comprise at least one date for the plurality of future live events.

US 11,386,367 B1

17

**15**. The method of claim **11**, wherein the plurality of performers comprises at least one of a band, a music group, an author, a comedian, a politician, an activist, or a speaker.

**16**. The method of claim **11**, wherein generating the schedule for the plurality of future live events that is optimized relative to the one or more prioritized target features comprises assigning (i) a first performer from the list of performers to a first venue from the list of available venues and (ii) a second performer from the list of performers to a second venue from the list of available venues.

**17**. The method of claim **11**, wherein the geographic regions comprise at least one of a country, a state, or a city.

**18**. The method of claim **11**, wherein detecting the real-time change to the one or more user-specific event parameters includes collecting and/or analyzing social media data related to the plurality of future live events.

**19**. A system comprising:

one or more computer systems programmed to perform operations comprising:

receiving one or more event parameters for live events comprising performances by a plurality of performers, wherein the one or more event parameters comprise at least one of a list of the performers, a list of available venues in a plurality of geographic regions, proposed ticket prices, performer fees, venue fees, scheduled performances by one or more performers, or any combination thereof;

receiving one or more event target features associated with live events, wherein the one or more event target features comprise at least one of event attendance, event profit, event revenue, event expenses, or any combination thereof;

providing the one or more event parameters and the one or more event target features to a machine learning (ML) model, wherein the ML model is at least one of a neural network ML model and a support vector ML model;

18

iteratively training, in a second stage, the ML model to identify relationships between different event parameters and the one or more event target features using historical data corresponding to a plurality of previous live events, wherein such iterative training improves the accuracy of the ML model;

receiving, from a user, one or more user-specific event parameters for a plurality of future live events to be held in a plurality of geographic regions;

receiving, from the user, one or more user-specific event weights representing one or more prioritized event target features associated with the plurality of future live events;

providing the one or more user-specific event parameters and the one or more user-specific event weights to the trained ML model;

generating, via the trained ML model, a schedule for the plurality of future live events that is optimized relative to the one or more prioritized event target features;

detecting a real-time change to the one or more user-specific event parameters;

providing the real-time change to the trained ML model to improve the accuracy of the trained ML model; and

updating, via the trained ML model, the schedule for the plurality of future live events such that the schedule remains optimized relative to the one or more prioritized event target features in view of the real-time change to the one or more user-specific event parameters.

**20**. The system of claim **19**, wherein detecting the real-time change to the one or more user-specific event parameters includes collecting and/or analyzing social media data related to the plurality of future live events.

* * * * *

US011537960B2

(12) **United States Patent**
Tabrizi et al.

(10) **Patent No.:** **US 11,537,960 B2**
(45) **Date of Patent:** **Dec. 27, 2022**

(54) **SYSTEMS AND METHODS FOR DETERMINING EVENT SCHEDULES**

(71) Applicant: **Recentive Analytics, Inc.**, Boston, MA (US)

(72) Inventors: **Andysheh Tabrizi**, Boston, MA (US); **Evan Charles Smith**, Lexington, MA (US)

(73) Assignee: **Recentive Analytics, Inc.**, Boston, MA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **17/857,597**

(22) Filed: **Jul. 5, 2022**

(65) **Prior Publication Data**
US 2022/0383234 A1    Dec. 1, 2022

**Related U.S. Application Data**

(63) Continuation of application No. 17/332,144, filed on May 27, 2021, now Pat. No. 11,386,367.

(51) **Int. Cl.**
*G06Q 10/06* (2012.01)
*G06N 20/00* (2019.01)

(52) **U.S. Cl.**
CPC ..... *G06Q 10/063116* (2013.01); *G06N 20/00* (2019.01)

(58) **Field of Classification Search**
CPC .............. G06Q 10/02; G06Q 30/0202; G06Q 10/1095; G06Q 10/00; G06Q 10/063116; G06Q 10/06315; G06Q 10/047; G06Q 10/1093; G06Q 10/06; G06N 20/00
USPC ........... 705/5, 7.29, 37, 7.25, 7.16; 707/748, 707/7.31
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 7,343,312 B2 | 3/2008 | Capek et al. | |
| 8,433,998 B2 | 4/2013 | Coffman et al. | |
| 10,614,426 B2 | 4/2020 | Bellary et al. | |
| 2003/0004773 A1 | 1/2003 | Clark et al. | |
| 2009/0248471 A1* | 10/2009 | Panay ................... | G06Q 10/02 |
| | | | 705/5 |
| 2009/0292550 A1 | 11/2009 | Ly | |
| 2013/0046580 A1* | 2/2013 | Harker ................... | G06Q 10/00 |
| | | | 705/7.29 |
| 2017/0236097 A1 | 8/2017 | Smith | |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 2743869 A1 | 6/2014 |
| WO | WO-2016108108 A1 | 7/2016 |

OTHER PUBLICATIONS

Chun, Andy Hon Wai, "Using AI for Olympic Equestrian Event Preparation," Association for the Advancement of Artificial Intelligence (www.aaai.org). pp. 1616-1623, 2008. (Year: 2008).*

*Primary Examiner* — Charles Guiliano
*Assistant Examiner* — Letoria G Knight
(74) *Attorney, Agent, or Firm* — Goodwin Procter LLP

(57) **ABSTRACT**

This application relates to systems and methods for generating desired or optimized event schedules. An example computer-implemented method of dynamically generating an event schedule includes: receiving ogle or more parameters for a series of live events to be held in a plurality of geographic regions; generating a schedule for the series of live events based on the one or more parameters; and automatically updating the schedule based on a change to the one or more parameters.

**20 Claims, 7 Drawing Sheets**



**US 11,537,960 B2**

Page 2

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2018/0213273 A1 * | 7/2018 | Carter | H04N 21/25825 |
| 2019/0034837 A1 * | 1/2019 | Lou | G06N 20/00 |
| 2022/0065633 A1 * | 3/2022 | Beaurepaire | G06Q 10/047 |

* cited by examiner

Case 1:22-cv-01545-GBW     Document 13-5     Filed 02/24/23     Page 4 of 19 PageID #: 276



FIG. 1

Case 1:22-cv-01545-GBW    Document 13-5    Filed 02/24/23    Page 5 of 19 PageID #: 277



FIG. 2



FIG. 3

**U.S. Patent**    Dec. 27, 2022    **Sheet 4 of 7**    **US 11,537,960 B2**



FIG. 4

Case 1:22-cv-01545-GBW    Document 13-5    Filed 02/24/23    Page 8 of 19 PageID #: 280



500

502 — Receive one or more parameters for a plurality of live events including performances by a plurality of performers

504 — Generate a schedule for the live events based on one or more parameters, including a list of the performers and a list of available venues in a plurality of geographic regions

506 — Automatically update the schedule based on a change to the one or more parameters

FIG. 5

Case: 23-2437    Document: 13    Page: 143    Filed: 12/22/2023

Case 1:22-cv-01545-GBW    Document 13-5    Filed 02/24/23    Page 9 of 19 PageID #: 281



FIG. 6

Case: 23-2437    Document: 13    Page: 144    Filed: 12/22/2023

Case 1:22-cv-01545-GBW    Document 13-5    Filed 02/24/23    Page 10 of 19 PageID #: 282

| Venue | 9/1 | 9/2 | 9/3 | 9/4 | 9/5 | 9/6 | 9/7 | 9/8 | 9/9 |
|---|---|---|---|---|---|---|---|---|---|
| Venue 1 | P1 | | | | | | | | |
| Venue 2 | | | | | | | | | P1 |
| Venue 3 | | | P1 | | | | | | |
| Venue 4 | | P1 | | | | | | | |
| Venue 5 | | | | | P1 | | | | |
| Venue 6 | | | | | | | | | |
| Venue 7 | | | | | | P1 | | | |
| Venue 8 | | | | | | | | P1 | |
| Projection | 221 | 141 | 432 | | 251 | 676 | | 549 | 246 |

714 → 2,516

FIG. 7

US 11,537,960 B2

## 1

# SYSTEMS AND METHODS FOR DETERMINING EVENT SCHEDULES

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 17/332,144 titled "SYSTEMS AND METHODS FOR DETERMINING EVENT SCHEDULES" and filed on May 27, 2021, the entirety of which is incorporated herein by reference.

## TECHNICAL FIELD OF THE INVENTION

In general, the subject matter of this disclosure relates to determining event schedules and, more specifically, to optimizing an event schedule for a series of live events or a set of live events to be held in a plurality of geographic regions.

## BACKGROUND

Celebrities, musicians, politicians, venue owners, venue managers, and other individuals and entities frequently schedule live events that occur in a plurality of different geographic locations over the course of anywhere from a couple of days to many years. Common examples of such events include concert tours, comedy tours, speaking tours, and campaign rallies. For example, a music group may need to determine a schedule (e.g., including dates and locations) for an upcoming concert tour that covers multiple cities, states, or countries over several months. Additionally, an owner or manager of one or more venues may need to determine a schedule for multiple performers who are available to perform at the one or more venues. Scheduling such live events can be difficult due to a wide variety of factors that may need to be considered (e.g., competing events, expenses, ticket prices, weather, performer availability, venue availability, etc.). Failure to properly consider such factors can lead to sub-optimal schedules that generate little interest among consumers and/or result in low attendance or ticket sales.

There is a need for improved systems and methods for scheduling live events involving one or more performers at a plurality of venues in different geographic locations.

## SUMMARY OF THE INVENTION

In various examples, the subject matter of this disclosure relates to improved techniques for scheduling live events for one or more performers in a plurality of geographic locations. In some examples, computer-implemented systems and methods can determine an optimized schedule for a proposed series of live events involving a performer in a plurality of geographic locations (e.g., a concert tour). The systems and methods can receive a variety of input parameters related to the proposed series of live events (e.g., performer availability, venue availability, projected ticket prices, etc.) and can generate a schedule (e.g., using machine learning) that optimizes one or more target features (e.g., total attendance or attendance by a particular demographic segment) for one or more of the live events. Additionally or alternatively, the computer-implemented systems and methods can determine an optimized schedule for proposed live events involving multiple performers in a plurality of geographic locations. The systems and methods can receive a variety of input parameters related to the proposed live events (e.g., performer availability, venue availability, pro-

## 2

jected ticket prices, etc.) and can generate a schedule (e.g., using machine learning) that optimizes one or more target features (e.g., total attendance) for one or more of the live events. In various examples, a generated schedule can be updated when one or more of the input parameters change. Such updates can be based on real-time data (e.g., real-time input parameters) and, in some instances, the schedule can be dynamically updated in response to changes in this data.

In general, in one aspect, the subject matter described in this specification relates to a computer-implemented method of dynamically generating an event schedule. The method includes: receiving one or more parameters for a series of live events to be held in a plurality of geographic regions; generating a schedule for the series of live events based on the one or more parameters; and automatically updating the schedule based on a change to the one or more parameters.

In certain examples, the one or more parameters can include a tentative schedule for the series of live events. The series of live events can include a tour for a band, a music group, an author, a performer, a comedian, a politician, an activist, and/or a speaker. Generating the schedule can include maximizing a revenue and/or a total attendance for the series of live events and/or a single event from the series of live events. Generating the schedule can include maximizing a revenue and/or a total attendance at the series of live events for a demographic segment. Generating the schedule can include providing the one or more parameters to a machine learning model. Generating the schedule can include choosing a venue, a date, and/or a time for each live event in the series of live events. The step of automatically updating the schedule can include using a machine learning model to update the schedule based on the change to the one or more parameters. The geographic regions can be or include a country, a state, and/or a city.

In another aspect, the subject matter described in this specification relates to a system. The system includes one or more computer systems programmed to perform operations including: receiving one or more parameters for a series of live events to be held in a plurality of geographic regions; generating a schedule for the series of live events based on the one or more parameters; and automatically updating the schedule based on a change to the one or more parameters.

In another aspect, the subject matter described in this specification relates to a computer-implemented method of dynamically generating an event schedule. The method includes: receiving one or more parameters for a plurality of live events including performances by a plurality of performers, the one or more parameters including a list of the performers and a list of available venues in a plurality of geographic regions; generating a schedule for the live events based on the one or more parameters; and automatically updating the schedule based on a change to the one or more parameters.

In certain examples, generating the schedule includes maximizing a total attendance for the plurality of live events and/or a single event from the plurality of live events. Generating the schedule can include maximizing a total attendance at the plurality of live events for a demographic segment. The one or more parameters can include at least one date for the plurality of live events. The plurality of performers can include a band, a music group, an author, a comedian, a politician, an activist, and/or a speaker. Generating the schedule can include providing the one or more parameters to a machine learning model. Generating the schedule can include assigning (i) a first performer from the list of performers to a first venue from the list of available venues and (ii) a second performer from the list of perform-

US 11,537,960 B2

3

ers to a second venue from. the list of available venues. The step of automatically updating the schedule can include using a machine learning model to update the schedule based on the change to the one or more parameters. The geographic regions can be or include a country, a state, and/or a city.

In another aspect, the subject matter described in this specification relates to a system. The system includes one or more computer systems programmed to perform operations including: receiving one or more parameters for a plurality of live events including performances by a plurality of performers, the one or more parameters including a list of the performers and a list of available venues in a plurality of geographic regions; generating a schedule for the live events based on the one or more parameters; and automatically updating the schedule based on a change to the one or more parameters.

Elements of embodiments described with respect to a given aspect of the invention can be used in various embodiments of another aspect of the invention. For example, it is contemplated that features of dependent claims depending from one independent claim can be used in apparatus, systems, and/or methods of any of the other independent claims.

BRIEF DESCRIPTION OF THE DRAWINGS

In the drawings, like reference characters generally refer to the same parts throughout the different views. Also, the drawings are not necessarily to scale, emphasis instead generally being placed upon illustrating the principles of the invention. In the following description, various embodiments of the present invention are described with reference to the following drawings, in which:

FIG. 1 is a schematic diagram of a system for determining schedules for live events, in accordance with certain examples;

FIG. 2 is a block diagram of a method of generating a schedule for a series of live events involving a single performer, in accordance with certain examples;

FIG. 3 is a flowchart of a method of generating a schedule for a series of live events involving a single performer, in accordance with certain examples;

FIG. 4 is a block diagram of a method of generating a schedule for live events involving multiple performers, in accordance with certain examples; and

FIG. 5 is a flowchart of a method of generating a schedule for live events involving multiple performers, in accordance with certain examples;

FIG. 6 is a schematic diagram of a graphical user interface presenting a schedule of live events involving multiple performers and multiple venues, in accordance with certain examples; and

FIG. 7 is a schematic diagram of a graphical user interface presenting a schedule for a series of live events involving a single performer and multiple venues, in accordance with certain examples.

DETAILED DESCRIPTION

In certain examples, a "performer" can be or include an individual or group of individuals who entertain, perform for, and/or speak to an audience, either in person or through a remote connection (e.g., video or audio transmission). The performer can be or include, for example, a musician, a band, a music group, a singer, an artist, a comedian, a theater troupe, an actor, an author, a politician, a speaker, an activist,

4

an acrobat, an athlete, or other individual or group of individuals who may perform for an audience.

In certain examples, a "venue" can be or include a stadium, an amphitheater, a theater, a club, a bar, a park, a cruise ship, a convention center, an exposition center, a town square, or any other building, structure, or location, either public or private, where a performer can perform for an audience.

In certain examples, a "live event" can be or include a live performance by a performer for an audience. The live event can be or include, for example, a concert, a musical performance, a speech, a comedy performance, or any other type of event performed for an audience that witnesses the live event in person or through a remote connection (e.g., video or audio transmission).

In certain examples, a "series" of live events can be or include multiple live events that occur in different geographical locations over a period of time, such as a day, a week, a month, or a year. For example, a series of live events can be a tour for a music group (or other performer) that performs in different venues, in different geographic regions (e.g., cities, states, or countries), over a period of weeks or months.

FIG. 1 illustrates an example system 100 for scheduling live events, such as a series of performances (e.g., concerts) by a performer (e.g., a musician or band) in different geographic regions (e.g., different cities, states, or countries). A server system 112 provides functionality for determining schedules for the live events based on a variety of inputs, as described herein. The server system 112 includes software components and databases that can be deployed at one or more data centers 114 in one or more geographic locations, for example. The server system 112 software components can include, for example, a performer module 116 and a venue module 118. The server system 112 can include subcomponents that can execute on the same or on different individual data processing apparatus, The server system 112 databases can include a performance data 120 database, though it is understood that any number of databases can be included. The databases can reside in one or more physical storage systems. The software components and data will be further described below.

An application, such as, for example, a web-based or other software application can be provided as an end-user application to allow users to interact with the server system 112. The software application or components thereof can be accessed through a network 124 (e.g., the Internet) by users of client devices, such as a smart phone 126, a personal computer 128, a smart phone 130, a tablet computer 132, and a laptop computer 134. Other client devices are possible.

The performer module 116 can include software components that support the software application by, for example, determining a desired or optimal schedule for a series of live events for a performer. For example, the performer module 116 can receive input parameters for a proposed series of live events for the performer and, based on the parameters, determine the desired or optimal schedule for the live events (e.g., using a machine learning model). The performer module 116 can update the schedule based on a change to the input parameters. For example, a performer or an agent or representative of the performer can use the software application to access the performer module 116 and determine a desired or optimal schedule for the performer's live events.

Similarly, the venue module 118 can include software components that support the software application by, for example, determining a desired or optimal schedule for a plurality of live events involving a plurality of performers at

US 11,537,960 B2

5

one or more venues. For example, the venue module 118 can receive input parameters for proposed performances at a venue and, based on the parameters, determine the desired or optimal schedule for the live events at the venue (e.g., using a machine learning model). The venue module 118 can update the schedule based on a change to the input parameters. For example, a manager or owner of one or more venues can use the software application to access the venue module 116 and determine a desired or optimal schedule for the one or more venues (e.g., over a specified date range).

The performance data 120 database can store and provide data for the software application and/or can provide data to or receive data from the performance model 116 and the venue module 118. The data can include, for example, information related to performers, venues, and associated live events. For example, the data can include information related to performance dates (e.g., proposed dates for a concert tour), performer availability (e.g., dates when an artist is available or not already booked), venue availability (e.g., dates when a venue is available or not already booked), financial data (e.g., ticket prices, artist fees, venue fees, etc.), demographics (e.g., demographic data for ticket holders or other consumers), travel data (e.g., travel expenses and/or distances traveled by a performer for a proposed series of live events), social media data (e.g., data related to performer popularity), or any combination thereof.

FIG. 2 depicts an example method 200 in which the performer module 116 is used to schedule a series of live events for a performer. Parameters 202 for a proposed series of live events are provided (step 204) as inputs to the performer module 116. Such input parameters 202 can be, include, or relate to, for example: a proposed or tentative schedule for the series of live events, a proposed range of dates for the live events, a proposed set of locations for the live events (e.g., including cities, states, and/or countries), venue availability (e.g., dates and/or times when one or more venues are available to host one or more of the live events in the proposed locations), venue locations (e.g., an address for each venue), proposed ticket prices (e.g., for each available venue or available seat in each venue), cost information (e.g., venue fees, travel expenses, etc.), scheduled performances by the same performer or other performers (e.g., a competing band in the same geographic region), weather data (e.g., average temperatures for a venue at a proposed time), or any combination thereof. The input parameters 202 can be retrieved from the performance data 120 database, can be manually entered by users, and/or can be retrieved from other sources (e.g., a database or website operated by a third party, such as a venue manager). In some instances, for example, a user may specify the dates when the performer is available to perform.

In the depicted example, the performer module 116 uses the input parameters 202 to determine and output (step 206) a desired or optimal schedule 208 for the series of live events 206. The schedule 208 can be or include, for example, a schedule for the series of live events that optimizes, maximizes, or minimizes one or more target features for the live events. Such target features can include, for example, attendance at one or more of the live events (e.g., a total attendance or attendance by a particular demographic), a profit for one or more of the live events, a revenue for one or more of the live events, and/or costs or expenses for one or more of the live events. A user of the software application can specify the target features that should be considered by the performer module 116. Additionally or alternatively, each target feature can be assigned a weight that indicates an importance of the target feature. For example, a user may

6

choose to weigh attendance for a particular demographic segment more heavily than total attendance or revenue. Such weights can allow the performer module 116 to determine the schedule 208 based on particular combinations of target features that may be of interest.

In some embodiments, the performer module 116 includes or utilizes a machine learning model 210 or other predictive tool for determining the desired or optimal schedule 208. In general, any suitable machine learning technique can be used, such as, for example: a gradient boosted random forest, a regression, a neural network, a decision tree, a support vector machine, a Bayesian network, other type of technique. The machine learning model 210 can be trained using a set of training data, The training data can be or include, for example, historical data from previous live events or series of live events. Such data can include lamination related to the input parameters 202 (e.g., dates, venue locations, ticket prices, social media data, etc.) and the target features (e.g., attendance, revenue, expenses, etc.). In general, the machine learning model 210 can be trained to recognize how to optimize, maximize, or minimize one or more of the target features based on a given set of input parameters. Once trained, the machine learning model 210 can receive the input parameters 202 as input, generate the optimized schedule, and provide the schedule 208 as output. To generate the schedule, the performer module 116 and/or the machine learning model 210 can choose a venue, a date, and/or a time for the live events (e.g., for each live event) in the series of live events.

In some examples, after the schedule 208 has been determined, the performer module 116 can receive (step 212) one or more updates or changes 214 to the input parameters. These parameter changes 214 can include, for instance, changes to venue availability, ticket prices, expenses, performer availability, weather conditions, other input parameters, or any combination thereof. The performer module 116 can then update the schedule 208 in response to the parameter changes 214. For example, if a higher capacity venue becomes available, the schedule 208 can be updated to replace a lower capacity venue with the higher capacity venue. Such a change could result in a new schedule 208 that is preferred over an original or previous schedule 208. For example, the new schedule 208 may achieve a better optimization of one or more of the target features (e.g., revenue, attendance, expenses, travel times, etc.). In some embodiments, the performer module 116 can search for and/or receive the parameter changes 214 on a regular schedule or at periodic intervals (e.g., every hour, day, week, or month). Alternatively or additionally, the performer module 116 can receive parameter changes 214 when prompted to do so by a user. For instance, the user can use a client device to instruct the performer module 116 to retrieve the parameter changes 214 and/or can enter the parameter changes 214 manually. In some examples, the schedule 208 can be updated based on real-time data (e.g., real-time parameter changes 214) and, in some instances, the schedule 208 can be dynamically updated in response to changes in this data.

FIG. 3 is a flowchart of a computer-implemented method 300 of dynamically generating an event schedule, in accordance with certain embodiments. One or more parameters for a series of live events to be held in a plurality of geographic locations are received (step 302). A schedule for the series of live events is generated (step 304) based on the one or more parameters. The schedule is automatically updated (step 306) based on a change to the one or more parameters.

US 11,537,960 B2

7

FIG. 4 depicts an example method 400 in which the venue module 118 is used to schedule live events for a plurality of performers at one or more venues. Parameters 402 for proposed live events involving the plurality of performers are provided (step 404) as inputs to the venue module 118. Such input parameters 402 can be, include, or relate to, for example: a proposed or tentative schedule for the live events at the one or more venues, a proposed range of dates for the live events, a proposed set of locations for the live events (e.g., including cities, states, and/or countries), venue availability (e.g., dates and/or times when one or more venues are available to host one or more of the live events in the proposed locations), venue locations (e.g., an address for each venue), proposed ticket prices (e.g., for each available venue or available seat in a venue), cost information (e.g., artist fees, vendor fees, etc.), scheduled performances by the same performer or other performers (e.g., a competing band in the same geographic region), weather data (e.g., average temperatures for a venue at a proposed time), or any combination thereof. The input parameters 402 can be retrieved from the performance data 120 database, can be manually entered by users, and/or can be retrieved from other sources (e.g., a database or website operated by a third party, such as a manager of a venue or performer). In some embodiments, for example, a user may specify a set of available locations, a set of available venues, and/or a range of dates for one or more performances.

In the depicted example, the venue module 118 can use the input parameters 402 to determine and output (step 406) a desired or optimized schedule 408 for the live events involving multiple performers at one or more venues. The schedule 408 can cover, for example, a plurality of performers and a plurality of venues (e.g., in different cities, states, countries, or other geographic regions) for a period of time that can range from a day to multiple weeks, months, or years. In some examples, the schedule 408 can be or include a schedule of live events for a plurality of venues owned or managed by a single user or entity. Alternatively or additionally, the schedule 408 can be a schedule for a plurality of performers who are managed by a single user or entity. Many other types of schedules 408 are possible. In some embodiments, multiple events on the schedule 408 can be scheduled to occur concurrently (e.g., two performers performing at the same time in different venues).

In various examples, the schedule 408 can be or include, for example, a schedule for the live events (by multiple performers at one or more venues) that optimizes, maximizes, or minimizes one or more target features for the live events. Such target features can include, for example, attendance at one or more of the live events (e.g., a total attendance or attendance by a particular demographic), a profit for one or more of the live events, a revenue for one or more of the live events, and/or costs or expenses for one or more of the live events. A user of the software application can specify the target features that should be considered by the venue module 118. Additionally or alternatively, each target feature can be assigned a weight that indicates an importance of the target feature. For example, a user may choose to weigh attendance for a particular demographic segment more heavily than total attendance or revenue. Such weights can allow the performer module 118 to determine the schedule 408 based on particular combinations of target features that may be of interest.

In various implementations, the venue module 118 includes or utilizes a machine learning model 410 or other predictive tool for determining the desired or optimal schedule 408. In general, any suitable machine learning technique

8

can be used, such as, for example: a gradient boosted random forest, a regression, a neural network, a decision tree, a support vector machine, a Bayesian network, other type of technique. The machine learning model 410 can be trained using a set of training data. The training data can be or include, for example, historical data from previous live events or series of live events. Such data can include information related to the input parameters 402 (e.g., dates, venue locations, ticket prices, social media data, etc.) and the target features (e.g., attendance, revenue, expenses, etc.). In general, the machine learning model 410 can be trained to recognize how to optimize, maximize, or minimize one or more of the target features based on a given set of input parameters. Once trained, the machine learning model 410 can receive the input parameters 402 as input, generate the optimized schedule, and provide the schedule 408 as output. To generate the schedule, the venue module 118 and/or the machine learning model 410 can choose a performer, a venue, a date, and/or a time for the live events (e.g., for each live event).

In some examples, after the schedule 408 has been determined, the venue module 118 can receive (step 412) one or more updates or changes 414 to the input parameters. These parameter changes 414 can include, for instance, changes to venue availability, ticket prices, expenses, performer availability, weather conditions, other input parameters, or any combination thereof. The venue module 118 can then update the schedule 408 in response to the parameter changes 414. For example, if a performer becomes unavailable, the venue module 118 can update the schedule 408 to include a substitute performer. Such a change could result in a new schedule 408 that is preferred over an original or previous schedule 408. For example, the new schedule 408 may achieve a better optimization of one or more of the target features (e.g., revenue, attendance, expenses, travel times, etc.). In some embodiments, the venue module 118 can search for and/or receive the parameter changes 414 on a regular schedule or at periodic intervals (e.g., every hour, day, week, or month). Alternatively or additionally, the venue module 118 can receive parameter changes 414 when prompted to do so by a user. For instance, the user can use a client device to instruct the venue module 118 to retrieve the parameter changes 414 and/or can enter the parameter changes 414 manually. In some examples, the schedule 408 can be updated based on real-time data (e.g., real-time parameter changes 414), and, in some instances, the schedule 408 can be dynamically updated in response to changes in this data.

FIG. 5 is a flowchart of a computer-implemented method 500 of dynamically generating an event schedule, in accordance with certain examples. One or more parameters for a plurality of live events are received (step 502). The live events can be or include performances by a plurality of performers, and the one or more parameters can include a list of the performers and a list of available venues in a plurality of geographic regions. A schedule for the live events is generated (step 504) based on the one or more parameters. The schedule is automatically updated (step 506) based on a change to the one or more parameters.

Advantageously, the systems and methods disclosed herein can allow performers, venue owners, promoters, and other individuals or entities to create optimized schedules for live events, including a series of live events by a single performer (e.g., a concert tour) or a collection of live events by multiple performers at one or more venues. The schedules can be optimized for profit, revenue, expenses, travel, attendance, other target features, or any combination thereof

US 11,537,960 B2

9

(e.g., based on weights assigned to the target features). In some embodiments, input parameters for the performer module 116 and/or the venue module 118 (e.g., the input parameters 202 and/or 402) can be or include social media activity data. Such data can be mined or analyzed to determine how popular a performer may be. For example, the performer module 116 and/or the venue module 118 can use such data to determine performer popularity or demand in one or more geographic regions. This can allow the performer module 116 and/or the venue module 118 to make more accurate predictions for ticket sales, attendance, and/or appropriate ticket prices. Such predictions can be made or used by the performer module 116 and/or the venue module 118 when generating the optimized schedules 208 and/or 408.

Advantageously, the systems and methods described herein represent and/or achieve a significant improvement in computer functionality. For example, use of the performer module 116 and the venue module 118 (and the associated machine learning models 210 and 410) can improve the accuracy and/or automation of data processing. In various instances, for example, the performer module 116 and venue module 118 are developed and trained to receive a wide variety and quantity of data (e.g., the input parameters) and to consider a variety of target features when generating desired or optimized schedules for live events. Such schedules can be updated, as needed, when any changes to the input parameters or target features are received. By training the performer module 116 and the venue module 118 to generate optimized schedules automatically and update the schedules dynamically, in response to real-time changes in data, the input parameters and target features can be processed and considered more efficiently and accurately, compared to prior approaches.

FIG. 6 depicts an example of an optimized schedule 600 (e.g., created using the venue module 118) for a plurality of venues 610 (labeled Venues 1 through 15) and a plurality of performers (labelled P1 through P9) over a range of dates (e.g., September 1 through September 10). The schedule 600 in this example is presented as a table, with a first column listing the venues 610 and each remaining column representing a date from the range of dates (e.g., consecutive dates over a time period or a subset of dates, such as weekend dates, for the time period). Each row in the table represents a different venue from the plurality of venues 610. In the depicted example, the schedule 600 identifies the dates when the performers are scheduled to perform and the venues where the performances are scheduled to occur. For example, performer P1 is scheduled to perform on September 1 at Venue 11, and performer P2 is scheduled to perform on September 2 at Venue 3. Some performers can appear multiple times in the schedule 600. For example, performer P2 is also scheduled to perform on September 6 at Venue 5. The list of venues 610 can include a listing of available venues for the performers during the date range. Some of the venues 610 in this example (e.g., Venue 2) are not selected to host any performances in the schedule 600. The venues 610 can be located in different geographic regions (e.g., cities, states, or countries) or in the same geographic region.

In some embodiments, the schedule 600 may list one or more target features that were optimized or calculated by the venue module 118 when generating the schedule 600. In the depicted example, a revenue target feature 612 is presented for several of the columns (e.g., columns associated with at least one performance), and a total revenue target feature 614 is presented for the entire schedule 600 (e.g., for all dates and scheduled performances), Other target features,

10

such as cost, attendance, and/or demographics for attendees can be presented in the schedule 600 in addition to or instead of the revenue target feature 612 and/or the total revenue target feature 614.

In certain examples, a graphical user interface for the schedule 600 can include various user interface buttons, such as, for example, an optimal button 616, a reset button 618, a CSV button 620, a save button 622, and/or a load button 624. By selecting the reset button 618, for example, the user can clear the schedule 600 of all or almost all of its values or information. By selecting the save button 622, the user can save a copy of the current schedule 600 (e.g., to a user client device or to a server computer). The load button 624 can be selected to import a schedule that was previously generated or saved. The CSV button 620 can be used to create a CSV file or a spreadsheet file that includes data from the schedule 600. Alternatively, in some examples, the CSV button 620 can be used to load a CS file or a spreadsheet file to create or present the schedule 600 or a different schedule.

FIG. 7 depicts an example of an optimized schedule 700 (e.g., created using the performer module 116) for a series of live events involving a single performer (labeled P1) and a plurality of venues 710 (labeled Venues 1 through 8) over a range of dates (e.g., September 1 through September 9). The schedule 700 in this example is presented as a table, with a first column listing the venues 710 and each remaining column representing a date from the range of dates (e.g., consecutive dates over a time period or a subset of dates, such as weekend dates, for the time period). Each row in the table represents a different venue from the plurality of venues 710. In the depicted example, the schedule 700 identifies the dates and venues for each scheduled performance by the performer P1. For example, the performer P1 is scheduled to perform on September 1 at Venue 1 and on September 2 at Venue 4. Some dates (e.g., September 4 and September 7) do not have any performances scheduled for the performer P1. Also, while the depicted example indicates the performer P1 is performing in no more than one venue on any given date, it is understood that the performer could be scheduled to perform in multiple venues on the same date, if scheduling permits. The list of venues 710 can include a listing of available venues for the performer during the date range. One of the venues 710 in this example (e.g., Venue 6) is not selected to host any performances in the schedule 700.

In certain embodiments, the schedule 700 may list one or more target features that were optimized or calculated by the venue module 118 when generating the schedule 700. For example, one or more target features (e.g., revenue, cost, and/or attendance) can be presented for one or more dates in or near a bottom row 712 of the schedule 700. Additionally or alternatively, a total target feature 714 (e.g., total revenue, cost, and/or total attendance) can be presented for the entire schedule 700 (e.g., all dates and scheduled performances). A graphical user interface for the schedule 700 can include one or more buttons (not shown) that allow a user to reset the schedule 700, generate a CSV or spreadsheet file with the schedule information, save the schedule, or load a different schedule.

Implementations of the subject matter and the operations described in this specification can be implemented in digital electronic circuitry, or in computer software, firmware, or hardware, including the structures disclosed in this specification and their structural equivalents, or in combinations of one or more of them. Implementations of the subject matter described in this specification can be implemented as one or more computer programs, i.e., one or more modules of

US 11,537,960 B2

**11**

computer program instructions, encoded on computer storage medium for execution by, or to control the operation of, data processing apparatus. Alternatively or in addition, the program instructions can be encoded on an artificially generated propagated signal, e.g., a machine-generated electrical, optical, or electromagnetic signal, that is generated to encode information for transmission to suitable receiver apparatus for execution by a data processing apparatus. A computer storage medium can be, or be included in, a computer-readable storage device, a computer-readable storage substrate, a random or serial access memory array or device, or a combination of one or more of them. Moreover, while a computer storage medium is not a propagated signal, a computer storage medium can be a source or destination of computer program instructions encoded in an artificially-generated propagated signal. The computer storage medium can also be, or be included in, one or more separate physical components or media (e.g., multiple CDs, disks, or other storage devices),

The operations described in this specification can be implemented as operations performed by a data processing apparatus on data stored on one or more computer-readable storage devices or received from other sources.

The term "data processing apparatus" encompasses all kinds of apparatus, devices, and machines for processing data, including by way of example a programmable processor, a computer, a system on a chip, or multiple ones, or combinations, of the foregoing. The apparatus can include special purpose logic circuitry, e.g., an FPGA (field programmable gate array) or an ASIC (application-specific integrated circuit). The apparatus can also include, in addition to hardware, code that creates an execution environment for the computer program in question, e.g., code that constitutes processor firmware, a protocol stack, a database management system, an operating system, a cross-platform runtime environment, a virtual machine, or a combination of one or more of them. The apparatus and execution environment can realize various different computing model infrastructures, such as web services, distributed computing and grid computing infrastructures.

A computer program (also known as a program, software, software application, script, or code) can be written in any form of programming language, including compiled or interpreted languages, declarative or procedural languages, and it can be deployed in any form, including as a stand-alone program or as a module, component, subroutine, object, or other unit suitable for use in a computing environment. A computer program may, but need not, correspond to a file in a file system. A program can be stored in a portion of a file that holds other programs or data (e.g., one or more scripts stored in a markup language document), in a single file dedicated to the program in question, or in multiple coordinated files (e.g., files that store one or more modules, sub-programs, or portions of code). A computer program can be deployed to be executed on one computer or on multiple computers that are located at one site or distributed across multiple sites and interconnected by a communication network.

The processes and logic flows described in this specification can be performed by one or more programmable processors executing one or more computer programs to perform actions by operating on input data and generating output, The processes and logic flows can also be performed by, and apparatus can also be implemented as, special purpose logic circuitry, e.g., an FPGA (field programmable gate array) or an ASIC (application-specific integrated circuit).

**12**

Processors suitable for the execution of a computer program include, by way of example, both general and special purpose microprocessors, and any one or more processors of any kind of digital computer. Generally, a processor will receive instructions and data from a read-only memory or a random access memory or both. The essential elements of a computer are a processor for performing actions in accordance with instructions and one or more memory devices for storing instructions and data. Generally, a computer will also include, or be operatively coupled to receive data from or transfer data to, or both, one or more mass storage devices for storing data, e.g., magnetic disks, magneto-optical disks, optical disks, or solid state drives. However, a computer need not have such devices. Moreover, a computer can be embedded in another device, e.g., a mobile telephone, a personal digital assistant (PDA), a mobile audio or video player, a game console, a Global Positioning System (GPS) receiver, or a portable storage device (e.g., a universal serial bus (USB) flash drive), to name just a few. Devices suitable for storing computer program instructions and data include all forms of non-volatile memory, media and memory devices, including, by way of example, semiconductor memory devices, e.g., EPROM, EEPROM, and flash memory devices; magnetic disks, e.g., internal hard disks or removable disks; magneto-optical disks; and CD-ROM and DVD-ROM disks. The processor and the memory can be supplemented by, or incorporated in, special purpose logic circuitry.

To provide for interaction with a user, implementations of the subject matter described in this specification can be implemented on a computer having a display device, e.g., a CRT (cathode ray tube) or LCD (liquid crystal display) monitor, for displaying information to the user and a keyboard and a pointing device, e.g., a mouse, a trackball, a touchpad, or a stylus, by which the user can provide input to the computer. Other kinds of devices can be used to provide for interaction with a user as well; for example, feedback provided to the user can be any form of sensory feedback, e.g., visual feedback, auditory feedback, or tactile feedback; and input from the user can be received in any form, including acoustic, speech, or tactile input, In addition, a computer can interact with a user by sending documents to and receiving documents from a device that is used by the user; for example, by sending web pages to a web browser on a user's client device in response to requests received from the web browser.

Implementations of the subject matter described in this specification can be implemented in a computing system that includes a back-end component, e.g., as a data server, or that includes a middleware component, e.g., an application server, or that includes a front-end component, e.g. a client computer having a graphical user interface or a Web browser through which a user can interact with an implementation of the subject matter described in this specification, or any combination of one or more such back-end, middleware, or front-end components. The components of the system can be interconnected by any form or medium of digital data communication, e.g., a communication network. Examples of communication networks include a local area network ("LAN") and a wide area network ("WAN"), an inter-network (e.g., the Internet), and peer-to-peer networks (e.g., ad hoc peer-to-peer networks).

The computing system can include clients and servers. A client and server are generally remote from each other and typically interact, through a communication network. The relationship of client and server arises by virtue of computer programs running on the respective computers and having a

US 11,537,960 B2

13

client-server relationship to each other. In some implementations, a server transmits data (e.g., an HTML page) to a client device (e.g., for purposes of displaying data to and receiving user input from a user interacting with the client device). Data generated at the client device (e.g., a result of the user interaction) can be received from the client device at the server.

While this specification contains many specific implementation details, these should not be construed as limitations on the scope of any inventions or of what may be claimed, but rather as descriptions of features specific to particular implementations of particular inventions. Certain features that are described in this specification in the context of separate implementations can also be implemented in combination in a single implementation.

Conversely, various features that are described in the context of a single implementation can also be implemented in multiple implementations separately or in any suitable subcombination. Moreover, although features may be described above as acting in certain combinations and even initially claimed as such, one or more features from a claimed combination can in some cases be excised from the combination, and the claimed combination may be directed to a subcombination or variation of a subcombination.

Similarly, while operations are depicted in the drawings in a particular order, this should not be understood as requiring that such operations be performed in the particular order shown or in sequential order, or that all illustrated operations be performed, to achieve desirable results. In certain circumstances, multitasking and parallel processing may be advantageous. Moreover, the separation of various system components in the implementations described above should not be understood as requiring such separation in all implementations, and it should be understood that the described program components and systems can generally be integrated together in a single software product or packaged into multiple software products.

Thus, particular implementations of the subject matter have been described. Other implementations are within the scope of the following claims. In some cases, the actions recited in the claims can be performed in a different order and still achieve desirable results. In addition, the processes depicted in the accompanying figures do not necessarily require the particular order shown, or sequential order, to achieve desirable results. In certain implementations, multitasking and parallel processing may be advantageous.

Each numerical value presented herein, for example, in a table, a chart, or a graph, is contemplated to represent a minimum value or a maximum value in a range for a corresponding parameter. Accordingly, when added to the claims, the numerical value provides express support for claiming the range, which may lie above or below the numerical value, in accordance with the teachings herein. Absent inclusion in the claims, each numerical value presented herein is not to be considered limiting in any regard.

The terms and expressions employed herein are used as terms and expressions of description and not of limitation, and there is no intention, in the use of such terms and expressions, of excluding any equivalents of the features shown and described or portions thereof. In addition, having described certain embodiments of the invention, it will be apparent to those of ordinary skill in the art that other embodiments incorporating the concepts disclosed herein may be used without departing from the spirit and scope of the invention. The features and functions of the various embodiments may be arranged in various combinations and permutations, and all are considered to be within the scope

14

of the disclosed invention. Accordingly, the described embodiments are to be considered in all respects as only illustrative and not restrictive. Furthermore, the configurations, materials, and dimensions described herein are intended as illustrative and in no way limiting. Similarly, although physical explanations have been provided for explanatory purposes, there is no intent to be bound by any particular theory or mechanism, or to limit the claims in accordance therewith.

What is claimed is:

1. A computer-implemented method of dynamically generating an event schedule, the method comprising:

receiving one or more event parameters for one or more series of live events, wherein the one or more event parameters comprise scheduling information for one or more performances by one or more performers;

receiving one or more event target features associated with the series of live events, wherein the one or more event target features comprise at least one of event attendance, event profit, event revenue, event expenses, or any combination thereof;

providing the one or more event parameters and the one or more event target features to a machine learning (ML) model, wherein the ML model is at least one of a neural network ML model and a support vector ML model;

iteratively training the ML model to identify relationships between the one or more event parameters and the one or more event target features using historical data corresponding to one or more previous series of live events, wherein such iterative training improves the accuracy of the ML model;

receiving, from a user, one or more user-specific event parameters for a future series of live events associated with a first performer, the user-specific event parameters including scheduling information for one or more future performances by at least one second performer;

receiving, from the user, one or more user-specific event weights representing one or more prioritized event target features associated with the future series of live events;

providing the one or more user-specific event parameters and the one or more user-specific event weights to the trained ML model;

generating, via the trained ML model, a schedule for the future series of live events that is optimized relative to the one or more prioritized event target features;

detecting a real-time change to the scheduling information for the one or more future performances by the at least one second performer;

providing the real-time change to the trained ML model to improve the accuracy of the trained ML model; and

updating, via the trained ML model, the schedule for the future series of live events such that the schedule remains optimized relative to the one or more prioritized event target features in view of the real-time change to the scheduling information for the one or more future performances by the at least one second performer.

2. The method of claim 1, wherein the one or more user-specific event parameters comprise a tentative schedule for the future series of live events.

3. The method of claim 1, wherein the future series of live events comprises a tour for at least one of a band, a music group, an author, a performer, a comedian, a politician, an activist, or a speaker.

US 11,537,960 B2

15

**4.** The method of claim **1**, wherein generating the schedule for the future series of live events that is optimized relative to the one or more prioritized target features comprises generating a schedule that maximizes at least one of a revenue or a total attendance for at least one of the future series of live events or a single event from the future series of live events.

**5.** The method of claim **1**, wherein generating the schedule for the future series of live events that is optimized relative to the one or more prioritized target features comprises generating a schedule that maximizes at least one of a revenue or a total attendance at the future series of live events for a particular demographic segment.

**6.** The method of claim **1**, wherein generating the schedule for the future series of live events that is optimized relative to the one or more prioritized target features comprises choosing at least one of a venue, a date, or a time for each live event in the future series of live events.

**7.** The method of claim **1**, wherein the at least one second performer includes at least one performer that competes with the first performer in at least one geographic region.

**8.** The method of claim **1**, wherein detecting the real-time change to the scheduling information for the one or more future performances by the at least one second performer includes collecting and/or analyzing social media data related to the at least one second performer.

**9.** A system comprising:

one or more computer systems programmed to perform operations comprising:

receiving one or more event parameters for one or more series of live events, wherein the one or more event parameters comprise scheduling information for one or more performances by one or more performers;

receiving one or more event target features associated with the series of live events, wherein the one or more event target features comprise at least one of event attendance, event profit, event revenue, event expenses, or any combination thereof;

providing the one or more event parameters and the one or more event target features to a machine learning (ML) model, wherein the ML model is at least one of a neural network ML model and a support vector ML model;

iteratively training the ML model to identify relationships between the one or more event parameters and the one or more event target features using historical data corresponding to one or more previous series of live events, wherein such iterative training improves the accuracy of the ML model;

receiving, from a user, one or more user-specific event parameters for a future series of live events associated with a first performer, the user-specific event parameters including scheduling information for one or more future performances by at least one second performer;

receiving, from the user, one or more user-specific event weights representing one or more prioritized event target features associated with the future series of live events;

providing the one or more user-specific event parameters and the one or more user-specific event weights to the trained ML model;

generating, via the trained ML model, a schedule for the future series of live events that is optimized relative to the one or more prioritized event target features;

16

detecting a real-time change to the scheduling information for the one or more future performances by the at least one second performer;

providing the real-time change to the trained ML model to improve the accuracy of the trained ML model; and

updating, via the trained ML model, the schedule for the future series of live events such that the schedule remains optimized relative to the one or more prioritized event target features in view of the real-time change to the scheduling information for the one or more future performances by the at least one second performer.

**10.** The method of claim **9**, wherein the at least one second performer includes at least one performer that competes with the first performer in at least one geographic region.

**11.** The system of claim **9**, wherein detecting the real-time change to the scheduling information for the one or more future performances by the at least one second performer includes collecting and/or analyzing social media data related to the at least one second performer.

**12.** A computer-implemented method of dynamically generating an event schedule, the method comprising:

receiving one or more event parameters for live events comprising performances by a plurality of performers, wherein the one or more event parameters comprise scheduling information for one or more performances by one or more performers;

receiving one or more event target features associated with live events, wherein the one or more event target features comprise at least one of event attendance, event profit, event revenue, event expenses, or any combination thereof;

providing the one or more event parameters and the one or more event target features to a machine learning (ML) model, wherein the ML model is at least one of a neural network ML model and a support vector ML model;

iteratively training the ML model to identify relationships between the one or more event parameters and the one or more event target features using historical data corresponding to a plurality of previous live events, wherein such iterative training improves the accuracy of the ML model;

receiving, from a user, one or more user-specific event parameters for a plurality of future live events associated with a first performer, the user-specific event parameters including scheduling information for one or more future performances by at least one second performer;

receiving, from the user, one or more user-specific event weights representing one or more prioritized event target features associated with the plurality of future live events;

providing the one or more user-specific event parameters and the one or more user-specific event weights to the trained ML model;

generating, via the trained ML model, a schedule for the plurality of future live events that is optimized relative to the one or more prioritized event target features;

detecting a real-time change to the scheduling information for the one or more future performances by the at least one second performer;

providing the real-time change to the trained ML model to improve the accuracy of the trained ML model; and

updating, via the trained ML model, the schedule for the plurality of future live events such that the schedule

US 11,537,960 B2

17                                                                    18

remains optimized relative to the one or more priori-tized event target features in view of the real-time change to the scheduling information for the one or more future performances by the at least one second performer.

**13**. The method of claim **12**, wherein generating the schedule for the plurality of future live events that is optimized relative to the one or more prioritized target features comprises generating a schedule that maximizes a total attendance for at least one of the plurality of future live events or a single event from the plurality of future live events.

**14**. The method of claim **12**, wherein generating the schedule for the plurality of future live events that is optimized relative to the one or more prioritized target features comprises generating a schedule that maximizes a total attendance at the plurality of future live events for a particular demographic segment.

**15**. The method of claim **12**, wherein the one or more user-specific event parameters comprise at least one date for the plurality of future live events.

**16**. The method of claim **12**, wherein the at least one second performer includes at least one performer that com-petes with the first performer in at least one geographic region.

**17**. The method of claim **12**, wherein detecting the real-time change to the scheduling information for the one or more future performances by the at least one second per-former includes collecting and/or analyzing social media data related to the at least one second performer.

**18**. A system comprising:

one or more computer systems programmed to perform operations comprising:

receiving one or more event parameters for live events comprising performances by a plurality of perform-ers, wherein the one or more event parameters com-prise scheduling information for one or more per-formances by one or more performers;

receiving one or more event target features associated with live events, wherein the one or more event target features comprise at least one of event atten-dance, event profit, event revenue, event expenses, or any combination thereof;

providing the one or more event parameters and the one or more event target features to a machine learning (ML) model, wherein the ML model is at least one of a neural network ML model and a support vector machine ML model;

iteratively training, in a second stage, the ML model to identify relationships between the one or more event parameters and the one or more event target features using historical data corresponding to a plurality of previous live events, wherein such iterative training improves the accuracy of the ML model;

receiving, from a user, one or more user-specific event parameters for a plurality of future live events asso-ciated with a first performer, the user-specific event parameters including scheduling information for one or more future performances by at least one second performer;

receiving, from the user, one or more user-specific event weights representing one or more prioritized event target features associated with the plurality of future live events;

providing the one or more user-specific event param-eters and the one or more user-specific event weights to the trained ML model;

generating, via the trained ML model, a schedule for the plurality of future live events that is optimized relative to the one or more prioritized event target features;

detecting a real-time change to the scheduling infor-mation for the one or more future performances by the at least one second performer;

providing the real-time change to the trained ML model to improve the accuracy of the trained ML model; and

updating, via the trained ML model, the schedule for the plurality of future live events such that the schedule remains optimized relative to the one or more prioritized event target features in view of the real-time change to the scheduling information for the one or more future performances by the at least one second performer.

**19**. The system of claim **18**, wherein detecting the real-time change to the scheduling information for the one or more future performances by the at least one second per-former includes collecting and/or analyzing social media data related to the at least one second performer.

**20**. The method of claim **18**, wherein the at least one second performer includes at least one performer that com-petes with the first performer in at least one geographic region.

\*    \*    \*    \*    \*